**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **HI-DESERT MEDICAL CENTER** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Case No. 1:07-cv-01000 (RBW)** |
| | ) |
| **MICHAEL O. LEAVITT,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**PLAINTIFF HI-DESERT MEDICAL CENTER'S**
**MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7.1 (h) of the

United States Court for the District of Columbia, Plaintiff Hi-Desert Medical Center ("Hi-

Desert") moves for entry of an order granting summary judgment in its favor, as this Court did in

nearly identical circumstances in *Mercy Medical v. Thompson*, No. 99-2765, 2004 WL 3541332

(May 14, 2004)(J. Jackson).

In 1994, The Defendant Secretary of Health and Human Services (the "Secretary")

promulgated, without notice and comment procedures, Provider Reimbursement Manual

("PRM") §2534.5 which created a new standard for establishing the basis for the atypical

services exception which substantially limited the exception's scope and application. Section

2534.5 sets forth an unreasonable interpretation of Medicare laws and regulations, and the

Secretary's application of this provision is arbitrary, capricious, and in violation of the

Administrative Procedures Act. There are no material facts in dispute in this matter. Therefore,

Hi-Desert's motion for summary judgment should be granted.

Hi-Desert's motion is supported by a separate memorandum of law and statement of undisputed material facts filed on this same date pursuant to Rule 7.1(h) of this Court, as well as the entire administrative record and rulemaking records in this matter.

A proposed Order granting Hi-Desert's motion and requested relief accompanies this motion.

Respectfully submitted,

_____/s/_____

Andrew L. Hurst
D.C. Bar # 455471
Andrew C. Bernasconi
D.C. Bar # 484614
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C.  20005
(202) 414-9200

Dated:  November 16, 2007

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **HI-DESERT MEDICAL CENTER** )<br><br>**Plaintiff,** )<br><br>**v.** )<br><br>**MICHAEL O. LEAVITT,** )<br><br>**Defendant.** ) | **Case No. 1:07-cv-01000 (RBW)** |

**PLAINTIFF HI-DESERT MEDICAL CENTER'S**
**MEMORANDUM IN SUPPORT OF ITS**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiff Hi-Desert Medical Center ("Hi-Desert") is an urban hospital-based skilled nursing facility ("SNF") participating in the Medicare program. In this action, Hi-Desert challenges the validity of Provider Reimbursement Manual Provision ("PRM") § 2534.5 which the Defendant, Tommy G. Thompson (the "Secretary" or "Defendant") has applied in a way that improperly limits the amount of Medicare reimbursement for atypical services furnished by hospital-based SNFs. Here, in the fiscal year ending June 30, 1995, Hi-Desert received nearly $200,000 less Medicare reimbursement than it was entitled to be paid under the Medicare program based on the Secretary's application of PRM § 2534.5.

PRM § 2534.5 established a new standard for a funding formula exception – a standard that substantially limited the exception's scope and application to atypical services. Because PRM § 2534.5 is an unreasonable interpretation of the regulation that establishes the atypical services exception, Hi-Desert challenges the validity of PRM § 2534.5 and contests the

Secretary's corresponding application of PRM § 2534.5 as arbitrary, capricious, and a violation of the Administrative Procedures Act ("APA").

This Court should grant Hi-Desert's motion for summary judgment. In support of its motion for summary judgment, Hi-Desert maintains that PRM § 2534.5 is invalid because the Secretary's provision: (1) is an unreasonable interpretation of Medicare law; (2) is inconsistent with the plain language of the atypical services exception regulation; (3) is an unreasonable interpretation of the atypical services exception regulation; (4) is a "plainly erroneous" interpretation of the atypical services exception regulation; (5) constitutes an impermissible change in agency interpretation without notice and comment procedures in violation of the APA; and, alternatively (6) is a substantive rule that should have been promulgated through notice and comment procedures.  There are no material facts in dispute in this matter, and this Court has previously refused to apply PRM § 2534.5 to an identical situation to that at bar.  *Mercy Medical v. Thompson*, No. 99-2765, 2004 WL 3541332 (May 14, 2004)(J. Jackson)(attached at **Exhibit "A"**)..  Accordingly, this Court should grant the motion, and order the Secretary to reimburse Hi-Desert for its eligible atypical services costs above the applicable RCLs.

# I.  LEGAL BACKGROUND: APPLICABLE PROGRAM PROVISIONS

## A.  Medicare Program Reimbursement - "Reasonable Cost"

The Medicare program is a federal health insurance program for people 65 years of age and older, certain younger disabled people, and people with kidney failure.  42 U.S.C. § 1395 *et seq.*  The Secretary is responsible for administering the Medicare program and exercises that responsibility through the Health Care Financing Administration ("HCFA")(now known as the Centers for Medicare and Medicaid Services ("CMS")).  The Medicare program reimburses providers for costs "that are necessary in the efficient delivery of needed health services" for

Medicare patients. 42 U.S.C. § 1395x(v)(1)(A). For the time periods relevant in this matter, the Medicare program reimbursed eligible SNFs on a per diem basis for the "reasonable cost" of covered services provided to Medicare beneficiaries. "Reasonable cost" is defined as those costs "actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services." *Id.*

### B. Routine Cost Limits ("RCLs")

For over thirty years, reimbursement under the Medicare statute for routine service costs of extended care services has been subject to Routine Cost Limits ("RCLs"). (Plaintiff Hi-Desert Medical Center's Statement of Material Facts Not in Dispute ("SMF") ¶¶3-4). In 1972, Congress specifically authorized the Secretary to establish limits on the direct or indirect overall costs of services to be recognized as reasonable by the Medicare program. *See* Social Security Amendments of 1972, Pub. L. 92-603, § 223 (Oct. 30, 1972)(SMF ¶3). As a result of this authority, the Secretary drafted a formula for calculating a SNF's "routine service costs" - the typical costs associated with providing care to Medicare patients (SMF ¶4).

At the outset, the Secretary distinguished between free-standing SNFs and hospital-based SNFs when determining '"routine service costs" or RCLs. Prior to 1984, the RCL for free-standing SNFs was equal to 112% of the peer group mean for free-standing SNFs and the RCL for hospital-based SNFs was set at 112% of the peer group mean for hospital-based SNFs. 45 Fed. Reg. 58,699, 58,700 (Sept. 4, 1980)(SMF ¶4). Because the RCL for hospital-based SNFs was based on the peer group mean for hospital-based SNFs (which was higher than the peer group mean for free-standing SNFs), the RCL for hospital-based SNFs was higher than the RCL for free-standing SNFs. *See St. Luke's Methodist Hosp. v. Thompson* ("*St. Luke's I*"), 182 F.

Supp. 2d 765, 772 n.4 (N.D. Ia. 2001)(stating that before 1984, the RCL for hospital-based SNFs

was higher than the RCL for free-standing SNFs and articulating reasons for the disparity).

In 1984, Congress established a new formula for calculating the RCL for hospital-based

SNFs. *See* Deficit Reduction Act of 1984 ("DEFRA"), Pub. L. 98-369 (July 18, 1984) codified

at 42 U.S.C. § 1395yy; (SMF ¶5). Although the RCL for a free-standing SNF remained equal to

112% of the peer group mean for similarly classified free-standing SNFs, the RCL of a hospital-

based SNF was altered to equal 112% of the mean per diem routine service cost for similarly

classified free-standing SNFs, plus one half of the amount by which 112% of the mean per diem

routine service cost for similarly classified hospital-based SNFs exceeds the limit for similarly

classified free-standing SNFs.1 42 U.S.C. § 1395yy(a); (SMF ¶5)  By enacting 42 U.S.C. §

1395yy(a), Congress effectively reduced by half the disparity between the RCL for hospital-

based SNFs and the RCL for free-standing SNFs.

### C. The Routine Cost Limit Exception for Atypical Services

As a result of its authority to establish limits on the direct or indirect overall costs of

Medicare services, the Secretary promulgated various exceptions to the RCLs. In 1979, the

Secretary issued a regulation granting an exception from the RCL for SNFs that provide atypical

services. (SMF ¶ 8.) In relevant part, the regulation provides as follows:

> (f) Exceptions. Limits established under this section may be
> adjusted upward for a SNF . . . under the circumstances specified
> in paragraphs (0(1) through (0(5) of this section. An adjustment is
> made only to the extent that the costs are reasonable, attributable to

---

1    In mathematical terms, the post-1984 calculation to determine the RCL for a hospital-
based SNF is: 112%(FS-SNF mean) + [1/2 (112%(HB-SNF mean) - 112%(FS-SNF
mean))].  A district court provided the following example when discussing the RCL
calculation for hospital-based SNFs.  Assuming 112% of the mean per diem routine
service cost for FS-SNFs is $80 and 112% of the mean per diem routine service cost for
HB-SNFs is $120, then the RCL for the HB-SNF would be 80 + [1/2 (120-80)] =
$100.00. *See St. Francis Health Care Ctr. v. Shalala*, 10 F. Supp. 2d 887, 889 (N.D. Oh.
1998)

the circumstances specified, separately identified by the SNF ... and verified by the intermediary.

1. Atypical services. The SNF... can show the

 (i) Actual cost of services furnished by a SNF ... exceeds the applicable limit because the services are atypical in nature and scope, compared to the services generally furnished by SNFs ... similarly classified; and

 (ii) Atypical services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.2

42 C.F.R. § 403(0(1).

Congress did not extinguish the Secretary's authority to grant exceptions to the applicable RCLs when it mandated the specific RCL levels (SMF ¶10). Although Congress limited the Secretary's discretion in calculating RCL levels for SNFs by passing 42 U.S.C. § 1395yy(a), it also reaffirmed the Secretary's authority to "make adjustments" to the established RCLs for any SNF to the extent the Secretary "deems appropriate, based upon case mix or circumstances."3 42 U.S.C. § 1395yy(c); (SMF 10.)

As a practical matter, 42 U.S.C. § 1395yy(a) did not have any impact on the application of the atypical services exception for almost ten years. As was noted in a recent opinion,

Although 42 U.S.C. § 1395yy lowered the RCL of HB-SNFs, it did not, at least initially, prohibit HB-SNFs which qualified for an

---

2 As was noted by the United States District Court for the Northern District of Iowa, "the substance of 42 C.F.R. § 413.30(f)(1) was first issued as a regulation effective July 1, 1974. The precise language of the current regulation was issued as an amended regulation effective July 1, 1979. In 1986, as part of [the] overall plan for reorganization of the regulations in 42 C.F.R. Part 405 in order to make them easier to locate and use' the regulation was redesignated 42 C.F.R. § 413.30(f)(1), the designation by which it was identified at the time of this dispute." *See St. Luke's Methodist Hosp. v. Thompson*, 182 F. Supp. 2d 765, 771 (N.D. Ia. 2001) (citations omitted); (SMF ¶ 8).

3 "Case Mix" means the mix of cases a facility treats in terms of the type and severity of illness, age of patient, and other factors that affect the cost of treatment. In subsection (c), Congress made no distinction between free-standing SNFs and hospital-based SNFs. 42 U.S.C. § 1395yy(c); *St. Luke's Methodist Hosp. v. Thompson*, 313 F.3d 984, 988 (8th Cir. 2003).

atypical services exception under 42 C.F.R. § 413.30(f)(1) from obtaining full reimbursement for reasonable costs. After passage of § 1395yy, the Secretary, in exercising the discretion granted in § 1395yy(c), continued to measure exceptions to HB-SNFs from the RCL, rather than from some point above the RCL.

*St. Luke's I*, 182 F. Supp. 2d at 772. In 1994, however, the Secretary enacted PRM § 2534.5 and

established an entirely new standard for reviewing requests for atypical services exceptions

(SMF ¶¶9-11).

### D. Provider Reimbursement Manual § 2534.5

In 1994, the Secretary issued HCFA Transmittal No. 378 which adopted, without notice

and comment, new provisions of the Provider Reimbursement Manual ("PRM")(SMF ¶9). One

such provision, PRM § 2534.5, established a new standard for calculating the atypical services

exception (SMF ¶10). Rather than measuring the atypical services exception from the applicable

RCL, PRM § 2534.5 requires the exception to be measured from 112% of a SNF's peer group

mean - a point significantly higher than the RCL for a hospital-based SNF (SMF ¶10). By

changing the foundation for the atypical services exception from the RCL to 112% of a specific

SNFs peer group mean, the Secretary unilaterally adopted a significant change in the calculation

of the atypical services exception and created the reimbursement "gap" methodology at issue in

this case (SMF ¶¶16-17).

PRM §2534.5 has had a drastic impact on a hospital-based SNF's atypical services

reimbursement because its RCL is significantly lower than 112% of its peer group mean. (SMF

¶17). As was set forth above, a hospital-based SNF's RCL is equal to 112% of the mean per

diem routine service cost for similarly classified free-standing SNFs, plus one half of the amount

by which 112% of the mean per diem routine service cost for similarly classified hospital-based

SNFs exceeds the limit for similarly classified free-standing SNFs (SMF ¶5). Because a

hospital-based SNF's congressionally-mandated RCL is significantly lower than 112% of the

- -6

mean per diem routine service costs for hospital-based SNFs, PRM § 2534.5 effectively creates a "gap" in a hospital-based SNF's atypical services expense reimbursement (SMF ¶¶16-17).

Pursuant to PRM § 2534.5, a hospital-based SNF is not entitled to reimbursement for the cost of any atypical service amounts between its RCL and 112% of its mean per diem routine service cost (SMF ¶16). Stated differently, PRM § 2534.5 creates an irrebutable presumption that any and all portions of the incurred costs between the hospital-based RCLs and 112% of the applicable mean per diem routine service costs for hospital-based SNFs are *per se* unreasonable. (SMF ¶17). Accordingly, a hospital-based SNF that qualifies for an atypical services exception to its RCLs (by meeting the standards established by 42 C.F.R. § 413.30(f)(1)) will never be reimbursed for any portion of the incurred costs between its RCL and 112% of the applicable mean per diem routine service costs for hospital-based SNFs - this is the inherent fallacy of the Secretary's "gap" methodology (SMF ¶20). It is important to note, however, that PRM § 2534.5 does not have a similar impact on a free-standing SNF's atypical services reimbursement because its RCL is equal to 112% of its peer group mean (SMF ¶15).

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Hi-Desert operated an urban hospital-based skilled nursing facility for the fiscal year ending on June 30, 1995. On June 25, 1995, Hi-Desert submitted an application to its fiscal intermediary for an exception to the facility's applicable RCL for urban hospital-based SNFs for fiscal year ending ("FYE") June 30, 1995 (SMF ¶24). Hi-Desert had requested an exception in the difference between its adjusted routine per diem costs, and the applicable RCL of $156.85 per patient day (SMF ¶25).

On August 25, 1997, the fiscal intermediary determined that Hi-Desert qualified for an exception to the routine cost limit for an urban hospital-based SNF (SMF ¶26).  The fiscal intermediary found that Hi-Desert served atypical patients with greater medical needs than those served by peer group facilities with typical patient populations, and met all established benchmarks relevant to that determination.  *Id.*

The amount of exception determined by the fiscal intermediary was $4.24 per day ($20,119 total based on 4,745 Medicare days).  This calculation was made through application of PRM §2534.5, and by this application, denied Hi-Desert reimbursement of approximately $193,121 for fiscal year 1995 (SMF ¶27).

Hi-Desert filed a timely appeal with the Provider Reimbursement Review Board ("PRRB") concerning the fiscal intermediary's application of PRM §2534.5.  After resolution of other issues, the sole issue in the appeal was whether the fiscal intermediary had improperly limited Hi-Desert's exception through its application of PRM §2534.5 (SMF ¶28).

On February 2, 2007, the PRRB found the fiscal intermediary's methodology of determining Hi-Desert's exception to the SNF cost limits to be improper, rejecting the application of PRM §2534.5.  It ordered that Hi-Desert be reimbursed for all of its costs above the cost limit, as opposed to being reimbursed only for its costs that exceeded 112 percent of the peer group's mean per diem costs (SMF ¶29).

The Administrator of the Center for Medicare and Medicaid Services ("CMS") decided to review the PRRB decision pursuant to 42 U.S.C. §1395oo(f).  The Administrator reversed the holding of the PRRB, finding that PRM §2534.5 was appropriately applied by the fiscal intermediary (SMF ¶30).

Hi-Desert filed the complaint in this matter thereafter in a timely manner.  Hi-Desert seeks judicial review of the Secretary's decision to apply PRM §2534.5 to limit its exception to the RCL, and contends that the Secretary's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

## III.  STANDARD OF REVIEW

### A. Summary Judgment Standard

Summary judgment is warranted where the moving party establishes that no genuine issue of material fact is in dispute and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *District of Columbia Hosp. Ass'n. v. D.C.*, 224 F.3d 776, 779 (D.C. Cir. 2000). "Summary judgment is especially appropriate in cases . . . where the Court is called on to review a decision of an administrative agency" because "what is often in issue are not the facts, but whether the agency erred in applying the law." *Keystone Shipping Co. v. United States*, 801 F. Supp. 771, 776 (D.D.C. 1992). "In ruling upon cross-motions for summary judgment, the Court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." *Torch Operating Co. v. Babbitt*, 172 F. Supp. 2d 113, 121 (D.D.C. 2001).

### B. Administrative Law Standards

An action under Section 1878 of the Social Security Act seeking judicial review of Medicare reimbursement actions is subject to the provisions of the APA, 5 U.S.C. § 701 *et seq. See* 42 U.S.C. § 1395oo.  Under the APA, a court must set aside agency actions which are: arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; contrary to constitutional right, power, privilege, or immunity, or in excess of statutory

jurisdiction, authority or limitations, or short of statutory right. 5 U.S.C. § 706(2)(A). The APA requires the reviewing court to engage in a "thorough, probing, in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971); *see also A.L. Pharm., Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995).

The primary substantive issue in this case is whether the methodology established by PRM § 2534.5 is a valid interpretation of the statutes and/or regulation establishing the atypical services exception. Another issue that permeates this case, however, is the level of deference the Court should apply to analyze the validity of PRM § 2534.5. At the heart of this issue is whether the Court should apply the deferential standard established in *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), or the less-deferential standard established in *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

### 1. Standards Applied to a Rule That Interprets an Ambiguous Statute

The applicable methodology for reviewing whether an agency's regulatory interpretation of a statute that it administers is "in accordance with the law" is to first determine whether Congress has "directly spoken to the precise question at issue." *Chevron U.S.A. Inc.*, 467 U.S. at 842 ("[i]f the intent of Congress is clear, that is the end of the matter . . . ."). If it has not, then the court must determine whether the regulation is binding or whether it is the type that lacks the force of law. *Christensen v. Harris County*, 529 U.S. 576, 587 (2001). If the court concludes that a regulation is binding, then court must defer to a "permissible" construction of the statute by the agency. *Chevron*, 467 U.S. at 843. However, if the court concludes that the agency's interpretation is contained in an agency manual that lacks the force of law, then it should defer to the agency's position only to the extent that it has the "power to persuade." *See Christensen*, 529 U.S. at 587; *United States v. Mead Corp.*, 533 U.S. 218, 234 (2001); *Public Citizen, Inc. v. U.S. Dep't of Health & Human Servs.*, 332 F.3d 654, 659 (D.C. Cir. 2003) (applying *Skidmore*

- 10

deference to HCFA's Peer Review Organization Manual after noting that "the Supreme Court has twice cited 'agency manuals' as an archetype of the kind of document that is not entitled" to *Chevron* deference).

### 2. Standards Applied to a Rule That Interprets an Agency's Own Regulation

The amount of deference a court must give to an agency's interpretation of its own regulation is based on whether the applicable regulation is clear or ambiguous. *See Christensen*, 529 U.S. at 588 (noting that the deferential standard established in *Auer v. Robbins*, 519 U.S. 452 (1997) for an agency's interpretation of its own regulation applies "only when the language of the regulation is ambiguous."); *Barrick Goldstrike Mines, Inc. v. Whitman*, 260 F. Supp. 2d 28, 35 (D.D.C. 2003) (J. Jackson).

If the court concludes that the regulation is ambiguous, then the court affords substantial deference to the agency's interpretation and simply determines whether the agency's interpretation of its own regulation is "plainly erroneous or inconsistent with the regulation." *See Auer*, 519 U.S. at 461; *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504 (1994); B̲owles v. Seminole Rock & Sand Co., 325 U.S. 410, 414 (1945). Alternatively, if the court concludes that the regulation is clear and straightforward, then the court should apply the regulation according to its plain meaning. *Barrick Goldstrike Mines. Inc.*, 260 F. Supp. 2d at 35-36 (finding regulation unambiguous and analyzing agency's interpretation of regulation to determine whether it violates the regulation's plain meaning).

Applying these standards to this matter, the Court should not afford *Chevron* deference to PRM § 2534.5 because it is a non-binding interpretative rule contained in an agency manual. *See St. Luke's I*, 182 F. Supp. 2d at 777-79 (analyzing the Secretary's interpretation of 42 C.F.R. § 413.30(f)(1) and concluding that it was not entitled to *Chevron* deference).

### 3. Standards Applied to a Reasonable Rule That is Not Promulgated Through Notice and Comment Procedures

Even if the Court finds that PRM § 2534.5 is reasonable, it must still consider whether the Secretary should have promulgated PRM § 2534.5 through notice and comment rulemaking procedures. *Barrick Goldstrike Mines, Inc.*, 260 F. Supp. 2d at 38. In the D.C. Circuit, an agency must invoke notice and comment procedures "if it gives a rule a sufficiently definite interpretation, and then later fundamentally modifies that interpretation." *See generally Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999); *Torch Operating Co.*, 172 F. Supp. 2d 113. The APA further requires an agency to promulgate all substantive rules through notice and comment procedures. 5 U.S.C. § 553; *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93-95 (D.C. Cir. 1997). Accordingly, a court must strike a reasonable rule as invalid if the agency violates the APA by failing to promulgate the rule through notice and comment procedures. *Torch Operating Co.*, 172 F. Supp. 2d at 127-28.

## IV. ARGUMENT

Hi-Desert's motion for summary judgment should be granted, and Hi-Desert should be reimbursed for all its eligible atypical services costs above the applicable RCLs. At the center of this dispute is the legal validity of PRM § 2534.5 - the provision that established the Secretary's "gap" methodology and thereby changed the qualifying standard for the atypical services exception. PRM §2534.5 is invalid because: (1) it is an unreasonable interpretation of Medicare laws; (2) it is plainly inconsistent with 42 C.F.R. § 413.30(f)(1); (3) it is an unreasonable interpretation of 42 C.F.R. § 413.30(f)(1); (4) it is a plainly erroneous interpretation of 42 C.F.R. § 413.30(f)(1). Alternatively, assuming for the sake of argument that the Secretary's gap methodology is valid, PRM § 2534.5 is still void because it was not promulgated through notice

and comment procedures and it fundamentally modified the Secretary's definitive interpretation

of 42 C.F.R. § 413.30(f)(1), and/or it is a substantive rule.

### A. PRM § 2534.5 is Invalid Because it is Not a Reasonable Interpretation of Medicare Law

The Secretary maintains that its "gap" methodology is based on a permissible

interpretation of 42 U.S.C. § 1395yy. Upon further review, however, the Secretary's argument is

without merit because PRM § 2534.5: (1) is not entitled to *Chevron* deference; (2) is not entitled

to *Skidmore* deference; and (3) is an unreasonable interpretation of Medicare law.

#### 1. HCFA Relied on 42 U.S.C. § 1395yy as Its Basis for Enacting PRM § 2534.5

As set forth above, in 1984 Congress amended Medicare laws to establish RCL levels

and to permit the Secretary to make adjustments to the RCL limits. *See* 42 U.S.C. §§ 1395yy(a)

and (c). A decade later, the Secretary specifically relied on § 42 U.S.C. § 1395yy(a) as its

authority for establishing PRM § 2534.5 and the atypical services methodology. Included in

HCFA Transmittal No. 378 were the following statements regarding its authority to alter the

methodology for calculating the atypical services exception:

> With cost reporting <u>period beginning prior to July 1, 1984</u>, for each freestanding group and each hospital based group, each cost center's ratio is applied to the cost limit applicable to the cost-reporting period for which the exception is requested. For each hospital-based group with cost reporting period beginning on and after July 1, 1989, the ratio is applied to 112% of the group's mean per diem cost (<u>not the cost limit</u>) adjusted by the wage index and cost reporting year adjustment factor applicable to the cost reporting period for which the exception is requested.

HCFA Transmittal 378 (SMF¶11) Although PRM § 2534.5 was issued in 1994, HCFA clearly

premised the development of its new atypical services exception methodology on Congress's

1984 mandate regarding SNF RCLs codified in 42 U.S.C. § 1395yy(a). *See also St. Luke's*

*Methodist Hosp. v. Thompson ("St. Luke's II")*, 315 F.3d 984, 988 (8th Cir. 2003) (noting

Secretary's argument that 42 U.S.C. § 1395yy(a) supports the methodology established by PRM

§ 2534.5).  Contrary to HCFA's position, PRM § 2534.5 is not a logical extension of the standards established by 42 U.S.C. § 1395yy.

### 2. PRM § 2534.5 Does Not Warrant *Chevron* Deference Because it is a Non-Binding Interpretative Rule Contained in an Agency Manual

The first step in determining whether PRM § 2534.5 is a reasonable interpretation of Medicare law is to analyze whether 42 U.S.C. § 1395yy clearly addresses the issue of atypical services reimbursement.  *Chevron*, 467 U.S. at 843.  While the statute specifically establishes RCL levels and permits the Secretary to make adjustments to such levels, it does not specifically address the atypical services exception calculation and therefore does not control the outcome of this case. 42 U.S.C. §§ 1395yy(a), (c).

The Medicare statute is ambiguous with respect to the "gap" issue; thus, the Court must next determine the level of deference it should give to the agency's interpretation of the statute. PRM § 2534.5 is not entitled to *Chevron* deference because it is a non-binding interpretative rule found in agency manual.  *See Cmty. Hosp. of Monterey Peninsula v. Thompson*, 323 F.3d 782, 791 (9th Cir. 2003) ("Pronouncements in manuals like the PRM, which do not have the force of law, are entitled to less deference than an interpretation arrived after a formal adjudication or notice-and-comment rulemaking.").  As noted in *Christensen*, the Supreme Court specifically concluded that non-binding agency interpretations contained in agency manuals "do not warrant *Chevron*-style deference."  *See Christensen*, 529 U.S. at 587; *Mead*, 533 U.S. at 234 (treating "classification rulings" like "interpretations contained in policy statements, agency manuals, and enforcement guidelines" as "beyond the *Chevron* pale.").  Instead, the *Christensen* Court concluded that interpretations in agency manuals "are entitled to respect under our decision in *Skidmore v. Swift & Co.*, but only to the extent that those interpretations have the power to persuade."  *Christensen*, 529 U.S. at 587 (citations omitted).  More recently, the D.C. Circuit

labeled the "agency manual" as an "archetype" of the kind of document that is not entitled to

*Chevron* deference. *See Public Citizen, Inc.*, 332 F.3d at 660 (noting that the Supreme Court has

twice cited "agency manuals" as an example of the kind of document that is not entitled to

deference and applying *Skidmore* deference to analyze a provision of HCFA's Peer Review

Organization Manual).

In fact, two Circuit Courts of Appeals recently concluded that various provisions in the

Provider Reimbursement Manual are non-binding *interpretative rules entitled only to some*

*deference. See Cmty. Hosp. of Monterey Peninsula*, 323 F.3d at 791 ("Pronouncements in

manuals like the PRM, which do not have the force of law, are entitled to less deference than an

interpretation arrived after a formal adjudication or notice-and-comment rulemaking.");

*Maryland Gen. Hosp. v. Thompson*, 308 F.3d 340, 347 n.3 (4th Cir. 2002)("[T]he provisions of

the PRM are treated as interpretive rules, and thus are entitled to "some deference . . . ."; *see also*

*St. Luke's I*, 182 F. Supp. 2d at 777-78 (applying *Skidmore* deference to PRM § 2534.5 because

it was an interpretative rule published in an agency manual.).  Because recent precedent has

firmly established that a non-binding interpretative rule published in an agency manual is not

entitled to *Chevron* deference, PRM § 2534.5 is entitled to *Skidmore* deference, and even then,

only to the extent that it has the "power to persuade."

### 3.  PRM § 2534.5 Does Not Warrant *Skidmore* Deference Because it Lacks the "Power to Persuade"

Under *Skidmore*, an agency's interpretation of a statute is entitled to deference to the

extent that it has the "power to persuade." *Skidmore*, 323 U.S. at 140. The *Skidmore* Court

articulated the following three factors to assist courts in determining whether an agency

interpretation has persuasive power: (1) the thoroughness evident in its consideration; (2) the

validity of its reasoning; and (3) the consistency with earlier and later pronouncements. *Id.*

Applying these three factors to PRM § 2534.5, it is apparent that the Secretary's "gap" methodology lacks the "power to persuade" and therefore is entitled to little deference.

### i. The Secretary's Reasoning in Support of PRM § 2534.5 is Not Thorough

The Secretary's reasoning in support of PRM § 2534.5 is less than thorough. As was noted above, the Secretary did not promulgate PRM § 2534.5 through notice and comment procedures; thus, the record does not provide any evidence to suggest that the Secretary investigated the hospital-based SNFs provision of atypical services prior to enacting PRM § 2534.5. In previous cases, the Secretary has supported the "gap" methodology by pointing to a 1985 HCFA study in which the agency concluded that at least 50% of the variance between hospital-based SNFs routine costs and free-standing SNFs routine costs is the result of the hospital-based SNFs inefficiencies. *See St. Luke's I*, 182 F. Supp. 2d at 780-81 (discussing Secretary's claim that the 1985 HCFA study established the basis for 42 U.S.C. § 1395yy(a)). This study, however, did not purport to specifically analyze the costs associated with the provision of atypical services. Accordingly, the Secretary has not set forth any evidence that it conducted a thorough analysis of atypical services costs, or the potential impact of its "gap" methodology prior to enacting PRM § 2534.5.

### ii. The Secretary's Reasoning in Support of PRM § 2534.5 is Not Valid

Further undercutting the Secretary's power to persuade is the fact that the Secretary's reasoning underlying PRM § 2534.5 is not valid. Not only is the Secretary's reliance on the 1985 HCFA study discussing hospital-based misplaced, it also is misguided. As was emphasized by a district court in a recent opinion, HCFA candidly noted in its 1985 report "that the methodologies in effect at the time of the studies yielded inconsistent results and precluded

accurate assessment of the contributing factors to the cost differences." Id.  Such an admission

drastically undercuts the validity of the study and any agency interpretation arising therefrom.4

Assuming for the sake of argument that PRM § 2534.5 was drafted to encourage hospital-

based SNFs to operate efficiently, the Secretary further fails to explain how the blind application

of the "gap" methodology "promotes efficiency or helps medical recipients receive the care they

need." St. Luke's II, 315 F.3d at 986.  In fact, Hi-Desert agrees with the Eighth Circuit that it is

difficult to comprehend how a "gap in coverage" encourages a hospital-based SNF to operate

efficiently. Id.  To the contrary, the "gap" encourages hospital-based SNFs to be less frugal

because the only way to receive any additional atypical services reimbursement is to produce

costs in excess of 112% of its peer group mean.  As the Eighth Circuit explained, if the Secretary

truly intended PRM § 2534.5 to promote efficiency, then it should have established "an upward

limit on the cost of atypical services." Id.  Like the Eighth Circuit, the Court should conclude that

the Secretary has not produced a valid reason for establishing the "gap" methodology.

### iii.  PRM § 2534.5 is Not Consistent With Earlier Pronouncements

As was stated by the Supreme Court, "the consistency of an agency's position is a factor

in assessing the weight that position is due."  Good Samaritan Hosp. v. Shalala, 508 U.S. 402,

417 (1993); Thomas Jefferson Univ., 512 U.S. at 515 ("[A]n agency's interpretation of a statute

or regulation that conflicts with a prior interpretation is 'entitled to considerably less deference'

than a consistently held agency view.").  As the general discussion of the law and facts

displayed, PRM § 2534.5 represents a substantial shift in long-standing agency position with

respect to atypical services reimbursement.  For at least a decade, the Secretary consistently

---

4       Moreover, to the extent that the Secretary maintains that Congress relied on the 1985
        study as a basis for its enactment of 42 U.S.C. § 1395yy(a) a year earlier, such a
        proposition is, at best, questionable.  See St. Luke's I, 182 F. Supp. 2d at 780-81 (noting
        that it was questionable that Congress relied on the 1985 HCFA study when it drafted the
        1984 legislation that established 42 U.S.C. § 1395yy(a)).

measured a provider's atypical services exception request from the applicable RCL and not from 112% of the peer group mean.  PRM § 2534 established a new reimbursement standard and accordingly is not entitled to the respect showed to a long-standing agency principle.  *See St. Luke's I*, 182 F. Supp. 2d at 779-80 ("PRM § 2534.5 represents a stark change in the Secretary's previous long-held position.").

The Secretary's reasoning in support of PRM § 2535.5 is not thorough, valid, or consistent; therefore, it lacks the "power to persuade" and is not entitled to *Skidmore* deference.

**4. PRM § 2534.5 is Not Entitled to Any Deference**

As set forth above, PRM § 2534.5 is not entitled to any deference because of its lack of power to persuade; consequently, the Court is free to conduct a relatively independent analysis with regard to the reasonableness of PRM § 2534.5. *See St. Luke's I*, 182 F. Supp. 2d at 781 (finding that PRM § 2534.5 is not entitled to *Skidmore* deference and applying a "relatively independent" reasonableness analysis).  Based on this standard, Hi-Desert maintains that PRM § 2534.5 is not a reasonable interpretation of the Medicare laws because: (1) it contravenes congressional intent by confusing two distinct reimbursement standards established in 1395yy(a) and 1395yy(c); (2) it is inconsistent with the plain meaning of 1395yy(c); and (3) its application undercuts the purpose of the Medicare program.  Accordingly, PRM § 2534.5 should be declared invalid and its application reversed.

As two courts have noted, the Secretary's reliance on 42 U.S.C. § 1395yy(a) to support the establishment of its "gap" methodology "confuses two distinct concerns: reimbursement of SNFs for their typical costs (addressed in § 1395yy(a)) and reimbursement of an individual SNF for providing services atypical of similarly classified providers (addressed in § 139yy(c))." *St. Luke's II*, 315 F.3d at 988; *St. Luke's I*, 182 F. Supp. 2d at 782-83.  Although 42 U.S.C. §

1395yy(a) does distinguish between hospital-based SNFs and free-standing SNFs with respect to routine costs, Congress did not express an intent to distinguish between the types of SNFs in reimbursing for atypical costs. See 42 U.S.C. 1395yy(c). Instead, Congress elected not to restrict upward adjustments "based upon case mix or circumstances" in this manner. St. Luke's II, 315 F.3d at 988-89 (finding it significant that § 1395yy(c) authorizes upward adjustments, and does not distinguish between hospital-based SNFs and free-standing SNFs). Congress clearly believed that any inherent distinction between hospital-based SNFs and free-standing SNFs was resolved by its precise RCL calculation, and, thus, there was no need to further distinguish between the types of SNFs with respect to atypical reimbursements.5 Therefore, the Secretary's interpretation of 42 U.S.C. § 1395yy(c) which establishes two separate standards for free-standing and hospital-based SNFs in obtaining upward adjustments is unreasonable because it contravenes congressional intent.

In addition to ignoring congressional intent, the Secretary's interpretation also is unreasonable because it disregards the plain meaning of 42 U.S.C. § 1395yy(c). Under § 1395yy(c), the Secretary is permitted to "make adjustments in the limits set forth in subsection (a)." 42 U.S.C. § 1395yy(c). As noted by the Eighth Circuit, "[w]e believe that Congress intended by this provision to allow adjustments to be made to the RCL, not to some point above the RCL." St. Luke's II, 315 F.3d at 987. In light of the fact that Congress's main purpose in enacting 42 U.S.C. § 1395yy was to establish the applicable RCLs, it is nonsensical to interpret § 1395yy(c) as permitting the Secretary to ignore completely the newly-established RCL and to measure adjustments from some random point above the established RCL.

---

5    As discussed, the regulation that established the atypical services exception preceded the enactment of 42 U.S.C. § 1395yy. Thus, the fact that Congress did not extend the free-standing/hospital-based distinction to 42 U.S.C. § 1395yy(c), the basis for the atypical services adjustment, is a particularly pertinent fact. See supra note 3 and corresponding text (discussing history of 42 C.F.R. § 413.30); (SMF ¶ 8.)

Finally, PRM § 2534.5 is unreasonable because its application flouts the Medicare goal of "reimbursing costs that are necessary in the efficient delivery of needed health services." 42 U.S.C. § 1395x(v)(1)(A). Although Congress and the Secretary have an interest in promoting efficient care, they also strive to ensure that Medicare patients receive appropriate medical treatment. *Id.* By refusing to reimburse hospital-based SNFs for a single cent of costs within the "gap," the Secretary "is likely to discourage efficient hospital-based SNFs that have typical costs below the RCL from providing atypical services to those who need them because the SNFs will not be reimbursed for the cost of those services." *St. Luke's II.,* 315 F.3d at 988. The Secretary's enactment of PRM § 2534.5 which creates a disincentive for hospital-based SNFs to spend the slightest amount on atypical care directly undercuts the statutory mandate aimed at encouraging healthcare providers to supply needed medical services. Accordingly, PRM § 2534.5 is an unreasonable interpretation of the Medicare laws because it undercuts a pivotal goal of the Medicare program.

Based on the foregoing argument, Hi-Desert maintains that PRM § 2534.5 is not a reasonable interpretation of applicable Medicare law. Applying the standards established in *Christenson* and *Skidmore,* the Secretary's interpretation of PRM § 2534.5 is entitled to little deference. Upon a substantially independent review, the inherent inconsistencies and unreasonableness of the "gap" methodology become startlingly apparent. On this basis, the Court should conclude that PRM § 2534.5 is invalid and should reverse the Secretary's application of the "gap" methodology as arbitrary and capricious.

### B. PRM § 2534.5 is Invalid Because it is Inconsistent With the Plain Language of 42 C.F.R. § 413.30(f)

PRM § 2534.5 also cannot withstand scrutiny when analyzed as an interpretation of a regulation that establishes the atypical services exception because it adds an additional, inconsistent requirement to an unambiguous regulation.

#### 1. 42 C.F.R. § 413.30(f)(1) is Clear and Straightforward

The substantive regulation governing the atypical services exception is clear and straightforward. In 42 C.F.R. § 413.30(f)(1), the Secretary specifically established the factors a SNF must show in order to qualify for an atypical services exception: (1) the costs are reasonable; (2) the costs are attributable to the provision of atypical services; (3) the actual cost of services *exceeds the applicable limit* because of atypical services; and (4) the SNF furnished the atypical services because of the special needs of the patients. 42 C.F.R. § 413.30(f)(1) (emphasis added); *see also St. Francis Health Care Ctr. v. Shalala*, 205 F.3d 937, 949 (6th Cir. 2000) (J. Gilman dissenting) (setting out four atypical services reimbursement requirements).

The terms of the regulation are not ambiguous; in fact, for over ten years, the Secretary has had no difficulty applying the three factors in a uniform and consistent manner. *See St. Luke's I*, 182 F. Supp. 2d at 787 n.16 (analyzing 42 C.F.R. § 413.30(f)(1) and concluding that "there is nothing ambiguous in the text of the regulation itself."). Because the regulatory elements are specific, 42 C.F.R. § 413.30(f)(1) is important for what it says as well as what it does not say. *See Barrick Goldstrike Mines. Inc.*, 260 F. Supp. 2d at 35 (analyzing regulation's ambiguity and stating that "regulation is not ambiguous as to the issue; it is simply silent"). When it drafted the regulation in its current form in 1979, the Secretary did not require hospital-based SNFs to prove an additional cost requirement above and beyond its RCL. With the

passage of PRM § 2534.5, the Secretary now construes 42 C.F.R. § 413.30(f)(1) as requiring

hospital-based SNFs to prove a fifth factor - that the cost of the atypical services in question is

above 112% of peer group mean costs. Such an interpretation directly conflicts with the plain

language of the unambiguous regulation.

### 2. PRM § 2534.5 is Plainly Inconsistent With 42 C.F.R. § 413.30(f)(1)

The instant case is similar to *Barrick Goldstrike Mines. Inc. v. Whitman*, 260 F. Supp. 2d

28 (D.D.C. 2003) (J. Jackson), in which the Court struck down an interpretative rule that added

an additional requirement to an established substantive rule. At issue in *Barrick*, was whether

the EPA correctly interpreted the regulation establishing the *de minimis* exception to its toxic

chemical reporting laws to include a requirement that the mixture in question derive from a

"threshold activity." Id. at 33-36 (describing *de minimis* exception as permitting facilities to not

report the presence of trace elements in a mixture). The *Barrick* plaintiff, a gold mining

corporation, contested the EPA's subsequent interpretation of the *de minimis* regulation to

exclude from exemption "waste rock" because it is "not manufactured, processed, or otherwise

used" in accordance with the regulation. *Id.* at 34-35.

Agreeing with the plaintiff, the *Barrick* Court read the EPA's interpretative guidance as

adding an additional "threshold activity" requirement to the *de minimis* exception regulation. *Id.*

at 35. The Court first determined that the *de minimis* exception regulation was not ambiguous

with respect to the "threshold activity" issue - "it was simply silent." *Id.* Specifically, the Court

concluded that "the regulatory language concerning the exemption is clear - a mixture need not

have been involved in a `threshold activity' to be eligible for the exemption." *Id.* Accordingly,

the Court struck down the EPA's interpretative guidance because it added an additional

requirement to an unambiguous regulation. *Id.* at 35-36. The same is true in this case.

Like the regulation establishing the *de minimis* exception, the regulation establishing the atypical services exception is "silent" and "not ambiguous" because it is complete on its face as it clearly sets out the four factors that a provider must establish in order to qualify for such an exception. The EPA used interpretative guidance to establish a "threshold activity" requirement to the *de minimis* exception regulation; the Secretary is using PRM § 2534.5 to establish an additional "threshold cost" requirement (112% of the peer group mean) to the atypical services exception regulation. *See St. Francis*, 205 F.3d at 949 (J. Gilman dissenting) ("At a minimum, the PRM rule adds a fifth, unwaivable requirement to the four reimbursement criteria."); *St. Luke's I*, 182 F. Supp. 2d at 786 (noting that PRM § 2534.5 imposes "an additional substantive threshold burden on the providers before they can be deemed eligible for a discretionary exception reimbursement"). Accordingly, PRM § 2534.5 is plainly inconsistent with 42 C.F.R. § 413.30 because it adds a "threshold cost" factor to a previously-established four factor test.

PRM § 2534.5's "threshold cost" requirement not only adds an additional factor to the atypical services exception regulation, but also directly conflicts with the current "threshold cost" requirement (the applicable cost limit). *See St. Francis*, 205 F.3d at 949 (J. Gilman dissenting) ("At a maximum, the PRM rule conflicts with the prior regulation."). As noted above, in order to obtain an atypical services exception, a provider must first establish that "the actual cost . . . exceeds the applicable limit." 42 C.F.R. 413.30(f)(1). "The plain (and obvious) meaning" of this language indicates that the atypical services exception applies to providers who prove actual costs above the applicable routine cost limit or "RCL." *See Barrick Goldstrike Mines*, 260 F. Supp. 2d at 35 (looking to the plain and obvious meaning of the regulation to establish its scope); *see also St. Luke's II*, 315 F.3d at 989 (stating that "we believe the 'applicable limit' is the RCL for that particular SNF, not 112% of the mean per diem cost for

hospital-based SNFs."). By requiring hospital-based SNFs to prove that they incurred atypical

services costs above 112% of the mean per diem cost for hospital-based SNFs, PRM § 2534.5

directly contradicts the plain meaning of the regulation's requirement to prove costs above the

applicable RCL. The Secretary's interpretation of the atypical services exception is invalid

because the threshold cost requirement established by PRM § 2534.5 adds an additional

requirement and directly conflicts with the clear and specific language of 42 C.F.R.

§ 413.30(f)(1).

### C. PRM § 2534.5 is Invalid Because it is Not a Reasonable Interpretation of 42 C.F.R. § 413.30(f)(1)

If the Court concludes that 42 C.F.R. § 413.30(f)(1) is not ambiguous and that PRM §

2534.5 is not inconsistent with the regulation, then the Court should nevertheless invalidate PRM

§ 2534.5 because it is an unreasonable interpretation of the atypical services regulation.

Recently, a district court concluded that PRM § 2534.5 is not a reasonable interpretation of 42

C.F.R. § 413.30(f)(1).[6] *See St. Luke's I*, 182 F. Supp. 2d at 787-88 (concluding that PRM §

2534.5 represents an unreasonable interpretation of 42 C.F.R. § 413.30 and invalidating its

application to the plaintiffs exception request).

In invalidating PRM § 2534.5, the *St. Luke's I* Court made two specific conclusions:

(1) the two-tier RCL of 42 U.S.C. § 1395yy cannot be read directly into 42 C.F.R. § 413.30; and

(2) PRM § 2534.5 does not reasonably "interpret" 42 C.F.R. § 413.30(f)(1). The Court rejected

the Secretary's argument that its interpretation of the atypical services regulation is appropriate

---

6    Before analyzing the reasonableness of PRM § 2534.5, the *St. Luke's I* Court first
     considered what level of deference to give to the Secretary's interpretation. Relying on
     *Christensen*, the court concluded that PRM § 2534.5 was not entitled to *Chevron*
     deference because its interpretation was contained in an agency manual. If the Court in
     the instant case considers whether PRM § 2534.5 is a valid interpretation of 42 C.F.R. §
     2534.5, then it also should conclude that *Chevron* deference is not appropriate. *See supra*
     section V(A)(2) at 19-20 (arguing that PRM § 2534.5 is a non-binding interpretative rule
     in an agency manual that is not entitled to *Chevron* deference).

because it merely incorporates the inherent underlying assumption of 42 U.S.C. § 1395yy(a) that hospital-based SNFs are inefficient.  Distinguishing between the statute (which establishes routine cost limits) and the regulation (which establishes the atypical services exception), the Court concluded that the two provisions "are not inter-related for reimbursement purposes."7 Id. at 783 (stating that "nothing in the language of 42 U.S.C. § 1395yy(a) suggests that it was intended to apply to the exception process of 42 C.F.R. § 413.30 and the . . . distinctions between the two in language and purpose are too significant to support the Secretary's attempt to directly read the former into the latter.").

The Court also found the Secretary's contention that PRM § 2534.5 interprets the words "reasonable" and "atypical" in 42 C.F.R. § 413.30 lacking in substance and merit.  Id. at 784. Noting that the Secretary was attempting to add elements and benchmarks to the regulation under the guise of "defining" its terms, the Court concluded that if it confirmed PRM § 2534.5, then it would allow the Secretary "to substantively rewrite the regulation to impose an additional hurdle for exceptions eligibility not clearly contemplated by the language of 42 C.F.R. § 413(f) or subsequently enacted statutes." Id.  On this basis, the Court should conclude that PRM § 2534.5 is an unreasonable interpretation of the atypical services regulation.

---

7       As was discussed at length above, PRM § 2534.5 is inconsistent with Medicare law because the Secretary improperly reads 42 U.S.C. § 1395yy(a) into 42 U.S.C. § 1395yy(c).  In 1395yy(c), Congress discussed the basis for "adjustments" such as the atypical services exception, and did not distinguish between free-standing SNFs and hospital-based SNFs.  This glaring omission proves that Congress did not intend for the Secretary to read § 1395yy(a)'s new two-tier standard into § 1395yy(c) and distinguish between the different types of SNFs when considering atypical services adjustments.  See supra section V(A) at 18-26 (arguing PRM § 2534.5 is invalid because it is inconsistent with Medicare law).

### D.  PRM § 2534.5 is Invalid Because it is a "Plainly Erroneous" Interpretation of 42 C.F.R. § 413.30(f)(1)

Although 42 C.F.R. § 413.30(f)(1) is an unambiguous regulation, even if the Court concludes otherwise, it should still declare PRM § 2534.5 invalid because it is a "plainly erroneous" interpretation of the regulation.  *See generally St. Luke's II*, 315 F.3d 984 (8th Cir. 2003).  In a recent opinion, the Eighth Circuit specifically considered the exact issue currently before the Court - whether PRM § 2534.5 sets forth a valid interpretation of the Medicare laws and regulations.  *Id*. at 985.  In a unanimous opinion, an Eighth Circuit panel struck down PRM § 2534.5 as unreasonable and arbitrary because it is a "plainly erroneous interpretation of the provisions that allow a Secretary to grant an upward adjustment to hospital-based SNFs."  *Id*. at 988.

To support its conclusion, the Eighth Circuit first noted that the Secretary's interpretation of 42 U.S.C. § 1359yy(c) and 42 C.F.R. 413.30(f)(I) as permitting the Secretary to measure the cost of atypical services from a point above the established RCL is contrary to the plain meaning of both provisions. *Id*. at 988-89.  The Eighth Circuit determined that the plain meaning of the provisions permitted hospital-based SNFs to obtain adjustments for costs exceeding the applicable "limit" which, the Court found, was tantamount to the RCL. Id. at 989.  Thus, the Court concluded that the Secretary's interpretation of 42 C.F.R. § 413.30(f)(1) as requiring hospital-based SNFs to show costs that greatly exceed the RCL in order to obtain adjustments was unreasonable. Id.

The Court next rejected the Secretary's contention that its interpretation of the atypical services exception regulation is based on a legitimate reading of 42 U.S.C. § 1395yy(a), by explaining:

> The Secretary thus attempts to justify categorically denying an upward adjustment for costs that would have been reimbursed

> under the previous interpretation of a fifteen-year-old regulation, <u>see</u> 44 Fed. Reg. 31802, 31804 (June 1, 1979); 42 C.F.R. § 405.460(f)(1) (1980), by relying on a ten-year old statutory provision that does not address upward adjustments, <u>see</u> 42 U.S.C. § 1395yy(a).

<u>Id</u>. at 989.  In sum, the Eighth Circuit recognized the inherent fallacies of PRM § 2534.5 - the

Secretary's interpretation of the regulation that establishes the atypical services exception: (1) is

based on a subsequently promulgated statute that establishes routine cost levels or RCLs (§

1395yy(a)); and (2) is contrary to the statute that grants the Secretary the right to make

adjustments to the established RCLs for circumstances such as the provision of atypical services

(§ 1395yy(c)).  On this foundation, the Eighth Circuit concluded that the Secretary's

interpretation of the atypical services exception regulation to create a "gap" in reimbursement is

"unreasonable and arbitrary." <u>Id</u>. at 989.

 In sum, although Hi-Desert asserts that 42 C.F.R. § 413.30(f)(1) is not ambiguous and

firmly establishes all factors a provider must prove to sustain an atypical services exception, the

regulation's alleged ambiguity is not the dispositive issue in this case.  If the Court concludes

that the regulation is not ambiguous, then PRM § 2534.5 is invalid because it: (1) is plainly

inconsistent with the terms of the regulation; and (2) is a based on an unreasonable interpretation

of the regulation.  Alternatively, if the Court concludes that the regulation is ambiguous, then

PRM § 2534.5 is invalid because it is "plainly erroneous."  In any event, the Court should strike

PRM § 2534.5 and require the Secretary to reimburse Hi-Desert for all eligible atypical services

costs above its applicable RCL.

### E. *PRM § 2534.5 is Invalid Because it was Not Promulgated Through Notice and Comment Procedures*

#### 1. PRM § 2534.5 Constitutes an Impermissible Change in Interpretation Without Notice and Comment Procedures in Violation of the APA

Even if the Court upholds PRM § 2534.5 as legally valid, the provision nevertheless should be declared unlawful because the Secretary violated the APA by failing to use notice and comment procedures to change its established position that the atypical services exception is measured from the RCL. This Court made that finding regarding PRM § 2534.5 in *Mercy Medical v. Thompson*, No. 99-2765, 2004 WL 3541332 (May 14, 2004)(J. Jackson) (attached at **Exhibit "A"**), in a challenge to the provision identical to the one at bar. The Court should make the same finding here.

In the D.C. Circuit, "if an agency gives a rule a sufficiently definite interpretation, and then later fundamentally modifies that interpretation, the agency must follow the procedures set forth in Section 553 of the APA for amending regulations." *See Torch Operating Co.*, 172 F. Supp. 2d 113 (citing *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030, 1036 (D.C. Cir. 1999)). As the D.C. Circuit has further explained "[o]nce an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking." *Paralyzed Veterans of Am. v. D.C. Arena,* 117 F.3d 579, 586 (D.C. Cir. 1997); *see also Syncor Int'l Corp.*, 127 F.3d 90. In order to maintain that an agency violated the APA by making an impermissible change in interpretation, a plaintiff must prove the following two elements: (1) "the agency must have adopted an initial interpretation of the rule with sufficient authority;" and (2) "the agency's actions must constitute rule interpretation rather than policy statements that guide the agency in applying the regulation." *See Torch Operating Co.*, 172 F. Supp. 2d at 125. Both elements are established in this case.

<em>i. The Secretary Established an Initial Definitive Interpretation by Consistently<br>Measuring the Atypical Services Exception From the Applicable RCL</em>

Over the past decade, the Secretary established a definitive interpretation of 42 C.F.R. §

413.30(f)(1) by consistently measuring the atypical services reimbursement amount from the

applicable RCL. *See Torch Operating Co.*, 172 F. Supp. 2d at 127 (concluding that an agency's

uniform application of a particular regulation can establish "a pattern and practice reflecting a

consistent agency interpretation of its regulation").

In *Torch Operating Co. v. Babbitt*, 172 F. Supp. 2d 113 (D.D.C. 2001), the Court

considered whether the Department of the Interior ("DOI" )8 violated the APA by changing its

interpretation of a long-standing tariff exception regulation. Pursuant to regulation, the plaintiffs,

lessees of the right to produce oil and gas located offshore, were permitted to deduct actual

transportation costs ("transportation allowances") from lessor DOI's royalty calculation. *Id.*

(citing 30 C.F.R. § 206.105(b)). To simplify this calculation, the DOI issued a regulation

establishing the Federal Energy Regulatory Commission tariff exception ("FERC tariff

exception") which permitted plaintiffs "to base their transportation allowances on tariffs filed

with FERC." *Id.* at 116 (citing 30 C.F.R. § 2066.105(b)(5). In applying this regulation, the DOI

"routinely granted" the FERC tariff exception as long as the affiliated pipeline company "had a

tariff on file at FERC." *Id.* In 1994, the DOI "decided to no longer accept tariffs issued by FERC

as automatically qualifying for the FERC exception;" instead, it only would grant a FERC

exception if the lessee presented additional proof of FERC jurisdiction. *Id.* at 117. The plaintiffs

filed an action against the agency asserting, *inter alia*, that the DOI violated the APA by

---

8    Minerals Management Service, a subdivision of the DOI, improperly changed its
interpretation of the FERC tariff exception, but for simplification purposes Hi-Desert will
refer only to the DOI as the defendant.

- 29

changing its long-standing interpretation of the FERC tariff exception without notice and comment procedures. *Id.* 120-21.

The District Court agreed with the plaintiffs, concluded that the agency's routine granting of exceptions based on FERC tariffs represented a definitive interpretation, and declared unlawful the agency's new contrary interpretation. *Id.* at 127-28. Disregarding the agency's claim that a formal adjudication is a necessary precursor for announcing a definitive agency interpretation, the Court stated that:

> The DOI uniformly and consistently granted the FERC exception to each oil company that applied with a FERC-filed tariff. Every time DOI granted a FERC exception it was called upon to interpret that regulation. Each of those decisions creates a pattern and practice reflecting a consistent agency interpretation of its regulation.

Id. at 127. Based on the interpretation maintained during informal adjudications and a minor comment in a regulation preamble, the Court concluded that the agency's long-standing application of the FERC tariff exception represented a definitive interpretation. *Id.*; *see also Alaska Prof'l Hunters*, 177 F.3d at 1031 (holding that agency's longstanding practice was sufficient to constitute initial interpretation).

Under the standard established in *Torch Operating Co.*, the Secretary's long-standing application of the RCL as the standard for the atypical services exception constitutes a definitive interpretation. For six years prior to its new interpretation, the DOI granted the FERC tariff exception based solely on proof of a FERC tariff; for at least a decade prior to the enactment of PRM § 2534.5, the Secretary measured the atypical services exception from the applicable RCL. Moreover, in HCFA Transmittal 378, the Secretary recognized its previous procedure of measuring the atypical services exception from the applicable RCL. *See* HCFA Transmittal 378 (noting that, prior to 1984, each hospital-based SNF's exception request "is applied to the cost

limit applicable to the cost-reporting period for which the exception is requested")(SMF ¶11).

The Secretary's statement in HCFA Transmittal 378 coupled with "the uniform and consistent

agency practice" of measuring the atypical services exception based on the applicable RCL

firmly shows an established agency interpretation of 42 C.F.R. § 413.30(f)(1). *Id.*

The Court so found in *Mercy Medical*, holding that the "Secretary had a long established

practice of granting atypical cost exceptions from the RCL limit." No. 99-2765, 2004 WL

3541332 at *3. Judge Jackson specifically found that "the length and consistency of that practice

is sufficient to establish a definitive agency interpretation" regarding the RCL exception. *Id.*

The Court should make the same finding in the case at bar.

### ii. PRM § 2534.5 Modified the Secretary's Initial Interpretation by Measuring the Atypical Services Exception From 112% of the Peer Group Mean

Because the Secretary's previous interpretation of the atypical services exception

constitutes a definitive interpretation, there is no doubt that PRM § 2534.5 fundamentally

modified the Secretary's established practices. Judge Jackson made this precise finding when

scrutinizing PRM § 2534.5 in *Mercy Medical*, and the Court should do the same here.

As was discussed at length in the legal and factual summary, PRM § 2534.5 shifted the

qualifying reimbursement level from a hospital-based SNF's RCL to 112% of its peer group

mean per diem costs. Under the Secretary's previous interpretation of 42 C.F.R. § 413.30,

hospital-based SNFs were entitled to recover all eligible atypical services costs above the RCL;

meanwhile, under the Secretary's current interpretation, hospital-based SNFs are not entitled to

any eligible atypical services costs in the gap between its RCL and 112% of their peer group

mean. The Secretary cannot legitimately dispute the fact that PRM § 2534.5 fundamentally

altered the methodology for calculating the atypical services exception. Accordingly, the

Secretary violated the APA by failing to promulgate PRM § 2534.5 - a rule that advances an

interpretation that fundamentally modifies the Secretary's initial definitive interpretation of 42

C.F.R. § 413.30(f)(1) - through notice and comment procedures. *See Torch Operating Co.*, 172

F. Supp. 2d at 127-28 (noting that the parties agreed that the DOI's interpretation represents a

new interpretation of the FERC tariff exception regulation).

This Court so found in *Mercy Medical*, holding that the Secretary's actions in issuing and

applying PRM §2534.5 constituted a "substantial departure from [the previous] interpretation."

*Mercy Medical v. Thompson*, 2004 WL 3541332 at *3. Because the Secretary based its

exception calculations on an unlawful rule, such reimbursement calculations should not be

enforced and Hi-Desert should be awarded all eligible atypical services costs above its applicable

RCLs. *See Torch Operating Co.*, 172 F. Supp. 2d at 127-28 (concluding that the DOI's

decisions to deny the plaintiffs' requests for a FERC tariff exception may not be enforced and

further noting that the DOI may not reject plaintiffs' request for the FERC exception based on

the DOI's new interpretation of the rule).

## 2.  PRM § 2534.5 is a Substantive Rule That Should Have Been Promulgated Through Notice and Comment Procedures

Alternatively, the Court should conclude that the Secretary violated the APA by failing to

invoke notice and comment procedures when enacting PRM § 2534.5 because it is a substantive

rule. Although some courts have made the generalized statement that the PRM contains

interpretative rules, upon closer inspection PRM § 2534.5 has many characteristics of a

substantive rule.[9]  *See Cmty. Hosp.*, 323 F.3d at 791; *Maryland Gen. Hosp.*, 308 F.3d at 347 n.3.

Substantive rules are ones which "grant rights, impose obligations, or produce other

significant effects on private interests." *Am. Hosp. Assoc. v. Bowen*, 834 F.2d 1037, 1045 (D.C.

---

[9]     Hi-Desert steadfastly maintains that PRM § 2534.5 is a non-binding interpretative rule
       for purposes of determining which type of deference should apply; however, as is its
       right, Hi-Desert presents this argument in the alternative.

Cir. 1987). By contrast, interpretative rules "are those which merely clarify or explain existing law or regulations." *Id.* In *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F2d 1106, 112 (D.C. Cir. 1993), the D.C. Circuit Court of Appeals set out four factors that would identify an interpretative rule as a legislative rule. The D.C. Court further noted that, any one factor, if present, would distinguish an interpretative rule as a legislative rule. *Syncor Int'l Corp.*, 127 F.3d at 96. The four *American Mining* factors are as follows: "(1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties; (2) whether the agency has published the rule in the Code of Federal Regulations; (3) whether the agency has explicitly invoked its general legislative authority; or (4) whether the rule effectively amends a prior legislative rule." In addition to these four factors, the D.C. Circuit has also considered "whether a purported policy statement genuinely leaves the agency and its decisionmakers free to exercise discretion" in distinguishing interpretative from substantive rules. *Am. Hosp. Assoc.*, 834 F.2d at 1047. Of these five factors, three are particularly relevant in this case.

First, PRM § 2534.5 is a substantive rule because the Secretary could not have relied on 42 C.F.R. § 413.30(f)(1) to raise a hospital-based SNF's cost threshold from the applicable RCL to 112% of the peer group mean. *See Paralyzed Veterans of Am.*, 117 F.3d at 588 (interpreting the first *American Mining* factor as requiring it to consider whether the government "arguably could have relied on the regulation itself, even without the manual interpretation," to support its conclusion). Under 42 C.F.R. § 413.30(f)(1) a provider may qualify for an exception as long its costs arising from the provision of atypical services "exceed the applicable limit." Because "applicable limit" is another way of saying "routine cost limit" or RCL, 42 C.F.R. § 413.30(f)(1) does not permit the Secretary to measure atypical services reimbursement from a level above the

routine cost limit. *See St. Luke's II*, 315 F.3d at 988.  Accordingly, the Secretary could not have relied on 42 C.F.R. § 413.30(f)(1) to restrict Hi-Desert's legitimate atypical services exception requests to .89 and .0 per patient day.

Second, PRM § 2534.5 is a substantive rule because it effectively amended 42 C.F.R. § 413.30(f)(1) by adding an additional threshold cost requirement. *See St. Francis*, 205 F.3d at 994 (J. Gilman, dissenting) (labeling PRM § 2534.5 as substantive because "at a minimum, the PRM rule adds a fifth, unwaivable requirement to the four reimbursement criteria set out in 42 C.F.R. § 413.30(f)(1) by imposing "new financial restrictions on HB-SNFs").  As was discussed at length above, PRM § 2534.5 effectively amends the regulation by requiring providers to prove an applicable "threshold cost" in addition to the other requirements to qualify for the atypical services exception. *See* section V(B) at 26-29 (arguing that PRM § 2534.5 is inconsistent with regulation because it adds a fifth "threshold cost" factor).

Finally, PRM § 2534.5 is a substantive rule because its specific methodology constrains the agency's discretion in calculating the amount of an atypical services exception.  In the D.C. Circuit, rules that constrain an agency's discretion are generally considered substantive. *Guardian Fed. Sav. & Loan Ass'n v. Fed. Sav. Loan Ins. Corp.*, 589 F.2d 658, 666-67 (D.C. Cir. 1978); *Am. Hosp. Assoc.*, 834 F.2d at 1047.  PRM § 2534.5 functions as a binding rule of substantive law because it removes all agency discretion involved in calculating the amount of atypical services reimbursement.  Simply put, PRM § 2534.5 requires mechanical application. *See St. Luke's I*, 182 F. Supp. 2d at 786 ("The PRM removes all discretion from the Secretary to consider reimbursement" under 42 C.F.R. § 413.30(f)(1)).

Because PRM § 2534.5 is the sole source of authority to restrict Hi-Desert's atypical services exception reimbursement, effectively amends 42 C.F.R. § 413.30 to add a "threshold

cost" requirement, and substantially restricts the Secretary's discretion, it is a substantive rule that should have been enacted through informal rulemaking.

## V.  CONCLUSION

For the foregoing reasons, Hi-Desert is entitled to summary judgment as a matter of law. PRM § 2534 is invalid because: (1) it is inconsistent with Medicare laws and regulations; (2) it is an unreasonable interpretation of Medicare laws and regulations; and (3) was not promulgated through notice and comment procedures.  Accordingly, the Secretary's application of PRM § 2534.5 to severely limit and outright deny Hi-Desert's requests for atypical services exceptions was arbitrary and capricious and should be set aside.

Respectfully submitted,


_____/s/_____
Andrew L. Hurst
D.C. Bar # 455471
Andrew C. Bernasconi
D.C. Bar # 484614
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C.  20005
(202) 414-9200


Dated:  November 16, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HI-DESERT MEDICAL CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01000 (RBW) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF HI-DESERT MEDICAL CENTER'S
## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Rule 7.1(h) of the Rules of the United States District Court for the District of

Columbia, Plaintiff Hi-Desert Medical Center ("Hi-Desert") submits this Statement of Material

Facts Not in Dispute to accompany its Motion for Summary Judgment and states that there is no

genuine issue to be tried with respect to the following facts:

### PARTIES

1.    Hi-Desert operated a hospital-based skilled nursing facility ("HB-SNF") in Joshua

Tree, California for the fiscal year ending June 30, 1995. The HB-SNF consisted of a 47-bed

certified distinct part unit and 73 uncertified beds. Administrative Record ("AR") at 38.

2.    Defendant Michael O. Leavitt (the "Secretary") is the Secretary of the United

States Department of Health and Human Services, and is sued in his official capacity.

### LEGAL BACKGROUND

3.    The Social Security Amendments of 1972 ("SSA 1972"), Pub. L. 92-603 (Oct. 30,

1972), §223 amended Section 1861v(1) of the Social Security Act (42 U.S.C. §1396x(v)(1)) to

authorize the Secretary to establish limits on the direct or indirect overall costs of services to be recognized as reasonable.

4.    As a result of its authority to establish "routine service costs" or "RCLs," the Secretary drafted a regulation setting the RCLs for hospital-based SNFs. Prior to 1984, the RCL for hospital-based SNFs was equal to 112% of the peer group mean for hospital based SNFs. 45 Fed. Reg. 58699, 58700 (Sept. 4, 1980).

5.    In 1984, Congress enacted the Deficit Reduction Act of 1984 ("DEFRA"), Pub L. 98-369 (Jul. 18, 1984), and added Section 1888 to the Social Security Act (42 U.S.C. §1395yy). Among other things, this new provision directed the Secretary, effective for cost report periods beginning on and after July 1, 1984, to set RCLs: (1) as to free standing SNFs, 112 percent of the mean per diem routine service costs for other freestanding SNFs; and (2) as to hospital-based SNFs, the sum of the limit for freestanding SNFs plus 50 percent of the amount by which 112 percent of the mean per diem routine service costs for hospital-based SNFs exceeds the limit for freestanding SNFs. 42 U.S.C. §1395yy(a).

6.    As a result of its authority to establish limits on the direct or indirect overall costs of Medicare services, the Secretary promulgated various exceptions to the RCLs. In 1979, the Secretary promulgated 42 CFR §405.460(f)(1) granting an exception from the RCL for SNFs that provide atypical services. 44 Fed. Reg. 31802, at 31804 (June 1, 1979). Under Section 405.460(f)(1), a SNF can obtain an exception from the RCLs if it establishes: (1) its actual costs of services exceeded the applicable limit because it provides atypical services; (2) the SNF actually furnished atypical services; (3) the additional costs are reasonable; and (4) the additional costs are attributable to the provision of atypical services. 42 C.F.R. §405.460(f)(1). In 1986,

with no changes, the Secretary reorganized its regulations and redesignated the atypical services

exception regulation as 42 CFR §413.30(f)(1).  51 Fed. Reg. 348790 (Sept. 30, 1986).

7.    For at least ten years prior to 1994, the Secretary uniformly calculated atypical

services reimbursements from the applicable RCL, and not from some amount above the RCL.

8.    Although Congress limited the Secretary's discretion in calculating RCL levels

for SNFs by passing 42 U.S.C. §1395yy(a), it also reaffirmed the Secretary's authority to "make

adjustments" to the RCLs for any SNF to the extent the Secretary "deems appropriate, based

upon case mix or circumstances."  42 U.S.C. §1395yy(c).

## PRM §2534.5

9.    In 1994, the Secretary issued HCFA Transmittal No. 378 which adopted, without

notice and comment, new provisions of the Provider Reimbursement Manual ("PRM").

10.    HCFA Transmittal No. 378 included PRM §2534.5 ("Determination of

Reasonable Costs in Excess of Cost Limit or 112 Percent of Mean Cost") which established a

new standard for calculating the atypical services exception.  Instead of calculating the atypical

services exception from the applicable RCL, PRM §2534.5 requires the fiscal intermediary to

measure the exception from 112% of a SNF's peer group mean – a point significantly higher

than the RCL for a hospital-based SNF.

11.    HCFA Transmittal No. 378 also summarized the difference between the pre- and

post-PRM §2534.5 RCL exception principles as follows:

> With cost reporting periods beginning prior to July 1, 1984 for each
> freestanding group and each hospital based group, each cost center's ratio
> is applied to the cost limit applicable to the cost reporting period for which
> the exception is requested.  For each hospital-based group with cost
> reporting period beginning on or after July 1, 1984, the ratio is applied to
> 112 percent of the group's mean per diem cost (not the cost limit) ,
> adjusted by the wage index and cost reporting year adjustment factor

applicable to the cost reporting period for which the exception is requested.

Moreover, although these provisions differentiate the RCL principles based upon whether a hospital-based SNF's cost reporting period begins prior to or on and after July 1, 1984, HCFA Transmittal No. 378 explains that it is only effective for exception requests submitted to intermediaries on and after July 20, 1994.

12.     PRM §2534.5 differentiates the RCL principles based upon whether a hospital-based SNF's cost reporting period begins prior to or on and after July 1, 1984.  PRM §2534.5 is only effective for exception requests submitted to intermediaries on and after July 20, 1994.

13.     PRM §2534.5 was not mandated by any explicit statutory directive from Congress or any express legislative history requiring that any RCL exception for hospital-based SNFs be measured from 112% of the peer group mean per diem cost as opposed to the actual RCL itself.

14.     For cost reporting periods prior to and not covered by PRM §2534.5, the Secretary and Medicare fiscal intermediaries calculated the amount of any RCL exception for a hospital-based SNF from the applicable RCL itself.

15.     PRM §2534.5 has had a drastic impact on a hospital-based SNF's atypical services reimbursement because its RCL is significantly lower than 112% of its peer group mean.

16.     For exception requests governed by PRM §2534.5, hospital-based SNFs qualifying (or otherwise qualifying) for exceptions to the RCLs may never recover or be reimbursed by Medicare for any portion of their incurred costs between the hospital-based RCLs and 112 percent of the applicable mean per diem routine service costs for hospital-based SNFs.

17.     PRM §2534.5 creates an irrebutable presumption that any and all portions of the incurred costs between the hospital-based RCLs and 112% of the applicable mean per diem

routine service costs for hospital-based SNFs are unreasonable.  In this way, PRM §2534.5 effectively creates a "gap" in a hospital-based SNF's atypical services expense reimbursement.

18.    PRM §2534.5 was not promulgated pursuant to notice and comment rulemaking under the federal Administrative Procedure Act, 5 U.S.C. §553.

19.    Because the applicability of PRM §2534.5 depends upon the date of submission of the RCL exception request, similarly situated hospital-based SNFs with the same fiscal years and identical costs could have their RCL exception amounts differ based solely on the dates when their RCL exception requests were submitted.

20.    For exception requests governed by PRM §2534.5, hospital-based SNFs qualifying (or otherwise qualifying) for exceptions to the RCLs may never recover or be reimbursed by Medicare for any portion of their incurred costs between the hospital-based RCLs and 112 percent of the applicable mean per diem routine service costs for hospital-based SNFs.

21.    Hospital based SNFs subject to PRM §2534.5 are the only type of provider for which the amount of any exception to the RCL is not measured from the relevant RCL but from a different, higher number than the RCL.

22.    On August 11, 1994, Mr. Booth sent a memorandum to all Regional Administrators for Medicare asking them to advise fiscal intermediaries of the proper procedures for finalizing interim RCL exception amounts to be determined prior to the implementation of PRM §2534.5.  The memorandum further explained that

> All exceptions currently being reviewed under the rules prior to
> Transmittal No. 378 will be allowed a rollover interim exception for only
> the first subsequent cost reporting period.  If a provider files an exception
> request prior to July 20, 1994 and requests a rollover interim exceptions
> for more than one subsequent costs reporting period, HCFA will consider
> an exception only for the first subsequent cost reporting period.  Any
> exception for the second subsequent cost reporting period must be
> determined in accordance with the rules set forth in Transmittal No. 378.

Therefore, the hold harmless provisions will only apply to the exception for the first subsequent cost reporting period.

### HI-DESERT EXCEPTION REQUEST FOR FYE 1995

23.   Hi-Desert operated an urban hospital-based skilled nursing facility for the fiscal year ending on June 30, 1995.  AR at 41.

24.   On June 25, 1996, Hi-Desert submitted an application to its fiscal intermediary for an exception to the facility's applicable RCL for urban hospital-based SNFs for fiscal year ending ("FYE") June 30, 1995.  AR at 41.

25.   Hi-Desert had requested an exception in the difference between its adjusted routine per diem costs, and the applicable RCL of $156.85 per patient day.  AR at 42.

26.   On August 25, 1997, the fiscal intermediary determined that Hi-Desert qualified for an exception to the routine cost limit for an urban hospital-based SNF.  AR at 41, 59-64.  The fiscal intermediary found that Hi-Desert served atypical patients with greater medical needs than those served by peer group facilities with typical patient populations, and met all established benchmarks relevant to that determination.  *Id.*

27.   The amount of exception determined by the fiscal intermediary was $4.24 per day ($20,119 total based on 4,745 Medicare days).  AR at 41, 59-64.  This calculation was made through application of PRM §2534.5, and by this application, denied Hi-Desert reimbursement of approximately $193,121 for fiscal year 1995.  AR at 42, 89.

28.   Hi-Desert filed a timely appeal with the Provider Reimbursement Review Board ("PRRB") concerning the fiscal intermediary's application of PRM §2534.5.  AR at27.  The sole issue in the appeal was whether the fiscal intermediary had improperly limited Hi-Desert's exception through its application of PRM §2534.5.  *Id.*

29.     On February 2, 2007, the PRRB found the fiscal intermediary's methodology of determining Hi-Desert's exception to the SNF cost limits to be improper, rejecting the application of PRM §2534.5. AR at 31. It ordered that Hi-Desert be reimbursed for all of its costs above the cost limit, as opposed to being reimbursed only for its costs that exceeded 112 percent of the peer group's mean per diem costs. *Id*.

30.     The Administrator of the Center for Medicare and Medicaid Services ("CMS") decided to review the PRRB decision pursuant to 42 U.S.C. §1395oo(f). AR at 2-16. The Administrator reversed the holding of the PRRB, finding that PRM §2534.5 was appropriately applied by the fiscal intermediary. AR at 15.

31.     Hi-Desert seeks judicial review of the Secretary's decision to apply PRM §2534.5 to limit its exception to the RCL, and contends that the Secretary's actions were arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law.

Respectfully submitted,

____/s/_____
Andrew L. Hurst
D.C. Bar #455471
Andrew C. Bernasconi
D.C. Bar # 484614
REED SMITH LLP
1301 K Street, N.W.
Suite 1100 – East Tower
Washington, D.C.  20005
(202) 414-9200

Dated:  November 16, 2007

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HI-DESERT MEDICAL CENTER | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:07-cv-01000 (RBW) |
| | ) |
| MICHAEL O. LEAVITT, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## ORDER GRANTING SUMMARY JUDGMENT

Upon consideration of Plaintiff Hi-Desert Medical Center's Motion For Summary

Judgment, this order shall issue this _____ day of _____ , 2008, by the United

States District Court for the District of Columbia,

**ORDERED** that Plaintiff's motion is hereby **GRANTED**, and it is further

**ORDERED** that the Decision of the Administrator referenced in this matter is hereby

**VACATED**, and it is further

**ORDERED** that the Intermediary is ordered to calculate and pay the Plaintiff consistent

with the February 2, 2007 Order of the Provider Reimbursement Review Board on this matter for

the fiscal year ending June 30, 1995, with all appropriate pre-judgment interest.

IT IS SO ORDERED:

Dated:_____

_____
Hon. Reggie B. Walton
United States District Court Judge

# EXHIBIT A

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2004 WL 3541332 (D.D.C.)
**(Cite as: 2004 WL 3541332 (D.D.C.))**

C Only the Westlaw citation is currently available.

United States District Court, District of Columbia.
MERCY MEDICAL SKILLED NURSING
FACILITY, Plaintiff,
v.
Tommy THOMPSON, Secretary U.S. Department of
Health and Human Services
Defendant.
MERCY MEDICAL SKILLED NURSING
FACILITY, Plaintiff,
v.
Tommy THOMPSON, Secretary U.S. Department of
Health and Human Services
Defendant.
ALAMEDA HOSPITAL, Plaintiff,
v.
Tommy THOMPSON, Secretary U.S. Department of
Health and Human Services
Defendant.
PROVIDENCE CENTRALIA HOSPITAL, Plaintiff,
v.
Tommy THOMPSON, Secretary U.S. Department of
Health and Human Services
Defendant.
**No. C.A.99-2765 TPJ, C.A.01-2014 TPJ, C.A.02-
2252 TPJ.**

May 14, 2004.
Gina M. Cavalier, Thomas C. Fox, Reed Smith LLP,
Washington, DC, for Plaintiff, Mercy Medical
Skilled Nursing Facility.

Andrew Lawrence Hurst, Tamara Van Antwerp
Scoville, Reed Smith LLP, Washington, DC, Frank
P. Fedor, Murphy Austin Adams Schoenfeld LLP,
Sacramento, CA, for Plaintiff, Alameda Hospital.

Charlotte A. Abel, Robert E. Leidenheimer, Jr., Peter
Blumberg, Peter S. Smith, United States Attorney's
Office, Jonathan C. Brumer, Sonia M. Orfield, U.S.
Dept. of Health & Human Services, Washington, DC,
for Defendant.

*MEMORANDUM & ORDER*

JACKSON, J.

**\*1** The three plaintiff hospitals in these consolidated
cases challenge decisions by the Secretary of the U.S.
Department of Health and Human Services ("HHS")
to refuse them reimbursement under the Medicare
Act for certain costs they have incurred in rendering
"atypical" nursing services to patients in their
"hospital-based" skilled nursing facilities ("SNFs").

Briefly summarized, and significantly oversimplified
for brevity and clarity's sake, the controversy centers
upon section 2534.5 of the Medicare Provider
Reimbursement Manual ("PRM") promulgated
without notice or comment by the Health Care
Financing Administration of HHS ("HCFA") in July,
1994, purporting to instruct hospital-based SNFs how
to calculate and apply for reimbursement for costs for
atypical services, *i.e.,* those that would be regarded as
reasonable, although in excess of routine cost limits
("RCL"). For a ten year period prior to the issuance
of PRM § 2534.5 the Secretary operated under a
policy that consistently resulted in plaintiffs being
granted full reimbursement for all atypical service
costs above the RCL. PRM § 2534.5, however,
altered the calculus to plaintiffs' disadvantage, in
effect leaving a "gap" between the applicable RCL
(reimbursable) and 112% of the mean *per diem* cost
for peer group SNFs (reimbursable at the discretion
of the Secretary). Costs falling in the gap were,
according to PRM § 2534.5, conclusively deemed
non-reimbursable.

I.

The Secretary contends that PRM § 2534.5
represents a rational exercise of authority granted him
by Congress by the Medicare Act (at 42 U.S.C. §
1395x(v)(1)(A)) in 1972, as amended (by 42 U.S.C. §
1395yy(c)) in 1984, and implemented by regulations
(at 42 C.F.R. § 413.30(f)) in 1986, to impose limits
upon escalating nursing care costs the government
must pay for under Medicare, specifically, those
incurred by hospital-based SNFs for their so-called
"atypical" services. [FN1]

> FN1. Provision 42 C.F.R. § 413.30 was
> amended in 1999 and the provision that had
> been subsection (f) and which is the subject
> of this lawsuit became subsection (e). The
> language of the provision remained
> substantially the same. All references in this

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                     Page 2
Not Reported in F.Supp.2d, 2004 WL 3541332 (D.D.C.)
**(Cite as: 2004 WL 3541332 (D.D.C.))**

decision are to the 1994 C.F.R., specifically, 42 C.F.R. § 413.30(f) (1994), because that was the year in which the Secretary promulgated PRM § 2534.5.

Plaintiffs contend that PRM § 2534.5 is arbitrary and capricious, and contrary to law, and ask that it be declared invalid pursuant to the Administrative Procedure Act (APA), 5 U.S.C. § 706(2). Plaintiffs also contend, however, that PRM § 2534.5 is a substantive rule subject to the APA's notice and comment requirements, and not merely an interpretive rule, which would not typically be subject to those requirements. Plaintiffs further argue that even if PRM § 2534.5 is deemed an interpretative rule it is nonetheless subject to the APA's notice and comment requirements because it changed the Secretary's established interpretation of 42 C.F.R § 413.30(f) (1994). The cases are presently before the Court on the parties' cross-motions for summary judgment, and for the reasons hereafter set forth the Court finds the plaintiffs' latter argument dispositive and will grant summary judgment for plaintiffs. A controlling D.C. Circuit case appears to supersede for this Court's purposes, relevant authority from other circuits.

II.

*2 The parties devote their major efforts to matters of the level of deference to which the Secretary's decisions are entitled, and to the relative merits of two circuit court opinions--St. Luke's Methodist Hosp. v. Thompson, 315 F.3d 984 (8th Cir.2003), and St. Francis Health Care Ctr. v. Shalala, 205 F.3d 937 (6th Cir.2000)--that arrive at opposite conclusions with respect to the Secretary's judgment as to his statutory and regulatory authority. [FN2] There is, however, no need to reach those issues. Even if PRM § 2534.5 is deemed the Secretary's interpretation of HHS's own regulation, namely 42 C.F.R. § 413.30(f), and granted substantial deference, it nevertheless violates the APA because it constitutes a change in the Secretary's definitive interpretation made without following the required notice-and-comment procedures. The D.C. Circuit addressed an analogous situation in Alaska Professional Hunters Ass'n, Inc. v. FAA, 177 F.3d 1030 (D.C.Cir.1999), a case involving the Federal Aviation Administration's ("FAA") sudden shift in its policy of regulation of Alaskan "guide-pilots" who transported customers on small planes to and from hunting and fishing locales. In January 1998, without notice or opportunity for comment, the FAA published a "Notice to Operators"

in the Federal Register announcing that it would henceforth apply the commercial operator regulations to guide-pilots and hold them to the applicable licensing requirements. The Notice to Operators effectively ended the FAA's thirty-year practice of not holding guide-pilots to the higher regulatory burden imposed on commercial operators. The Alaska Professional Hunters Association sued the FAA, claiming that the new regulation violated the APA because it altered the FAA's well-established interpretation of its regulations without notice and comment.

> FN2. Both Mercy Medical and Alameda Hospital added individual claims to their complaints. It appears to the Court that those claims may be addressed upon remand to HHS and accordingly the Court will dismiss them without prejudice pending the Secretary's decision upon remand.

Finding that the FAA's thirty year practice established a definitive interpretation of the regulation, the court of appeals held, "[w]hen an agency has given its regulation a definitive interpretation, and later significantly revises that interpretation, the agency has in effect amended its rule, something it may not accomplish without notice and comment." Alaska Professional Hunters, 177 F.3d at 1034. SeealsoParalyzed Veterans of America v. D.C. Arena, 117 F.3d 579, 586 (D.C.Cir.1997) ("Once an agency gives its regulation an interpretation, it can only change that interpretation as it would formally modify the regulation itself: through the process of notice and comment rulemaking.").

The Fifth Circuit reached a similar conclusion in Shell Offshore Inc. v. Babbitt, 238 F.3d 622 (5th Cir.2001). In that case, Shell Offshore challenged the U.S. Department of Interior's ("Interior") change to a long standing practice for computing transportation costs that could be deducted by oil drilling right lessees when calculating oil royalties due to Interior for the extraction of crude oil. The formula Interior had been using was based on its interpretation of 30 C.F.R. § 206.105(b), and allowed lessees to substitute a tariff approved by the Federal Energy Regulatory Commission ("FERC"), for a showing of actual transportation costs. FERC typically accepted and approved all filed tariffs so long as a timely challenge was not made. SeeShell Offshore Inc. v. Babbitt, 238 F.3d at 625. The change in Interior's policy required

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d                                                                Page 3
Not Reported in F.Supp.2d, 2004 WL 3541332 (D.D.C.)
**(Cite as: 2004 WL 3541332 (D.D.C.))**

lessees to first petition FERC for a determination that FERC had jurisdiction over the relevant pipeline before Interior would accept a FERC-approved tariff as proof of transportation costs. When Shell Offshore, in 1994, sought permission from Interior to use their latest FERC-approved tariff in lieu of actual transportation costs, Interior rejected the tariff because Shell Offshore had failed to first secure a FERC jurisdiction decision. The Fifth Circuit found the change in Interior's policy to be a violation of the APA holding that "[i]f a new agency policy represents a significant departure from long established and consistent practice that substantially affects the regulated industry, the new policy is a new substantive rule and the agency is obliged, under the APA, to submit the change for notice and comment." *Shell Offshore Inc.,* 238 F.3d at 630. *SeealsoTorch Operating Co. v. Babbitt,* 172 F.Supp.2d 113, 124-25 (D.D.C.2001) ("Generally, when an agency interprets its own rules those interpretations are afforded deference. However, if an agency gives a rule a sufficiently definite interpretation, and then later fundamentally modifies that interpretation, the agency must follow the procedures set forth in Section 553 of the APA for amending regulations.") (internal citations omitted).

*3 The Secretary's primary argument against application of *Alaska Professional Hunters* is his claim that the rationale of *Alaska Professional Hunters* applies only in cases in which an agency has made a previous "definitive" interpretation, by which he means an express written statement of the interpretation or adjudicative ruling establishing the agency's interpretation. [FN3] Aside from the fact that neither qualification is mentioned in *Alaska Professional Hunters,* whether it is written down or not, a consistent ten-year practice of granting atypical cost exceptions in the same manner year after year reflects a "definitive" interpretation of the relevant authoritative text. *SeeShell Offshore Inc.,* 238 F.3d at 630. Any significant alteration of that established practice requires notice and an opportunity for those affected to comment. To hold otherwise would grant agencies the power to reinterpret regulations at will so long as their prior interpretations, no matter how established, had not been written down.

> FN3. The Secretary also challenges the application of *Alaska Professional Hunters* arguing that the case applies only in instances in which an agency interprets its own rules or regulations and not in cases in

which it interprets statutes enacted by Congress. The Secretary claims that because plaintiffs argue in parts of their motions that PRM § 2534.5 is a direct interpretation of a federal statute, namely 42 U.S.C. § 1395yy, they should be precluded from arguing for the application of *Alaska Professional Hunters.* It appears to the Court that PRM § 2534.5 is, as plaintiffs argue in other parts of their motions, an interpretation of the atypical services exception found at 42 C.F.R. § 413.30(f). The rule of *Alaska Professional Hunters* is therefore entirely applicable in this instance.

The Court finds that the Secretary had a long established practice of granting atypical cost exceptions from the RCL limit. The Secretary carried out that practice without fail for, at least, the years between 1984 and July 1994. The length and consistency of that practice is sufficient to establish a definitive agency interpretation of § 413.30(f)'s language concerning the granting of "reasonable" exceptions to the RCL for atypical costs. The plaintiffs relied on this interpretation for 10 years and shaped their practices on the basis of it. The Secretary's abrupt shift in policy brought about through PRM § 2534.5 constitutes a substantial departure from that interpretation and the Secretary's failure to follow the APA's notice and comment procedures in making the change constitutes a violation of the APA.

ORDERED, that this case is remanded to the Secretary of the Department of Health and Human Services for further proceedings in accordance with this decision; and it is

FURTHER ORDERED, that plaintiffs' remaining claims are dismissed without prejudice.

Not Reported in F.Supp.2d, 2004 WL 3541332 (D.D.C.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. US Gov. Works.