## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HI-DESERT MEDICAL CENTER, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01000 (RBW) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| ———————————————— | ) | |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56(b), Defendant Michael O. Leavitt, the Secretary of Health and Human Services, by and through his undersigned counsel, respectfully moves this Court for summary judgment on the grounds that there are no material facts in dispute and Defendant is entitled to judgement as a matter of law.  In support of the instant motion, the Court is respectfully referred to the accompanying Statement of Material Facts Not In Dispute, and Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Reg. No. 4202982
Civil Division
555 Fourth Street, N.W.
Washington, D.C.  20530
(202) 307-0372


_____/s/_____
Bridgette L. Kaiser
D.C. Bar No. 492406
U.S. Department of Health and Human Services
Office of the General Counsel/CMS Div.
330 Independence Ave., S.W., Room 5309
Washington, D.C. 20201
(202) 205-5872/FAX: (202) 401-1405


Of Counsel:

JAMES C. STANSEL
Acting General Counsel

JANICE HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General Counsel
for Litigation

United States Department of
Health and Human Services

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HI-DESERT MEDICAL CENTER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No. 1:07-cv-01000 (RBW) |
| | ) | |
| MICHAEL O. LEAVITT, | ) | |
| Secretary of Health and Human Services, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**<u>INTRODUCTION</u>**

Hi-Desert Medical Center ("Hi Desert" or "Plaintiff") is a hospital-based skilled nursing

facility ("SNF").  For the period at issue in this case, Plaintiff was reimbursed for furnishing

skilled nursing care to Medicare beneficiaries on the basis of its "reasonable costs."   By statute,

providers of services paid on a reasonable cost basis are entitled to reimbursement only for costs

that are determined to be necessary in the efficient delivery of needed health services.  42 U.S.C.

§ 1395x(v)(1)(A).  The Medicare statute also provides for cost limits on the reimbursement paid

to SNFs.  In some cases, reimbursement to SNFs may exceed the cost limits if the higher costs

can be justified.

For the fiscal year at issue in this case, Plaintiff sought and received an exception to the

applicable cost limit on the grounds that it had treated an atypical mix of patients.  The

Secretary, however, found that some of the costs Plaintiff incurred above the cost limit were not

reasonable and therefore denied Hi-Desert's request for reimbursement of those costs. Plaintiff

argues that the Secretary's decision is based upon an invalid interpretation of the Medicare

statute and regulations. Plaintiff also argues that the Secretary's long-term practice had been to

pay for all of the costs above the cost limit if an exception to the cost limit was granted.

According to Plaintiff, this practice embodies an authoritative interpretation of the controlling

regulation that the Secretary cannot change without notice and comment rulemaking.

Despite Plaintiff's arguments to the contrary, the Secretary's conclusion that additional

reimbursement was unwarranted was based on a reasonable interpretation of the Medicare statute

and regulations and is entitled to substantial deference. Moreover, the Secretary has not applied

a new legal standard that requires notice and comment rulemaking to Plaintiff's request for

additional reimbursement. Plaintiff's request was denied because the Secretary found the costs

in question were unreasonable, which would preclude reimbursement under any reading of the

regulation.

## STATUTORY AND REGULATORY BACKGROUND

I.    Medicare Generally

This case involves Medicare reimbursement for treatment at SNFs. Under Part A of the

Medicare program, the Government reimburses healthcare providers for providing certain

services to Medicare beneficiaries. See generally 42 U.S.C. § 1395 et seq. Since the Medicare

program began, Congress has amended the statute repeatedly to control costs by ensuring that

providers have incentives to operate efficiently. The controversy in this case arises out of the

administration of the statutory cost-control requirements and the regulations implementing those

requirements by the Secretary of Health and Human Services.

II.    <u>Reasonable Cost Payment to SNFs</u>

In 1972, Congress amended the Medicare statute to provide that "reasonable costs" reimbursable under Medicare should exclude "any part of incurred cost found to be unnecessary in the efficient delivery of needed health services."  Social Security Amendments of 1972, Pub. L. No. 92-603, § 223(a), 86 Stat. 1329, 1393 (codified at 42 U.S.C. § 1395x(v)(1)(A)).  At the same time, it authorized the Secretary to set "limits on the direct or indirect overall incurred costs . . . to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services."  Pub. L. No. 92-603 § 223(b).

In setting cost limits under the statute, the Secretary recognized that different types of SNFs face different costs.  Thus, he divided SNFs into four groups using two criteria.  First, SNFs are classified as located in urban areas or in rural areas.  Second, they are classified as free-standing or hospital-based.  <u>See generally</u> 42 U.S.C. § 1395yy(a) (setting out the current version of this classification).

Each group of SNFs has its own cost limit, known as a "routine cost limit" ("RCL") because it applies to the cost of routine services (including nursing, room, board, and administration), as opposed to ancillary costs (such as laboratory services or drugs) or capital costs.  The cost limits, which fix the maximum reimbursement per patient per day of treatment, were initially set at 115% of the mean per diem cost of services at SNFs in each group.  <u>See</u> 44 Fed. Reg. 51,542 (1979).  The Secretary later lowered them to 112% of the mean per diem cost.  <u>See</u> 45 Fed. Reg. 58,670 (1980).

Under this system, the cost limits for hospital-based SNFs are higher than those for free-standing SNFs.  In part, this is because hospital-based SNFs tend to treat sicker patients and to

provide more intensive care.  Administrative Record ("A.R.") 7.  But a study conducted by the

Secretary found that these factors could account for only about half of the cost difference

between hospital-based and free-standing SNFs.  A.R. 12-13.

Concerned that the remaining cost difference was due to inefficiency, Congress in 1984

codified its own system of cost limits.  See Deficit Reduction Act of 1984, Pub. L. No. 98-369,

§ 2319(b), 98 Stat. 494, 1082 (codified at 42 U.S.C. § 1395yy(a)).  It maintained the cost limit

for free-standing SNFs at 112% of mean per diem costs, see 42 U.S.C. § 1395yy(a)(1)-(2), but it

lowered the hospital-based SNF cost limits to the sum of the free-standing SNF cost limits plus

half the difference between 112% of mean per diem hospital-based SNF costs and 112% of mean

per diem free-standing SNF costs, see id. at § 1395yy(a)(3)-(4).  In other words, Congress

concluded that the cost limits for hospital-based SNFs should take into account only half of those

institutions' higher costs.[1]

At the same time that it established cost limits, Congress gave the Secretary the

discretionary power to make adjustments to those limits in appropriate cases:

> The Secretary may make adjustments in the [cost limits] with respect to any
> skilled nursing facility to the extent the Secretary deems appropriate, based upon
> case mix or circumstances beyond the control of the facility.

42 U.S.C. § 1395yy(c).  Congress did not specify any particular methodology for granting

exceptions to the cost limits.  Instead, adjustments were to be made "to the extent" the Secretary

---

[1]In St. Francis Health Care Centre v. Shalala, the Sixth Circuit offered a numerical
example of how this system works.  205 F.3d 937, 942 (6th Cir. 2000).  Suppose that 112% of
mean per diem cost at free-standing SNFs is $80, while 112% of mean per diem cost at hospital-
based SNFs is $120.  Given these figures, the free-standing SNF cost limit will be $80, or 112%
of mean per diem cost.  The hospital-based SNF cost limit will be $100, or $80 + ½($120-$80).

"deem[ed] appropriate" in his discretion.[2]

III.    SNF Cost Limit Exceptions Regulations

Exercising the authority granted by this statutory delegation, the Secretary has adopted a regulation specifying the circumstances under which he may adjust the cost limits. Such adjustments take two forms: exemptions and exceptions. An exemption is available to new providers and, if granted, relieves them of the cost limit entirely. See 42 C.F.R. § 413.30(e) (1995).[3] Exceptions provide more limited relief. As the Secretary explained in a preamble to the final rule, "if a provider receives an exception, it is reimbursed on the basis of the cost limit, plus an incremental sum for the reasonable costs warranted by the circumstances that justified its exception." 44 Fed. Reg. 31,802 (1979). The regulation states:

> **(f) Exceptions.** Limits established under this section may be adjusted upward for a provider under the circumstances specified . . . . An adjustment is made only to the extent the costs are reasonable, attributable to the circumstances specified, separately identified by the provider, and verified by the intermediary.

42 C.F.R. § 413.30(f). One of the specified circumstances is "atypical services." Id. at § 413.30(f)(1). An exception for atypical services may be granted under this regulation when the provider's costs are reasonable and

[t]he provider can show that the —

---

[2] Congress has since made further changes to the Medicare reimbursement system. Most significantly, in 1997, it replaced the cost-based reimbursement scheme with a prospective payment system, under which SNFs are paid at a per diem rate without regard to the actual costs they incur. See Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4432(a), 111 Stat. 251, 414 (codified at 42 U.S.C. § 1395yy(e)). This amendment applies only to cost-reporting periods beginning on or after July 1, 1998, so it has no effect on this case. See id. at § 4432(d).

[3] In 1999, the Secretary renumbered the regulation and made amendments not relevant to this case. See 42 C.F.R. § 413.30 (2003); 64 Fed. Reg. 42,610 (1999). All citations to the regulation in this brief refer to the 1995 version.

(i) Actual cost of items or services furnished by the provider exceeds the applicable limit because such items or services are atypical in nature and scope, compared to the items or services generally furnished by providers similarly classified; and

(ii) Atypical items or services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care.

Id.

Until 1994, the Secretary had not specifically addressed the application of § 413.30(f) to hospital-based SNFs or set out a precise methodology for determining the appropriate reimbursement for hospital-based SNFs that qualified for an exception. Instead, his practice was to evaluate such requests depending on the type of service involved. For costs other than nursing service costs, exceptions were allowed only to the extent that the provider's costs exceeded 112% of the mean for SNFs in its group. For nursing services, a "nursing hour" methodology was used, under which the total number of nursing service hours provided per patient-day was multiplied by a salary rate to produce the "atypical nursing service per diem" amount that could be claimed as an exception. Using this approach, it was possible – but not guaranteed – that SNFs that provided atypical nursing services could capture all of their costs above the cost limit.

In 1994, the Secretary issued Health Care Financing Administration Transmittal No. 378, which amended the Medicare Provider Reimbursement Manual ("PRM") by adding a new section, PRM § 2534.5. A.R. 10. Under § 2534.5, nursing costs are treated like all other costs, and a SNF may obtain an adjustment only to the extent that its costs exceed 112% of the mean costs of providers in its group. Because of the 1984 changes to the statute, this figure, for hospital-based SNFs, is higher than the cost limit. As a result, hospital-based SNFs – including those providing atypical services – cannot recover costs that fall between the cost limit and 112% of mean per diem cost.

- 6 -

The approach set out in PRM § 2534.5 can be understood by considering three categories of possible costs for a hospital-based SNF.  First, a hospital-based SNF whose costs are less than the cost limit will be reimbursed the full amount of its actual reasonable costs.  Second, a hospital-based SNF whose costs are between the cost limit and 112% of the mean costs for hospital-based SNFs will receive only the amount of the cost limit.  Third, a hospital-based SNF whose costs exceed 112% of the mean costs for hospital-based SNFs will receive the cost limit, plus any additional amount attributable to atypical services, up to the amount by which its reasonable costs exceed 112% of the mean.  See St. Francis, 205 F.3d at 943 (describing the operation of PRM § 2534.5).

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

Plaintiff operated a hospital-based SNF during the fiscal year ending June 30, 1995.  A.R. 24, 26.  For that year, Plaintiff's costs exceeded the SNF cost limits and, on June 25, 1996, Plaintiff applied to its fiscal intermediary ("FI")[4] for an exception on the basis that Plaintiff provided "atypical services."  A.R. 177, 26.

The intermediary approved Plaintiff's exception request, finding that Plaintiff treated more patients than its peer group and that its patients had greater medical needs.  A.R. 61.  The intermediary determined the amount of the exception using the methodology of PRM § 2534.5, and therefore denied reimbursement for costs that exceeded the RCL for hospital-based SNFs but amounted to less than 112% of the mean per diem costs of the relevant peer group.  According to Plaintiff, the reimbursement "gap," representing the amount between the RCL and 112% of the

_____

[4]Fiscal intermediaries (now called "Medicare administrative contractors") are entities, usually private insurance companies, with which the Secretary contracts to assist him in processing payments to health care providers.  See 42 U.S.C. § 1395h.

peer group mean, is $158,588.  Compl. ¶ 15.

Plaintiff appealed the FI's decision to the Provider Reimbursement Review Board ("PRRB" or "the Board").[5]  On February 2, 2007, the PRRB issued its decision, holding that the intermediary should have allowed all of the hospital's costs above the RCL.  A.R. 31-32.  According to the Board, the agency's methodology for determining the amount of Plaintiff's exception, as set forth in PRM 2534.5, was improper.  A.R. 31.  The Administrator of the Centers for Medicare and Medicaid Services ("CMS") reversed the PRRB's decision, rejecting the Board's view that the statute and implementing regulations entitle all SNFs to be reimbursed for all costs above the applicable RCL.  A.R. 12.  The Administrator found that, in promulgating PRM § 2534.5, CMS had properly determined that the reimbursement "gap" "was due to hospital-based SNF's inefficiencies" and therefore represented costs that "are not reasonable" and "could not be reimbursed pursuant to the exception process."  A.R. 13.  The Administrator's decision is the final decision of the Secretary in this matter.  Plaintiff subsequently filed this action seeking judicial review of the Secretary's final decision.

## SUMMARY OF ARGUMENT

The Secretary found that some of the costs Plaintiff incurred over and above the cost limit were not reasonable and necessary for the efficient delivery of care to Medicare patients.  Pursuant to 42 C.F.R. § 413.30(f), therefore, Plaintiff was not entitled to reimbursement for these costs.

The Secretary's decision was based upon the application of PRM § 2534.5, which

---

[5]The Board is an adjudicative body that hears Medicare reimbursement disputes.  See 42 U.S.C. § 1395oo.

embodies a reasonable interpretation of the Medicare statute and which falls within the broad

delegation of authority the statute affords the Secretary to define the circumstances under which

to grant exceptions to the cost limits, and the amount of any such exceptions.  The manual

provision is also a reasonable interpretation of the Secretary's own regulations which is entitled

to substantial deference under <u>Thomas Jefferson University v. Shalala</u>, 512 U.S. 504, 512 (1994)

("<u>Thomas Jefferson</u>").  Plaintiff argues that the Secretary has improperly changed his

interpretation of the controlling regulation without notice and comment rulemaking.  However,

the Secretary has not changed his interpretation of the regulation. The Secretary has never

interpreted the statute or the regulation to require the reimbursement of <u>all</u> costs above the cost

limit, so long as the atypical services exception to the RCL applies; moreover, there is simply no

possible reading of 42 C.F.R. § 413.30(f) that requires the Secretary to reimburse Plaintiff for

unreasonable costs. Therefore, this Court should uphold the Secretary's decision.

<u>**STANDARD OF REVIEW**</u>

A narrow, deferential standard of review governs this case.  Jurisdiction over this action

is based exclusively on 42 U.S.C. § 1395oo(f)(1), which provides for judicial review of final

agency decisions on Medicare provider reimbursement disputes under the terms of the

Administrative Procedure Act ("APA"), 5 U.S.C. § 701, <u>et</u> <u>seq.</u>  The APA standard of review,

5 U.S.C. § 706(2)(A) and (E), provides that a court may set aside agency action only if it is

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or

"unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing

provided by statute."  <u>Citizens to Preserve Overton Park v. Volpe</u>, 401 U.S. 402, 413-15 (1971).

The APA establishes a "narrow" standard of review, and "a court is not to substitute its judgment

for that of the agency." Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Ins. Co., 463 U.S. 29, 43

(1983); see FCC v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 803 (1978).

Under the arbitrary and capricious standard, a court may invalidate an agency action only

if it is "not rational and based on consideration of the relevant factors." Nat'l Citizens Comm.

for Broadcasting, 436 U.S. at 803; see also Motor Vehicle Mfrs. Ass'n., 463 U.S. at 43. The

substantial evidence standard is satisfied if the final agency decision is supported by "'such

relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"

Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619-20 (1966) (quoting Consolidated

Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229 (1938)); see Richardson v. Perales, 402 U.S.

389, 401 (1971). Substantial evidence is "something less than the weight of the evidence, and

the possibility of drawing two inconsistent conclusions from the evidence does not prevent an

administrative agency's findings from being supported by substantial evidence." Consolo, 383

U.S. at 620 (citations omitted). In applying the substantial evidence standard, the reviewing

court may not "displace the . . . choice between two fairly conflicting views, even though the

court would justifiably have made a different choice had the matter been before it de novo."

Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951).

Given the narrowness of the APA standard of review, the reviewing court owes

substantial deference to the final agency decision. "The agency decision must be upheld as long

as there is a rational basis for the Secretary's interpretation of the statute and regulations." Sun

Towers, Inc. v. Heckler, 725 F.2d 315, 325-26 (5th Cir. 1984) (citing Homan & Crimen, Inc. v.

Harris, 626 F.2d 1201, 1211 (5th Cir. 1980)). The Secretary's interpretation of his own

regulations is entitled to "substantial deference," and "must be given 'controlling weight unless

- 10 -

it is plainly erroneous or inconsistent with the regulation.'" <u>Thomas Jefferson</u>, 512 U.S. at 512

(internal citations omitted).  Applying the foregoing standards, the Secretary's final decision is

reasonable and should be affirmed.

Summary judgment is appropriate if the record, viewed in the light most favorable to the

nonmoving party, reveals that there is no genuine issue of material fact and the moving party is

entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>see</u> <u>Tao v. Freeh</u>, 27 F.3d 635, 638

(D.C. Cir. 1994).  The Secretary submits that, in this case, there is not a genuine issue of material

fact.

<div align="center"><b><u>ARGUMENT</u></b></div>

**I.      Under 42 C.F.R. § 413.30(f), Plaintiff Is Not Entitled to the Costs at Issue in this
         Case Because They Are Not Reasonable Costs.**

The premise which underlies all of Hi-Desert's arguments, that the Secretary has denied

it reimbursement for reasonable costs, is directly contradicted by the record.  The Secretary

denied reimbursement for the costs at issue in this case <u>because</u> he found that they were

unreasonable.  A.R. 13.  The Administrator stated that "CMS properly determined . . . that 50%

of the difference between the free-standing SNF and the hospital-based SNF cost limits, i.e., the

'gap,' was due to hospital-based SNFs' inefficiencies."  A.R. at 12-13.  Costs which are due to a

provider's inefficiencies are not "necessary in the efficient delivery of needed health services."

<u>See</u> 42 U.S.C. § 1395x(v)(1)(A).  "As such costs are not reasonable, CMS properly determined

that these costs could not be reimbursed through the exceptions process."  A.R. 13.

Under the controlling regulation, a SNF that receives an exception to the cost limits is

only entitled to reasonable costs above the cost limit.   42 C.F.R. § 413.30(f) states that if a SNF

qualifies for an exception to the cost limit, it will receive additional reimbursement "<u>only to the</u>

<div align="center">- 11 -</div>

extent the costs are reasonable." Id. (emphasis added). The regulation simply could not be more clear on this point – costs incurred by a SNF above the cost limit that are found to be unreasonable are not reimbursable. Id. Once the Secretary found that the costs at issue in this case were unreasonable, the Secretary had no choice under the regulation but to deny Plaintiff's request to be reimbursed for them.

## II.    PRM § 2534.5 Is Consistent With the Medicare Statute and Regulations

Plaintiff argues that PRM § 2534.5 is an unreasonable interpretation of, and inconsistent with, both the Medicaid statute and 42 C.F.R. 413.30(f). Pl.'s Mem.[6] at 13 (PRM § 2534.5 is "an unreasonable interpretation of Medicare law"); id. at 20 (PRM § 2534.5 "flouts the Medicare goal of 'reimbursing costs that are necessary in the efficient delivery of needed health services.'" (quoting 42 U.S.C. § 1395x(v)(1)(A)); id. at 19 (the Secretary's interpretation "disregards the plain meaning of 42 U.S.C. § 1395yy(c)"; id. at 21 (§ 2534.5 is inconsistent with the plain language of 42 C.F.R. § 413.30(f)). As explained below, these contentions are without merit. The statute and regulations are silent with respect to the precise methodology that should be employed in recognizing exceptions to the cost limits for hospital based SNFs. St. Francis Health Care Ctr. v. Shalala, 205 F.3d 937, 945 (6th Cir. 2000) ("neither provision provides guidance as to the level of adjustment the Secretary must make"). As a result, the Secretary promulgated PRM § 2534.5, which reasonably implements both the statute and the regulation.

### A.    PRM § 2534.5 is a reasonable interpretation of, and consistent with, the Medicare Statute

The relevant provision of the statute states that the Secretary "may" make adjustments to

_____

[6]Plaintiff Hi-Desert Medical Center's Memorandum in Support of its Motion for Summary Judgment.

the SNF cost limits "to the extent the Secretary deems appropriate." 42 U.S.C. § 1395yy(c).

This statutory language constitutes a broad delegation of authority to the Secretary to define the

circumstances under which exceptions to the cost limits should be granted. Thus, Plaintiff's

argument that the Secretary "disregards the plain meaning" of this provision in measuring

adjustments for hospital-based SNFs from 112% of their peer group mean, Pl.'s Mem. at 19, is

misguided. This statutory language in no way requires the Secretary to grant a dollar-for-dollar

exception in every case in which a hospital-based SNF's costs exceed the RCL, nor does it direct

the Secretary to determine the amount of reimbursement in any particular way.

There is no merit to Plaintiff's argument that the manual provision contravenes the

statute's goal of "'reimbursing costs that are necessary in the efficient delivery of needed health

services.'" Pl.'s Mem. at 20 (quoting 42 U.S.C. § 1395x(v)(1)(A)). To the contrary, the

approach represented by PRM § 2534.5 reasonably furthers the policies of the Medicare statute

by disallowing reimbursement for the unreasonable and unnecessary costs that concerned

Congress when it established a two-tiered system of cost-limits in 42 U.S.C. § 1395yy(a). See

St. Francis. 205 F.3d at 945 ("discounting for these unreasonable costs comports with the general

recognition by Congress that certain systematic inefficiencies associated with unreasonable cost

are associated with [hospital-based] SNFs. In fact, the PRM calculation reduces the

reimbursement to [them] by the same proportion that Congress deemed to be inefficient. . . .")

(citation omitted).

Plaintiff is correct that § 1395yy(a) addresses a differential between hospital-based and

free-standing SNFs with respect to reimbursement of *typical* costs, whereas PRM § 2534.5

applies this distinction for purposes of reimbursement to hospital-based SNFs providing *atypical*

- 13 -

services.  Pl.'s Mem. at 18.  However, the Secretary has not "confuse[d]" these "distinct

concerns."  Id.  All of a provider's costs, including unreasonable costs, may cause a provider's

total costs to exceed its cost limit. When a SNF, such as Plaintiff, provides atypical services, its

total costs will nonetheless be a mix of typical and atypical items or services.[7]  The Secretary

must somehow disaggregate the costs of hospital-based SNFs in order to determine what portion

of their costs are attributable to the atypical services and what portion are attributable to the

inefficiency of hospital-based SNFs generally.

The approach represented by PRM § 2534.5 reasonably furthers the policies of the

Medicare statute and its regulations.  In particular, it implements the congressional determination

reflected in 42 U.S.C. § 1395yy(a) that some of the excess costs associated with hospital-based

SNFs are unreasonable and should not be reimbursed.  In this way, PRM § 2534.5 furthers

Congress's purpose of not reimbursing that portion of the excess costs of hospital-based SNFs

that is due to inefficiency.  The Sixth Circuit reached this same conclusion, recognizing that it

was appropriate for the Secretary "to account for the systemic cost inefficiencies identified by

Congress, while still allowing [hospital-based] SNFs to obtain reimbursement when they

demonstrate that costs above the 112% threshold are due to atypical services."  St. Francis, 205

F.3d at 946.

**B.    PRM § 2534.5 is a reasonable interpretation of, and consistent with, the
       regulation**

The regulation at issue is phrased in permissive terms: "Limits established under this

---

[7]It is therefore irrelevant that the Secretary did not "specifically analyze the costs
associated with the provision of *atypical* services",  Pl.'s Mem. at 16 (emphasis added), before
enacting the manual provision.

- 14 -

section <u>may</u> be adjusted upward for a provider under the circumstances specified in paragraphs (f)(1) through (f)(5) of this section."  42 C.F.R. § 413.30(f) (emphasis added).  It does not require the Secretary to grant any exceptions at all.  In this respect, the regulation echoes the statute, which provides that "[t]he Secretary <u>may</u> make adjustments" to the cost limits.  42 U.S.C. § 1395yy(c) (emphasis added).  In upholding PRM § 2534.5, the Sixth Circuit recognized that these provisions leave the Secretary with "broad discretion."  <u>St. Francis</u>, 205 F.3d at 944; <u>accord</u> <u>St. Luke's Methodist Hosp. v. Thompson</u>, 315 F.3d 984, 988 (8th Cir. 2003) ("[W]e agree that the Secretary has discretion.").  This is made all the more clear from the portion of the regulation that makes explicit that even if grounds for an exception are satisfied, "an adjustment is made only to the extent the costs are reasonable[.]" 42 C.F.R. § 413.30(f).

Plaintiff mistakenly argues that PRM § 2534.5 impermissibly adds an additional substantive requirement to the regulation, as occurred in <u>Barrick Goldstrike Mines, Inc. v. Whitman</u>, 260 F. Supp. 2d 28 (D.D.C. 2003).  <u>See</u> Pl.'s Mem. at 22-23.  However, paragraph (f)(1) of 42 C.F.R. § 413.30, on which Plaintiff relies, merely states the criteria for determining whether a facility is eligible for an exception based on atypical services.  <u>See</u> 42 C.F.R. § 413.30(f) ("Limits established under this section may be adjusted upward . . . under the circumstances specified in (f)(1) through (f)(5).") It is the language which precedes the eligibility criteria that explicitly addresses the <u>amount</u> of such exceptions.  <u>See</u> <u>id.</u> ("An adjustment is made only to the extent that the costs are reasonable [and] attributable to the circumstances specified . . .. ").  Section 2534.5 therefore does not impermissibly add to the criteria in § 413.30(f)(1) for determining qualification for an exception; it simply explains how the Secretary interprets the language of § 413.30(f) regarding the <u>amount</u> of such exceptions

when the facility involved is a hospital-based SNF.  Through PRM § 2534.5, the Secretary has

determined that a certain portion of hospital-based SNF costs are not reasonable, and therefore

not reimbursable, even if the facility's total costs exceed the RCL.

      To be sure, the regulation does not leave the Secretary's discretion completely

unconstrained.  Instead, it specifies the five circumstances in which an exception may be

granted.  Under 42 C.F.R. § 413.30(f), the Secretary may not grant an exception to a provider

that cannot demonstrate one of the circumstances listed in the rule.  But the regulation's

permissive language does not require that an exception be granted to every provider who does

demonstrate one of the specified circumstances or dictate the amount of reimbursement for

eligible providers.

      The manual provision is also consistent with the regulation's causation requirement.  The

regulation requires the Secretary to determine whether the costs are "attributable to the

circumstances provided," that is, whether the provider's costs "excee[d] the applicable limit

<u>because</u> [the provider's services] are atypical."  42 C.F.R. § 413.30(f)(1)(i) (emphasis added).

As noted above, <u>supra</u> at 14, costs that a provider incurs, whether due to the treatment of sicker

patients or to systematic inefficiencies, will contribute to the provider's total costs.  Therefore,

all costs that a provider incurs are part of the reason why the total cost exceeds the cost limit.

Section 413.30(f) does not specify how all of these contributing factors are to be sorted out, or

how the Secretary should decide which costs to count in determining whether a provider has

exceeded the cost limit because it provides atypical services, or because it is simply inefficient.

PRM § 2534.5 fits comfortably within the range of discretion created by 42 C.F.R. § 413.30(f).

      Plaintiff complains that the Secretary has created an irrebutable presumption that certain

- 16 -

costs are per se unreasonable.  Pl.'s Mem. at 7.  However, when an agency has discretion (as the Secretary does under the open-ended language of § 413.30), it need not exercise that discretion on a case-by-case basis.  Rather, it is free to lay out principles to guide the exercise of that discretion.  Cf. Lopez v. Davis, 531 U.S. 230 (2001) (holding that, when a statute provided that the Bureau of Prisons "may" grant early release to a class of inmates, the Bureau had discretion to adopt a rule categorically denying early release to inmates whose offenses involved firearms).

Of course, PRM § 2534.5 is not the only way the Secretary could have chosen to take account of inefficiency at hospital-based SNFs in considering exception requests.  For example, rather than use the methodology of § 2534.5, he might have measured the costs from the RCL but applied a percentage discount to all costs above that limit.  But the question is not whether the Secretary was required to adopt the approach he did, or even whether his approach is the best among available alternatives– it is not the function of a reviewing court to determine whether the Secretary's interpretation "promotes efficiency or helps Medicare recipients receive the care they need."  St. Luke's, 315 F.3d at 989 (quoted in Pl.'s Mem. at 17).  Rather, the issue is simply whether the Secretary's approach is permissible under the statute and under 42 C.F.R. § 413.30(f).  Because it falls within the range of discretion created by those provisions, it must be upheld.  Accordingly, at least one Court of Appeals and three district courts have rejected the very claims that Plaintiff makes here.  See  St. Francis, 205 F.3d at 946 (In PRM § 2534.5, "the Secretary merely acted within the discretion she was granted by putting to place the very cost ratio established by Congress in 42 U.S.C. § 1395yy and elaborated upon by 42 C.F.R. §413.30"); San Joaquin Cmty Hosp. v. Thompson, No. Civ F 01-5733, slip op. at 42 (E.D. Cal. Aug. 13, 2002) (attached as Exhibit ("Ex.") 1) ("[t]he interpretation of the exceptions regulation

embodied in PRM § 2534.5 is not arbitrary, capricious, inconsistent with the statute or regulations, nor plainly erroneous"); <u>Fort Bend Cmty. Hosp. v. Thompson</u>, No. H-00-4020, slip op. at 9 (S.D. Tex. Mar. 22, 2002) (adopting Magistrate Judge's recommendation) (attached as Ex. 2) (same); <u>Canonsburg Gen. Hosp. v. Thompson</u>, No. 00-0284, slip. op. at 8 (W.D. Pa. Feb. 28, 2001) (attached as Ex. 3) (adopting reasoning of <u>St. Francis</u> to hold that PRM § 2534.5 "is not an arbitrary or capricious interpretation of the statute and regulations").

## III.    Because PRM § 2534.5 was an Interpretation of Both the Statute and Regulation It is Entitled to Substantial Deference

Plaintiff argues that because PRM § 2534.5 is a nonbinding interpretative rule found in an agency manual, this Court should apply the "power to persuade" standard reflected in <u>Christensten v. Harris County</u>, 529 U.S. 576 (2001) ("<u>Christensen</u>"). Pl.'s Mem. at 14. Plaintiff largely ignores the very deferential standard of review of an agency's interpretation of its own regulations called for by <u>Thomas Jefferson</u>.

As Plaintiff recognizes, PRM § 2534.5 interprets not just the Medicare statute but also the Secretary's regulations. <u>See</u> Pl.'s Mem. at 1 (manual provision is "an unreasonable interpretation of the regulation that establishes the atypical services exception"). The Secretary's interpretation is therefore entitled to "controlling weight unless it is plainly erroneous or inconsistent with the regulation." <u>Thomas Jefferson</u>, 512 U.S. at 512 (citing <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414 (1945)). This Court must defer to the Secretary's interpretation of regulation section 413.30 unless an alternative reading is compelled by the regulation's plain language or other indications of the Secretary's intent at the time of the regulation's promulgation. <u>Id.</u>

<u>Christensen</u> in no way changed the degree of deference that is due to the Secretary's

- 18 -

interpretations of his own ambiguous *regulations*.  <u>See</u>, <u>e.g.</u>, <u>Christensen</u>, 529 U.S. at 588 (noting

continued adherence to the rule set forth in <u>Auer v. Robbins</u>, 519 U.S. 454 (1997) and <u>Seminole

Rock & Sand Co.</u> that an agency's interpretation of its own ambiguous regulation is entitled to

deference); <u>see also</u> <u>In Re Sealed Case</u>, 237 F. 3d 657, 667 (D.C. Cir. 2001) (noting, in the wake

of <u>Christensen</u>, that "we review an agency's interpretation of its own regulations with

'substantial deference'" and that it is still the case that "[t]he agency's interpretation thus 'will

prevail unless it is 'plainly erroneous or inconsistent' with the plain language of the disputed

regulation"); <u>Tozzi v. Dep't of Health & Human Servs.</u>, 271 F.3d 301, 311 (D.C. Cir. 2001)

(continuing to apply <u>Bowles</u> in another post-<u>Christensen</u> case); <u>Paragon Health Network, Inc. v.

Thompson</u>, 251 F.3d 1141, 1145 (7th Cir. 2001) (applying <u>Thomas Jefferson</u> in a post-

<u>Christensen</u> case); <u>San Joaquin Cmty Hosp.</u>, Civ F 01-5733, slip op. at 21 (rejecting argument

that <u>Christensen</u> diminishes the deference due "to the Secretary's interpretation of his own

regulation in an area where Congress has expressly delegated lawmaking authority to the

Secretary").  The Supreme Court's decision in <u>Christensen</u> was concerned only with the scope of

<u>Chevron</u> deference, not with the deference that is owed to an agency's interpretations of

ambiguous regulations (whether those interpretations are found in other regulations or, as is far

more common, in informal documents, like manuals).  The Court should reject any suggestion

that it apply limited deference to the Secretary's interpretation of his own *regulations* based on a

misreading of the <u>Christensen</u> decision.[8]

---

[8] As one court of appeals has observed, in the area of Medicare and Medicaid
reimbursement, "where a highly expert agency administers a large and complex regulatory
scheme in cooperation with many other institutional actors, the various possible standards for
deference begin to converge."  <u>See</u> <u>Community Health Center v. Wilson-Coke</u>, 311 F.3d 132, 138
(2d Cir. 2002).  The court concluded that it "need not decide the exact molecular weight of the

Assuming <u>arguendo</u> that the manual provision is not entitled to <u>Thomas Jefferson</u> deference, it is still entitled to significant deference because it has substantial "power to persuade." <u>See</u> <u>Christensten v. Harris County</u>, 529 U.S. 576 (2001); <u>Skidmore v. Swift & Co.</u>, 323 U.S. 134 (1944). Perhaps the best proof of this fact is that it already <u>has</u> persuaded no fewer than four federal courts, which have approved it. <u>Supra</u> at 17-18. PRM § 2534.5 represents a well-thought out, detailed scheme governing the amount of exception requests granted to hospital-based SNFs, which takes as its foundation conclusions about the nature of such facilities' costs that have also been accepted by Congress as the basis for legislative action. It is difficult to imagine an interpretation with much more "power to persuade."

IV.    **This Court's <u>Paralyzed Veterans</u> Rule Does Not Require That PRM § 2534.5 Be Adopted Through Notice-And-Comment Rulemaking**.

Plaintiff argues that even if PRM § 2534.5 is a sound interpretation of the statute and regulation, it is still unlawful because the Secretary failed to use notice and comment procedures to change his "established position that the atypical services exception is measured from the RCL." Pl.'s Mem. at 28. In order to establish that the Secretary has changed his interpretation of the regulation, Plaintiff must identify the Secretary's original interpretation, the Secretary's current interpretation, and how the interpretations are different. This Court cannot find that the Secretary impermissibly changed his interpretation without Plaintiff first identifying the words in the regulation that the Secretary now interprets differently. However, Plaintiff does not, and cannot, point to any evidence that the Secretary ever interpreted 42 C.F.R. § 413.30(f) to allow (or, more to the point, <u>require</u>) reimbursement of unreasonable costs or reimbursement of <u>all</u>

deference we accord to CMS's position" in order to find that "we owe some significant measure of deference" to the agency's interpretation. <u>Id.</u> at 137-38.

costs above the RCL. Nor does Plaintiff demonstrate that the Secretary has ever construed

"reasonable" costs, in either the statute or the regulation, to mean all costs above the cost limit.

In <u>Mercy Medical Skilled Nursing Facility v. Thompson</u>, another court in this district

held that the exceptions methodology set out in PRM § 2534.5 is invalid because, in its view,

that provision represents "a substantial departure" from the Secretary's prior interpretation of 42

C.F.R. § 413.30(f).  No. 99-2765, 2004 WL 3541332, at *3 (D.D.C. May 14, 2004).  Plaintiff

urges this Court to follow that analysis and hold the Secretary's exception methodology to be

contrary to law.   Pl.'s Mem. at 28.  This Court should not do so because the analysis in <u>Mercy</u> is

in error and represents a fundamental misapplication of the principle of administrative law set

out in <u>Paralyzed Veterans of America v. D.C. Arena L.P.</u>, 117 F.3d 579 (D.C. Cir. 1997).[9]

Under the rule set out in <u>Paralyzed Veterans</u>, "[o]nce an agency gives its regulation an

interpretation, it can only change that interpretation as it would formally modify the regulation

itself: through the process of notice and comment rulemaking."  <u>Id.</u> at 586.  <u>Paralyzed Veterans</u>

is inapplicable here, however, because PRM § 2534.5 does not articulate a new interpretation of

42 C.F.R. § 413.30(f).

The primary error in <u>Mercy</u>, repeated by Plaintiff in this case, is that it assumed that

simply because the Secretary had reached a different result (<u>i.e.</u> not reimbursing Plaintiff for all

costs over the cost limit) after applying 42 C.F.R. § 413.30(f), he necessarily applied a new

interpretation of the regulation.  Yet, as previously explained, the Secretary has not changed his

_____

[9] While the Secretary recognizes that <u>Paralyzed Veterans</u> is binding upon this Court, the
Secretary believes that the rule articulated in <u>Paralyzed Veterans</u> is inconsistent with controlling
precedent from the Supreme Court.  That an agency has changed its interpretation of a regulation
properly goes to the amount of deference the agency's interpretation is due and should not create
a <u>per se</u> rule that the new interpretation is invalid.  <u>See</u> <u>Thomas Jefferson</u>, 512 U.S. at 515.

interpretation of 42 C.F.R. § 413.30(f) – the Secretary gives exactly the same meaning to every word in the regulation that he did from when it was first promulgated. Moreover, it is not clear that there is any real dispute over the meaning of the regulation. Both the Secretary and Plaintiff believe that the Secretary should reimburse SNFs that qualify for an exception to the applicable cost limit for reasonable costs incurred over that limit. They disagree only about whether, as a factual matter, certain hospital-based SNF costs are due to inefficiencies, and therefore unreasonable.

Mercy, moreover, misapplies the rule of Alaska Professional Hunters Association v. FAA, and this Court should not repeat that error. 177 F.3d 1030 (D.C. Cir. 1999). Alaska Hunters and Paralyzed Veterans stand for the proposition that, in some cases, an administrative agency cannot change a well-established interpretation of a regulation without engaging in new rulemaking. Both cases deal with agency attempts to reinterpret a governing legal standard. In Alaska Hunters, the court held that the FAA could not decide that hunting guides suddenly counted as "commercial operators" who "'for compensation or hire,' carry persons or property by aircraft" and were thus subject to regulation, after decades of concluding they did not. Id. at 1031, 1035-36. In Paralyzed Veterans, upon which Plaintiff also relies, the court decided that the Justice Department had not changed its understanding of the requirement that handicapped seating have a "comparable line of sight" when it decided that the line of sight did not need to be over temporary obstructions created by standing spectators. 117 F.3d at 582. The rule established by these cases is that rulemaking may sometimes be required before a new meaning, which effectively establishes a new legal rule, can be given to words in a regulation. These cases are simply inapposite here. Although Hi-Desert suggests that the Secretary has changed

- 22 -

his "qualifying standard for the atypical services exception," Pl.'s Mem. at 12, he has not. Nor has he altered his interpretation. As explained below, the Secretary used the same legal standard he has always used, and interpreted that standard the same way he always has, but reached a new result based on a changed understanding of the facts.

Plaintiff's argument that this Court should overturn the Secretary's decision runs together the Secretary's application of the regulation with his interpretation of the regulation. See, e.g., Pl.'s Mem. at 30 (stating that "the Secretary's long-standing application of the RCL as the standard for the atypical services exception constitutes a definitive interpretation.") (emphasis added). However, the regulation provides for payment over the cost limit but also provides for a factual test that may reduce that reimbursement if costs are found not to be reasonable. 42 C.F.R. § 413.30(f) (adjustments are made "only to the extent the costs are reasonable"). A simple example illustrates this point. Suppose that the regulation in question stated that Medicare would for pay for safe and effective drugs. After many years of paying for an anemia drug, the Secretary discovered that taking the drug greatly increased the risk of heart attack. If the Secretary subsequently decided not to continue paying for the drug because he found that it was not safe and effective, the drug's manufacturer could not reasonably argue that the Secretary had changed his interpretation of the regulation or his understanding of the words "safe and effective." To the contrary, the Secretary would simply be applying the same standard to a new understanding of the facts. The drug manufacturer might argue that the Secretary was wrong and that the drug really was safe and effective, but the manufacturer would not have a procedural challenge under Paralyzed Veterans that the Secretary had changed his interpretation of the regulation. The situation in this case is exactly parallel to the preceding example, the only

- 23 -

difference being that the regulation calls for the Secretary to reimburse SNFs for reasonable costs over the cost limit instead of requiring him to pay for safe and effective drugs.

Binding precedent from the Court of Appeals in this Circuit recognizes exactly this distinction between the application of a regulation and the interpretation of a regulation. In Hudson v. FAA, the D.C. Circuit rejected the argument that the FAA had impermissibly changed its interpretation of a regulation when the FAA changed its policy and stopped requiring actual demonstrations to determine how quickly new designs of airplanes could be evacuated. 192 F.3d 1031 (D.C. Cir. 1999). The regulation at issue in Hudson required that before new airplane designs could be used in commercial aviation, the manufacturer was required to demonstrate that a new airplane could "be evacuated from the airplane to the ground under simulated emergency conditions within ninety seconds. Compliance with this requirement must be shown by actual demonstration … unless the Administrator finds that a combination of analysis and testing will provide data equivalent to that which would be obtained by actual demonstration. 14 C.F.R. § 25.803(c)." Id. at 1033. In 1990, the FAA published an "Advisory Circular" in the Federal Register which stated that the FAA did not believe simulations were adequate and the requirement had to be met through actual demonstrations. See Advisory Circular 25.803-1, 55 Fed. Reg. 4,934 (Feb. 12, 1990). Eight years later, the FAA changed its policy, and concluded that simulations could be used to show that a new airplane could be evacuated in less than 90 seconds. Hudson, 192 F.3d at 1033. The FAA subsequently allowed Boeing to demonstrate that the new 777-300 met the requirement through the use of simulations rather than qualifying through an actual demonstration. Id. at 1034. When the new policy was challenged an as impermissible change in interpretation of the regulation, the Court of Appeals found that the

FAA was entitled to apply the requirements in 14 C.F.R. § 25.803(c) to a new understanding of the facts without violating the principles articulated in <u>Alaska Hunters</u> and <u>Paralyzed Veterans</u>. The court stated that "there is no dispute as to the regulation's meaning" and concluded that "[w]hether this test is met requires a factual determination by the FAA, and clearly, as methods of analysis and other considerations develop over time, the FAA's response to the test can also." <u>See</u> <u>Hudson</u> at 1036.

The argument that Plaintiff makes in this case is nearly identical to the argument rejected by the Court of Appeals in <u>Hudson</u>.    In that case, the plaintiffs argued that FAA changed its "interpretation" of the regulation because the application of the factual test in the regulation resulted in a different conclusion – <u>i.e.,</u> that Boeing could show that the 777-300 was safe through a simulation.  Here, Plaintiff argues that the Secretary has changed his "interpretation" of 42 C.F.R. § 413.30(f) because the application of the factual test (payments are only made to the extent costs are reasonable) resulted in a different conclusion – <u>i.e.,</u> that some of Plaintiff's costs above the cost limit were not reimbursable.[10]  The Court of Appeals properly recognized that an agency could reach a different result simply because of a different understanding of the facts without changing the applicable legal standard.  Plaintiff's argument in this case is that because the Secretary had not previously disallowed costs above the cost limit, he cannot do so now.  This argument is not really that he cannot change his interpretation of the regulation, but that he cannot apply the regulation.  There is simply no authority to support Plaintiff's argument.

---

[10] One notable distinction between this case and <u>Hudson</u> is that, unlike the FAA in <u>Hudson</u>, the Secretary never actually adopted the policy that he is accused of departing from. The alleged pattern of practice at issue is simply that the Secretary had not denied costs above the cost limit as unreasonable, not that he had specifically addressed the question and consistently concluded that all costs above the cost limit were reasonable.

The Secretary's decision simply reflects the application of the test in 42 C.F.R. § 413.30(f) to the costs incurred by Plaintiff. The Secretary found that hospital-based SNFs systematically have unnecessarily high costs due to inefficiencies in the hospital-based SNF model and, consequently, that their unnecessary costs are not reasonable. This is not a different interpretation of the regulation, just an application of the regulation to a changed situation which calls for a different result.

Moreover, the cases that have applied Paralyzed Veterans make clear that an informal or unofficial statement of an agency's interpretation is not subject to the rule – and with good reason, since otherwise "an agency's initial, often chaotic process of considering an unresolved issue could prematurely freeze its thinking into a position that it would then be unable to change without formal rulemaking." Association of Am. R.Rs., 198 F.3d 944, 950 (D.C. Cir. 1999). Thus, in Paralyzed Veterans itself, a speech by an agency official and statements by an advisory board that had drafted a regulation were insufficient to establish an official agency interpretation of that regulation. See 177 F.3d at 586-87. So too, in Association of American Railroads, were letters from agency officials setting out their interpretation of a regulation insufficient to establish an official agency interpretation. See 198 F.3d at 948.

In addition to being embodied in an official statement, a prior interpretation must also be clear and unambiguous. For example, in Alaska Professional Hunters, notice-and-comment rulemaking was required to change a regulatory interpretation when the agency had "consistently advised" regulated parties of its prior interpretation over a thirty-year period. 177 F.3d at 1031. Conversely, an ambiguous agency statement "cannot be said to mark a definitive interpretation from which the agency's [new] construction [would be] a substantial departure." Darrell

Andrews Trucking, Inc. v. Federal Motor Carrier Safety Admin., 296 F.3d 1120, 1126 (D.C. Cir. 2002).  Likewise, if the agency's prior understanding "can reasonably be interpreted" to be consistent with the new interpretation, then the agency will not be deemed to have "'significantly revise[d]' a previous 'definitive interpretation'" of its regulation.  Air Transport Ass'n of Am. v. FAA, 291 F.3d 49, 57-58 (D.C. Cir. 2002) (quoting Alaska Hunters, 177 F.3d at 1034).

The court in Mercy therefore erred when it concluded that the Secretary "had a long established practice of granting atypical cost exceptions" that established a definitive interpretation of 42 C.F.R. § 413.30(f).   2004 WL 3541332, at *3.  The court noted that in a series of decisions by fiscal intermediaries, the Provider Reimbursement Review Board, and the Administrator of CMS, SNFs were awarded all of their atypical costs above the cost limits.  Id. at *2-3.  These decisions did not establish a definitive interpretation of the regulation, for two reasons.  First, even if the relevant adjudications were clear and unambiguous, they would not have established an official interpretation, since decisions of the Board and of the Administrator lack precedential effect and do not bind the Secretary in future cases.  See PRM § 2927 ("Decisions by the Administrator are not precedents for application to other cases."); see also Community Care Found. v. Thompson, 318 F.3d 219, 226-27 (D.C. Cir. 2003).

Second, the decisions did not clearly establish a rule of full reimbursement, because they did not state that full reimbursement through the exceptions process was required by 42 C.F.R. § 413.30(f).  That regulation allows exceptions for "reasonable" costs, and the administrative decisions reflect case-by-case determinations of reasonableness.  Such decisions do not – either explicitly or implicitly – establish any interpretation of the regulation that would be inconsistent with determining reasonableness through a categorical principle such as PRM § 2534.5.

Contrary to <u>Mercy</u>'s view, there is considerable evidence that the Secretary has never interpreted 42 C.F.R. § 413.30(f) to require full reimbursement of all atypical costs through the exceptions process. At the time the regulation was adopted in its present form, the Secretary explained the difference between exemptions from the cost limits and exceptions to the limits. In a preamble to the final rule, he noted that "[a]n exception differs from an exemption," because "[i]f a provider receives an exemption, it is not affected at all by the cost limits," while "if a provider receives an exception, it is reimbursed on the basis of the cost limit, <u>plus an incremental sum for the reasonable costs warranted by the circumstances that justified its exception</u>." 44 Fed. Reg. 31,802 (1979) (emphasis added). This preamble language makes clear that the Secretary considered the distinction that 42 C.F.R. § 413.30(f) makes between exceptions and exemptions, <u>see id.</u> § 413.30(e), (f), to be important. It therefore casts doubt on the idea that the Secretary intended to eliminate this distinction by providing for the automatic reimbursement of <u>all</u> atypical costs above the cost limit through the exceptions process – an approach that would use the "exceptions" process to "exempt" all costs relating to atypical services from the cost limit. In any event a <u>per se</u> rule that all costs above the cost limit are necessarily reimbursable clearly conflicts with the plain language of the regulation that costs are reimbursable only to the extent that they are reasonable. 42 C.F.R. § 413.30(f). A reading that all costs above the cost limit are <u>per se</u> reasonable reads this language completely out of the regulation.

In fact, the Secretary did not provide full reimbursement to every SNF that qualified for an atypical-services exception. Prior to 1994, the Secretary based atypical-services exceptions on the number of nursing hours provided. This approach did not necessarily result in full reimbursement, even when a provider qualified for an exception. For example, the Secretary has

- 28 -

consistently applied a "low-occupancy adjustment," which is currently set out at PRM § 2534.5.A.  That adjustment reduces compensation to SNFs that have less than 75% occupancy, ensuring that Medicare does not pay for costs associated with excess capacity.  <u>See</u>, <u>e.g.</u>, <u>Hospice of St. John v. Blue Cross & Blue Shield Ass'n</u>, PRRB No. 93-D28, Medicare & Medicaid Guide (CCH) ¶41,463 (H.C.F.A. 1993) (applying 75% occupancy standard); <u>Bay Harbor Rehab. Ctr. v. Blue Cross & Blue Shield Ass'n</u>, PRRB No. 85-D55, Medicare & Medicaid Guide (CCH) ¶34,854 (H.C.F.A. 1985) (same).  So even before PRM § 2534.5 was adopted, the Secretary interpreted 42 C.F.R. § 413.30(f) to provide that not all costs could be compensated with an atypical-services exception, but only those deemed "reasonable."  The methodology in PRM § 2534.5 is entirely consistent with this interpretation.

Under any interpretation, the Secretary's practice falls short of establishing the "express, direct, and uniform" interpretation of the regulation that would be required to make <u>Paralyzed Veterans</u> applicable.  <u>Association of Am. R.Rs.</u>, 198 F.3d at 949.  But if there were any doubt about the proper interpretation of the Secretary's prior practice, it should be resolved in favor of the Secretary, consistent with the general rule that an "agency's interpretation of its own precedent is entitled to deference."  <u>Boca Airport, Inc. v. FAA</u>, 389 F.3d 185, 190 (D.C. Cir. 2004) (quoting <u>Cassell v. FCC</u>, 154 F.3d 478, 483 (D.C. Cir. 1998)).

A principal concern underlying the <u>Paralyzed Veterans</u> line of cases is the possibility of detrimental reliance by regulated parties.  Moreover, the Supreme Court has recently stated that the fact that an agency "may have interpreted the two regulations differently at different times in their history is not a ground for disregarding the present interpretation," noting that there was no chance of  "unfair surprise."  <u>Long Island Home Care v. Coke</u>, 127 S. Ct. 2339 (2007).  That

- 29 -

concern is not present in this case, making application of the doctrine inappropriate here.

Paralyzed Veterans and the cases following it make clear that notice-and-comment rulemaking is required only when an agency abandons an interpretation on which the public has reasonably relied. For example, in rejecting a claim that the Justice Department had changed its interpretation of disability regulations, the Paralyzed Veterans Court emphasized that "it is not open to appellants to claim that they reasonably relied to their detriment on the speech" by a Department official setting out the prior interpretation. 117 F.3d at 587. Similarly, Alaska Hunters stressed that the regulated parties had "relied on the advice FAA officials imparted to them – they opened lodges and built up businesses dependent" on the agency's regulatory interpretation. 177 F.3d at 1035. And Association of American Railroads declined to apply Paralyzed Veterans, in part because "[n]othing in this record suggests that the railroads relied . . . in any comparable way," since they had not "made large capital expenditures based on their interpretation . . . or altered their business practices in any significant way." 198 F.3d at 950.

Here, any reliance by hospital-based SNFs on a supposed right to dollar-for-dollar payment of costs in excess of the cost limit would have been unreasonable. The governing statute and regulations both make clear that the granting of exceptions is a matter of regulatory grace. And, as we have explained, the Secretary stated as early as 1979 that exceptions amounts would be limited to incremental sums reflecting a provider's reasonable costs. PRM § 2534.5 could not have upset any reasonable expectations on the part of providers, and it therefore is not subject to Paralyzed Veterans.

- 30 -

## <u>CONCLUSION</u>

For the foregoing reasons, the Secretary respectfully requests that the Court deny

Plaintiff's motion for summary judgment and grant Defendant's motion for summary judgment.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Reg. No. 4202982
Civil Division
555 4th St., N.W.
Washington, D.C. 20530
(202) 307-0372


_____/s/_____
BRIDGETTE KAISER
Attorney
D.C. Bar No. 492406
U.S. Department of Health and Human Services
Office of the General Counsel-CMS Division
Room 5309 Cohen Building
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 205-5872

<u>OF COUNSEL</u>:

JAMES C. STANSEL
Acting General Counsel

JANICE HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ )<br>HI-DESERT MEDICAL CENTER,　　　　)<br>　　　　　　　　　　　　　　　　)<br>　　　　　Plaintiff,　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>　　　　　v.　　　　　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>MICHAEL O. LEAVITT,　　　　　　)<br>Secretary of Health and Human Services,　)<br>　　　　　　　　　　　　　　　　)<br>　　　　　Defendant.　　　　　　)<br>　　　　　　　　　　　　　　　　)<br>_____) | 07-CV-01000 (RBW) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Defendant, Michael O. Leavitt, the Secretary of Health and Human Services, submits the following statement of material facts not in dispute in accordance with Rule 56 of the Federal Rule of Civil Procedure and Local Civil Rule 7(h).

1. Plaintiff operated a hospital-based Skilled Nursing Facility ("SNF") during the fiscal year ending June 30, 1995.  A.R. 24, 26.

2. For the fiscal year ending June 30, 1995, Plaintiff's costs exceeded the SNF cost limit for hospital-based SNFs.  A.R. 26.

3. On June 25, 1996, Plaintiff applied to its fiscal intermediary[1] for an exception to its cost limit on the basis that Plaintiff had provided "atypical services."  A.R. 59.

4. The intermediary approved Plaintiff's exception request, finding that the Plaintiff treated more patients than its peer group and that its patients had greater medical needs.  A.R. 61.

_____

[1]Fiscal intermediaries (now called "Medicare administrative contractors") are entities, usually private insurance companies, with which the Secretary contracts to assist him in processing payments to health care providers.  See 42 U.S.C. § 1395h.

5.  The intermediary determined the amount of Plaintiff's exception reimbursement using the methodology of Provider Reimbursement Manual ("PRM") § 2534.5, and therefore denied reimbursement for costs that exceeded the cost limit for hospital-based SNFs but amounted to less than 112% of the mean per diem costs of the relevant peer group.  A.R. 3.

6.  Plaintiff appealed the intermediary's decision to the Provider Reimbursement Review Board ("PRRB" or "the Board").[2]

7.  On February 2, 2007, the PRRB issued its decision, holding that the intermediary should have allowed all of the hospital's costs above the RCL.  A.R. 31-32.

8.  The Administrator of the Centers for Medicare and Medicaid Services reversed the PRRB's decision.  A.R.  12.  The Administrator's decision is the final decision of the Secretary in this matter.

<div style="text-align:center">_____/s/_____</div>

JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610

<div style="text-align:center">_____/s/_____</div>

CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Reg. No. 4202982
Civil Division
555 4th St., N.W.
Washington, D.C. 20530
(202) 307-0372

---

[2]The Board is an adjudicative body that hears Medicare reimbursement disputes.  See 42 U.S.C. § 1395oo.

_____/s/_____
BRIDGETTE KAISER
Attorney
D.C. Bar No. 492406
U.S. Department of Health and Human Services
Office of the General Counsel-CMS Division
Room 5309 Cohen Building
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 205-5872

OF COUNSEL:

JAMES C. STANSEL
Acting General Counsel

JANICE HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services

Dated: February 7, 2007

RECEIVED

AUG 19 2002

PROVIDER REIMBURSEMENT
REVIEW BOARD

FILED

AUG 13  3 03 PM '02

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIF.
FRESNO

BY _____
                    DEPUTY

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

SAN JOAQUIN COMMUNITY HOSPITAL,     )     CIV F 01-5733 OWW DLB
                                    )
              Plaintiff,            )     MEMORANDUM DECISION AND
                                    )     ORDER RE:  CROSS MOTIONS
     v.                             )     FOR SUMMARY JUDGMENT
                                    )
TOMMY G. THOMPSON, Secretary of     )
the Department of Health and        )
Human Services,                     )
                                    )
              Defendant.            )
_____)

## I.  INTRODUCTION

Pursuant to 42 U.S.C. §1395oo(f)(1), San Joaquin Community
Hospital ("Plaintiff" or the "Provider") seeks judicial review
under the Administrative Procedures Act, 5 U.S.C. §701 et seq.
(the "APA"), of the final decision of Tommy G. Thompson,
Secretary of the Department of Health and Human Services
("Defendant" or the "Secretary"), in his official capacity,
denying two portions of Plaintiff's atypical services exception
request totaling $448,211.00 for fiscal year 1995.  See Doc.1,
Complaint, filed June 8, 2001; see also Doc.12 at p.29 (listing
$326,857.52 as the additional exception amount sought).
Plaintiff and Defendant cross-move for summary judgment.  See

1

1  Docs.11, 15.  Oral argument was heard July 22, 2002.

2

3                    II.  **BACKGROUND**

4       Plaintiff operates a 21-bed Medicare certified hospital-

5  based skilled nursing facility ("HB-SNF") in Bakersfield,

6  California.  *See* Doc.19 at Fact 1.  Plaintiff seeks review of

7  both the Secretary's refusal to reimburse its per diem costs

8  between the Routine Cost Limit and 112 percent of the peer group

9  mean (the "reimbursement gap issue") and the Secretary's practice

10 of reclassifying Plaintiff's indirect costs without also making a

11 corresponding reclassification of these same costs in the peer

12 group, which is used to measure the amount of the exception

13 awarded (the "reclassification issue").  *See* Doc.12 at p.1.

14

15     A.  Undisputed Facts

16         1.  *Prior Proceedings*

17       During fiscal year 1995, Plaintiff exceeded all of the

18 benchmarks established by the HCFA to determine whether it

19 provided atypical services.  Plaintiff had an average length of

20 stay of 13.11 days compared to a national average of 132.34,

21 Medicare utilization of 97.88% compared to a national average of

22 52.39%, and Medicare SNF ancillary per diem costs of $230.52

23 compared to a national average of $62.73.  A lower than average

24 length of stay, combined with a higher than average Medicare

25 Utilization and Medicare SNF ancillary costs all point to the

26 provision of atypical services to higher acuity patients.  *See*

27 Doc.14 at ¶15; Doc.17; Administrative Record, lodged October 25,

28 2001 ("AR"), at 7.

                              2

1      On September 13, 1996, Plaintiff requested from the HCFA an
2  atypical services exception to Medicare's routine service cost
3  limits ("RCLs") for the cost reporting period ending December 31,
4  1995. *See* Doc.19 at Fact 2; Doc.14 at ¶16; Doc.17. On January
5  21, 1997, Plaintiff's intermediary, Blue Cross of California
6  ("Blue Cross" or the "Intermediary"), reviewed the exception and
7  recognized that Plaintiff had provided atypical services and
8  granted an interim exception in the amount of $556,873.00, or
9  $90.78 per diem. *See* Doc.19 at Fact 3. In granting the
10  exception, the Intermediary compared Plaintiff's actual per diem
11  costs, as adjusted for low occupancy, to the mean per diem cost
12  of Plaintiff's peer group. Blue Cross also reclassified certain
13  direct salary costs to the nursing administration cost center and
14  certain indirect costs, which were directly assigned to the
15  routine area, to indirect cost centers for comparison to the
16  corresponding peer group mean cost per diem. *See id.* at Fact 4.
17  On October 14, 1998, the Health Care Financing Administration
18  (the "HCFA", since renamed Centers for Medicare and Medicaid
19  Services ("CMS")) agreed with Blue Cross's recommendation to
20  grant Plaintiff an exception of $88.73 per day for 1995, subject
21  to a comment about the treatment of nursing administration costs
22  which could change the amount of the final exception. *See* AR at
23  733-34.

24      Blue Cross subsequently reopened Plaintiff's cost report and
25  reclassified directly expensed nursing management cost from the
26  routine cost centers to the nursing administration cost center,
27  and a revised Notice of Program Reimbursement ("NPR") issued on
28  April 2, 1999. *See* Doc.19 at Fact 7; Doc.14 at ¶¶16-19; Doc.17..

SENT BY:                    9-13- 2 ; 14:28 ;           OGC HCFD→      HHS/OGC/HCF DIV:# 5/51

1   Based on this revised cost report, the HCFA approved a final

2   exception amount of $92.92 per diem. *See* Doc.19 at Fact 8; AR at

3   198.  The final exception amount was communicated to Plaintiff by

4   the Intermediary's letter of September 7, 1999. *See* Doc.14 at

5   ¶¶16-19; Doc.17.  The notice from the HCFA explained Plaintiff's

6   appeal rights to the Provider Reimbursement Review Board (the

7   "PRRB") if it disagreed with the HCFA's determination. *See*

8   Doc.19 at Fact 8; AR at 198.

9        Plaintiff appealed the HCFA's decision to the PRRB. *See*

10  Doc.19 at Fact 9.  On April 17, 2001, the PRRB majority ruled in

11  favor of the Secretary. *See id.* at Fact 10.  On June 11, 2001,

12  the CMS Administrator declined to review the PRRB's decision,

13  making it a final decision of the Secretary. *See id.* at Fact 12.

14  On June 12, 2001, CMS notified Plaintiff of the Administrator's

15  final decision. *See id.* at Fact 13.

16       Plaintiff then filed this suit seeking judicial review.

17  Plaintiff seeks per diem costs of $93.81 and an alternative

18  computation of a per diem exception amount of $136.42.

19

20       2.   *Reimbursement Procedures*

21       At all relevant times, the Medicare program reimbursed

22  eligible HB-SNFs and freestanding skilled nursing facilities

23  ("FS-SNFs") on a per diem basis for the "reasonable cost" of

24  covered services provided to Medicare beneficiaries. *See* Doc.14,

25  Plaintiff's Statement of Undisputed Facts, ¶1; Doc.17,

26  Defendant's Response to Plaintiff's Statement of Undisputed

27  Facts, p.1.  "Reasonable cost" is defined as only "the cost

28  actually incurred, excluding therefrom any part of incurred cost

4

SENT BY:                9-13- 2 ; 14:29 ;             OGC HCFD~        HHS/OGC/HCF DIV;# 6/51

1   found to be unnecessary in the efficient delivery of needed
2   health services." 42 U.S.C. §1395x(v)(1)(A).  The controlling
3   statute, commonly referred to as the Medicare statute, requires
4   that the reasonable cost "shall be determined in accordance with
5   regulations establishing the method or methods to be used, and
6   the items to be included, in determining such costs for various
7   types or classes of institutions, agencies, and services." *Id.*
8   The Medicare statute prohibits payors from "cross-subsidizing"
9   each other. *See id.*

10      As part of the Medicare statute's goal to recognize only
11  costs that are "reasonable," reimbursement for routine service
12  costs of extended care services are subject to Routine Cost
13  Limits ("RCLs").  *See* 42 U.S.C. §1395yy(a).  Prior to 1984, the
14  RCL for FS-SNFs was 112 percent of the peer group mean for FS-
15  SNFs.  The RCL for HB-SNFs was 112 percent of the peer group mean
16  for HB-SNFs.[1]  The Secretary is authorized to "make adjustments
17  in the limits set forth in subsection (a) with respect to any
18  skilled nursing facility to the extent the Secretary deems
19  appropriate, based upon case mix or circumstances beyond the
20  control of the facility," *provided that each year* the Secretary
21  publishes the data and criteria to be used in establishing the
22  SNF per diem cost limits.  42 U.S.C. §1395yy(c) (emphasis
23  added).[2]  In 1984, as part of the Deficit Reduction Act of 1984

24  _____

25      [1]112 percent represents one standard deviation from the
26  mean.  See AR at 341.

27      [2]Neither party offered any evidence that the Secretary
    annually publishes the data and criteria used tin establishing
28  SNF per diem costs.

5

Case 1:07-cv-01000-RBW    Document 15-3    Filed 02/07/2008    Page 6 of 52
Case 1:99-cv-02765-TPJ    Document 59-3    Filed 08/26/2003    Page 6 of 52

SENT BY:                    9-13- 2 ;  15:05 ;          OGC HCFD→          HHS/OGC/HCF DIV:# 2/ 4

1   ("DEFRA"), Congress lowered the RCL for HB-SNFs relative to the

2   RCL for FS-SNFs.  The RCL for FS-SNFs remained at 112% of the

3   mean per diem routine service cost for FS-SNFs.  The RCL for HB-

4   SNFs was lowered to the limit for FS-SNFs plus 50% of the amount

5   by which 112% of the mean per diem routine service cost for HB-

6   SNFs exceeds the limit for FS-SNFs.  See Doc.14 at ¶¶9-10;

7   Doc.17; 42 U.S.C. §1395yy(a).

8        The regulations, under which the Medicare statute requires

9   "reasonable cost" to be determined, see 42 U.S.C.

10  §1395x(v)(1)(A), authorize the Secretary to grant exceptions to

11  the RCLs in certain circumstances.  See 42 C.F.R. §413.30(f).

12  The substance of 42 C.F.R. §413.30(f)(1) was first issued as a

13  regulation effective July 1, 1974.  The regulation was originally

14  numbered 20 C.F.R. §405.460(f)(2); in 1979 it was renumbered 42

15  C.F.R. §405.460(f)(1); in 1986 it was redesignated 42 C.F.R.

16  §413.30(f)(1); in 1999 it was renumbered 42 C.F.R. §413.30(e)(1).

17  See Doc.14 at ¶4; Doc.17 at p.1.  The precise language of 42

18  C.F.R. §413.30(f)(1) was issued as an amended regulation

19  effective July 1, 1979.  See 39 Fed. Reg. 20164 (June 6, 1974)

20  and 44 Fed. Reg. 31802 (June 1, 1979), attached as Exhs. 1-2 to

21  Doc. 13, Pl. Request for Judicial Notice.  With no changes to its

22  text, as "part of our overall plan for reorganization of the

23  regulations in 42 C.F.R. Part 405 in order to make them easier to

24  locate and use," the regulation was redesignated in 1986 as 42

25  C.F.R. §413.30(f)(1), the designation by which it was identified

26  at the time relevant to this dispute and the designation by which

27  it is referred here.  See Doc.14 at ¶6; Doc.17.

28       42 C.F.R. §413.30(f)(1), adopted by the Secretary pursuant

6

SENT BY:                   9-18- 2 :  14:29 ;        OGC HCFD→        HHS/OGC/HCF DIV:# 7/51

1   to his authority to establish appropriate cost limits as part of

2   determining reasonable costs, *see* 42 U.S.C. §1395x(v)(1)(A),

3   provides:

4       (f) Exceptions.  Limits established under this section may

5       be adjusted upward for a SNF or HHA [Home Health Agency]

6       under the circumstances specified in paragraphs (f)(1)

7       through (f)(5) of this section.  An adjustment is made only

8       to the extent that the costs are reasonable, attributable to

9       the circumstances specified, separately identified by the

10      SNF or HHA, and verified by the intermediary.

11          (1) Atypical services.  The SNF or HHA can show that

12          the --

13              (i) Actual cost of services furnished by a SNF or HHA

14              exceeds the applicable limit because the services are

15              atypical in nature and scope, compared to the services

16              generally furnished by SNFs or HHAs similarly

17              classified; and

18              (ii) Atypical services are furnished because of the

19              special needs of the patients treated and are necessary

20              in the efficient delivery of needed health care.

21  42 C.F.R. §413.30(f)(1).

22      In July 1994, ten years after the RCL for HB-SNFs was

23  lowered by Congress in 42 U.S.C. §1395yy(a), the Secretary,

24  through the HCFA, issued Transmittal No. 378 which published a

25  new Chapter 25 of the Provider Reimbursement Manual ("PRM").  *See*

26  AR at 868.  Chapter 25 included PRM §2534.5(B) and its related

27  appendices A and B.  *See* AR at 876-77.  Transmittal No. 378 and

28  §2534.5 were not issued pursuant to notice and comment

7

SENT BY:                9-13- 2 ; 14:30 ;          OGC HCFD→      HHS/OGC/HCF DIV;# 8/51

1   rulemaking, but were instead published in an agency manual.  *See*

2   Doc.14 at ¶13; Doc.17.  §2434.5(B) reads, in pertinent part:

3           Uniform National Peer Group Comparison.

4           ...  If indirect costs are directly assigned (e.g.

5       nursing administration (indirect cost) assigned to the

6       direct cost center), the indirect cost elements must be

7       identified and reassigned, for the purpose of constructing

8       the peer group, to the indirect cost center identified with

9       the type of cost incurred.  The ratios are then based on the

10      averages for the cost centers reflecting the reassigned

11      costs....

12          ...  For each hospital-based group ... the ratio is

13      applied to 112 percent of the group's mean per diem cost

14      (not the cost limit), adjusted by the wage index and cost

15      reporting year adjustment factor applicable to the cost

16      reporting period for which the exception is requested.  The

17      result is the provider's per diem cost is disaggregated into

18      the same proportion of its peer group mean per diem cost for

19      each cost center.

20          The SNF's actual per diem cost ... is compared to the

21      appropriate component of the disaggregated cost limit or 112

22      percent of the hospital-based mean per diem cost.  If the

23      SNF's per diem cost exceeds the peer group per diem cost for

24      any cost center, the higher cost must be explained.  Excess

25      per diem costs which are not attributable to the

26      circumstances upon which the exception is requested and

27      cannot be justified may result in either a reduction in the

28      amount of the exception or a denial of the exception.

1  AR at 876-77.

2      Pursuant to Transmittal No. 378, the amount of a provider's
3  exception for direct costs is determined by subtracting the peer
4  group direct salary per diem cost from the provider's direct
5  salary per diem cost . A provider's direct salary per diem cost
6  – peer group direct salary cost = direct salary cost exception.
7  See Doc.14 at ¶56; Doc.17.

8      In the exception process, the comparison of a provider's
9  costs to the peer group costs is not made in the aggregate, but
10  is instead compared by specific "cost centers." There is a
11  single "direct" cost center, and there are several "indirect"
12  cost centers. See Doc.14 at ¶¶28-29; Doc.17. During the process
13  of determining Plaintiff's atypical services exception request
14  for fiscal year 1995, the Intermediary took certain direct costs
15  reported by Plaintiff in its cost report and reclassified them
16  into various indirect cost centers. The Intermediary's letter of
17  September 7, 1999, informing Plaintiff of the revised final
18  exception per diem amount, details these reclassifications. The
19  Intermediary reclassified directly assigned costs of $11,668 in
20  consulting fees to the Administrative and General ("A&G")
21  indirect cost center, $202,119 of employee benefits to the
22  Employee Health and Welfare ("EH&W") indirect cost center,
23  $22,363 of expenses related to special functions and $10,662 of
24  start-up cost amortization to the A&G indirect cost center,
25  $10,228 of pharmacy technician salaries to the Pharmacy indirect
26  cost center, $53,412 of social worker salaries to the Social
27  Service indirect cost center, and $41,922 of medical supplies to
28  the Central Service indirect cost center. See Doc.14 at ¶31;

9

1 Doc.17.  Transmittal No. 378 reflects that no reclassifications
2 occurred before the peer groups were constructed.  *See* Doc.14 at
3 ¶36; Doc.17.

5         3.    *Past Practices*

6     Plaintiff claims that 100% reimbursement has been the
7 working rule until the Secretary promulgated the PRM.  From this
8 "long standing" practice of alleged 100% reimbursement, Plaintiff
9 argues a de facto rule developed which could only be changed by
10 notice and comment rulemaking.

12     B.    <u>Disputed Facts and Legal Positions</u>

13     There are no disputed material facts, only disputed
14 characterizations of material facts.  The facts are uncontested
15 and are contained in the Administrative Record.  *See* Doc.8 at
16 p.7:3-6.

18         -        III.  <u>LEGAL STANDARDS</u>

19     Summary judgment is warranted only "if the pleadings,
20 depositions, answers to interrogatories, and admissions on file,
21 together with the affidavits, if any, show that there is no
22 genuine issue as to any material fact."  Fed.R. Civ.P. 56(c); *see*
23 *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).  The
24 evidence must be viewed in a light most favorable to the
25 nonmoving party.  *See Lopez v. Smith*, 203 F.3d 1122, 1131 (9th
26 Cir. 2000) (en banc).

27     The moving party bears the initial burden of demonstrating
28 the absence of a genuine issue of fact.  *See Celotex Corp. v.*

1  *Catrett*, 477 U.S. 317, 325 (1986).  If the moving party fails to
2  meet this burden, "the nonmoving party has no obligation to
3  produce anything, even if the nonmoving party would have the
4  ultimate burden of persuasion at trial."  *Nissan Fire & Marine*
5  *Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102-03 (9th
6  Cir. 2000).  However, if the nonmoving party has the burden of
7  proof at trial, the moving party must only show "that there is an
8  absence of evidence to support the nonmoving party's case."
9  *Celotex Corp.*, 477 U.S. at 325.

10      Once the moving party has met its burden of proof, the non-
11  moving party must produce evidence from which a reasonable trier
12  of fact could find in its favor viewing the record as a whole in
13  light of the evidentiary burden the law places on that party.
14  *See Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th
15  Cir. 1995).  The nonmoving party cannot simply rest on its
16  allegations without any significant probative evidence tending to
17  support the complaint.  *See Nissan Fire & Marine Ins. Co. v.*
18  *Fritz Cos.*, 210 F.3d 1099, 1107 (9th Cir. 2000).  Instead, the
19  nonmoving party, through affidavits or other admissible evidence,
20  "must set forth specific facts showing that there is a genuine
21  issue for trial."  Fed.R. Civ.P 56(e).

22          [T]he plain language of Rule 56(c) mandates the entry
23      of summary judgment, after adequate time for discovery and
24      upon motion, against a party who fails to make a showing
25      sufficient to establish the existence of an element
26      essential to the party's case, and on which that party will
27      bear the burden of proof at trial.  In such a situation,
28      there can be "no genuine issue as to any material fact,"

11

1       since a complete failure of proof concerning an essential

2       element of the nonmoving party's case necessarily renders

3       all other facts immaterial.

4  *Celotex Corp.*, 477 U.S. at 322-23.

5       Evidence submitted in support of, or in opposition to, a

6  motion for summary judgment must be admissible under the standard

7  articulated in 56(e).  Properly authenticated documents can be

8  used in a motion for summary judgment if the appropriate

9  foundation is provided by affidavit or declaration.  *See Hal*

10 *Roach Studios v. Richard Feiner & Co.*, 896 F.2d 1542, 1550-51

11 (9th Cir.1990).  Supporting and opposing affidavits must be made

12 on personal knowledge, set forth such facts as would be

13 admissible in evidence, and show that the affiant is competent to

14 testify to the matters stated therein.  *See* Fed.R. Civ.P. 56(e).

15      "Questions of statutory construction and legislative history

16 present legal questions which are properly resolved by summary

17 judgment."  *T H Agric. & Nutrition Co. v. Aceto Chem. Co.*, 884

18 F.Supp. 357, 359 (E.D. Cal. 1995) (citations omitted).

19

20                    IV.  **ANALYSIS**

21      Plaintiff contends PRM §2534.5, promulgated July 1994 in

22 Transmittal No. 378, represents a new interpretation of 42 C.F.R.

23 §413.30(f)(1), which prohibits HB-SNFs from being reimbursed for

24 exceptional per diem costs between the RCL for HB-SNFs and 112

25 percent of the peer group mean for HB-SNFs.  Plaintiff contends

26 PRM §2534.5 requires the exception amount of an HB-SNF be

27 measured not from its RCL, as was the Secretary's interpretation

28 prior to July 1994, but rather from 112 percent of its peer group

                              12

1    mean, a point significantly higher than the RCL for HB-SNFs due
2    to HB-SNFs' generally incurring higher costs than FS-SNFs.    The
3    difference between 112 percent of the HB-SNF peer group mean and
4    the RCL for HB-SNFs represents a "reimbursement gap" for which an
5    HB-SNF whose costs exceed the HB-SNF RCL can never receive
6    compensation even if it could show that its costs above the HB-
7    SNF RCL were reasonable and incurred for atypical services.
8    Plaintiff contends the Secretary's new interpretation, resulting
9    in the reimbursement gap, is arbitrary and capricious because it
10   is unrelated to alleged inefficiencies to justify the
11   disallowance level.

12        Plaintiff contends the Secretary's practice of reclassifying
13   Plaintiff's indirect costs without making a corresponding
14   reclassification in the peer group used to measure the amount of
15   the exception awarded is arbitrary and capricious.

16

17        A.    Deference to which the Secretary's Final Agency
18              Decision is Entitled
19              1.    Conflicting Precedent
20        Plaintiff relies primarily on the reasoning contained in a
21   federal district court opinion from the Northern District of
22   Iowa, St. Luke's Methodist Hosp. v. Thompson, 182 F.Supp.2d 765
23   (N.D. Iowa 2001).    St. Luke's held that the reimbursement gap
24   created by PRM §2534.5 is an unreasonable interpretation of 42
25   C.F.R. §413.30(f)(1).    St. Luke's, 182 F.Supp.2d at 787.    St.
26   Luke's concluded the Secretary's interpretation of its own
27   regulation is not entitled to substantial deference because PRM
28   §2534.5, promulgated ten years after DEFRA without notice and

                                   13

1  comment rulemaking procedures, represents an abrupt change in the
2  substantive requirements for reimbursable exceptional costs.  *See*
3  *id.*  Although concluding PRM §2534.5 does not inherently conflict
4  with the Medicare statute, the regulation, or the Secretary's
5  previous interpretation, *St. Luke's* found no persuasive evidence
6  supporting the Secretary's position that otherwise potentially
7  reimbursable costs within the reimbursement gap should be
8  irrebuttably excluded.  *See id.*

9       *St. Luke's* recognized its holding contradicted the holding
10  reached a year earlier by the Sixth Circuit in *St. Francis Health*
11  *Care Centre v. Shalala*, 205 F.3d 937 (6th Cir. 2000).  *See St.*
12  *Luke's*, 182 F.Supp.2d at 787 n.19.  *St. Francis* concluded PRM
13  §2534.5 was entitled to substantial deference.  *See St. Francis,*
14  205 F.3d at 943-44.  *St. Francis* held the Secretary's
15  interpretation of the exceptions regulation was not arbitrary or
16  capricious, but instead was a valid exercise of Congressionally
17  delegated authority.  *See id.*  The Secretary was not required to
18  comply with the APA's notice and comment procedures in issuing
19  PRM §2534.5 because the rule does not effect a new substantive
20  reimbursement requirement inconsistent with prior regulations.
21  *See id.* at 947.

22       *St. Luke's* erroneously premises its disagreement with *St.*
23  *Francis* on an intervening Supreme Court case, *Christensen v.*
24  *Harris County,* 529 U.S. 576, 588 (2000) (now disapproved and
25  limited by *Barnhart v. Walton*, – U.S. –, 122 S. Ct. 1265, 1272
26  (2002)), which *St. Luke's* interpreted as announcing a change in
27  the level of deference owed the Secretary's interpretations of
28  Medicare regulations.  *See St. Luke's*, 182 F.Supp.2d at 787 n.19.

14

1

2        ... There appears no question that after *Christensen*

3     ... extreme deference to an interpretive rule is the

4     exception and not the rule. Guided by *Christensen*, this

5     court accorded the Secretary's interpretation much less

6     deference and ultimately found it unpersuasive. Because

7     such contrasting standards of review were applied, the

8     difference in conclusion reached by this Court and the Sixth

9     Circuit is neither irreconcilable nor particularly

10     surprising.

11 *St. Luke's*, 182 F.Supp.2d at 787 n.19. This judicial "creation"

12 by a trial court of a new rule of interpretation for

13 administrative law is unwarranted.

14     The Secretary contends the long-accepted approach in *St.*

15 *Francis* to accord substantial deference to the Secretary's

16 interpretation of the exceptions regulation is correct, and that

17 *St. Luke's* conclusion that *Christensen* requires a different

18 result is erroneous. *See* Doc.18 at p.22 n.16. Plaintiff argues

19 *St. Luke's* approach is correct. *St. Luke's* is entitled to no

20 precedential effect in the Eastern District of California, as a

21 district court decision from outside the Ninth Circuit. *See Hart*

22 *v. Massanari*, 266 F.3d 1155, 1172-73 (9th Cir. 2001).[3]

23

24

25

26     [3]The Iowa court did not have the Supreme Court's later

27 limitation of *Christensen's* suggestion of a limitation of *Chevron*
deference to agency rulemaking. *See Barnhart v. Walton, infra*,

28 122 S. Ct. at 1272.

SENT BY:

2.  *Secretary's Interpretation of Its Own Regulations*
    *Entitled to Substantial Deference*

Established in 1965 under Title XVIII of the Social Security
Act, 79 Stat. 291, as amended, 42 U.S.C. §1395 et seq., Medicare
is a federally funded health insurance program for the elderly
and disabled.  Congress authorized the Secretary to issue
regulations to give content to the broad outlines of the Medicare
statute.  *See* §1395x(v)(1)(A).  That authority encompasses the
discretion to determine the "reasonable cost" of services.  *See*
*Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506-07 (1994)
(concluding the Secretary's interpretation of 42 C.F.R.
§413.85(c) was neither plainly erroneous nor inconsistent with
the regulation).

Provider reimbursement decisions made by the PRRB are
reviewed under the same standards embodied in the APA.  *See* 42
U.S.C. §1395oo(f)(1).  Under the APA, the reviewing court shall
"hold unlawful and set aside agency action, findings, and
conclusions found to be ... arbitrary, capricious, an abuse of
discretion, or otherwise not in accordance with law."  5 U.S.C.
§706(2)(A).  The Secretary's reasonable construction of Medicare
regulations is entitled to substantial deference.  *See Thomas*
*Jefferson*, 512 U.S. at 512 ("we must give substantial deference
to an agency's interpretation of its own regulations") (citing
*Martin v. Occupational Safety And Health Review Comm'n*, 499 U.S.
144, 150 (1991) ("an agency's construction of its own regulations
is entitled to substantial deference") (citations omitted));
*Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 94-95 (1995)
(holding the Secretary's interpretation of 42 C.F.R. §413.20(a)

16

1  as not mandating reimbursement pursuant to generally accepted
2  accounting principles, supported by the regulation's text and the
3  overall structure of the regulations, "is a reasonable regulatory
4  interpretation, and we must defer to it"). "[R]eview under the
5  arbitrary and capricious standard is narrow, and the reviewing
6  court may not substitute its judgment for that of the agency."
7  *United States v. Snoring Relief Labs Inc.*, 210 F.3d 1081, 1085
8  (9ᵗʰ Cir. 2000) (citations and alterations omitted).

9      If the regulation at issue is not ambiguous, it is applied
10  according to its plain meaning. *See Christensen*, 529 U.S. at
11  588. If the regulation is ambiguous, the Secretary's
12  interpretation is entitled to "controlling weight unless it is
13  plainly erroneous or inconsistent with the regulation." *Thomas*
14  *Jefferson*, 512 U.S. at 512 (citing *Bowles v. Seminole Rock & Sand*
15  *Co.*, 325 U.S. 410, 414 (1945)). A court must defer to the
16  Secretary's interpretation unless an alternative reading is
17  compelled by the regulation's plain language or by other
18  indications of the Secretary's intent at the time of the
19  regulation's promulgation. *See Thomas Jefferson*, 512 U.S. at 512
20  (citation and alterations omitted). Because Medicare is a highly
21  complex and technical program, deference to the Secretary's
22  determinations is especially warranted. *See Thomas Jefferson*,
23  512 U.S. at 512; *Alhambra Hosp. v. Thompson*, 259 F.3d 1071, 1076
24  (9ᵗʰ Cir. 2001) ("[T]he Secretary is entitled to considerable
25  deference in interpreting his own regulations, particularly in a
26  regulatory scheme as complex as Medicare.").

27      Further, an agency need not adopt the most natural reading
28  of the regulation, but only a reasonable one. *See Paragon Health*

17

4   exemption requirements was not plainly erroneous) (citing *Pauley*
5   *v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991)).  The role
6   of a court is "not to decide which among several competing
7   interpretations best serves the regulatory purpose." *Thomas*
8   *Jefferson*, 512 U.S. at 512.  Rather, the Secretary's
9   interpretation must be given controlling weight unless it is
10  plainly erroneous or inconsistent with the regulation.  *See id.*
11      "Notably, with respect to statutory interpretation, *Chevron*
12  *v. Natural Resources Defense Council*, 467 U.S. 837 (1984),
13  mandates that absent a clear expression of congressional intent
14  to the contrary, courts should defer to reasonable agency
15  interpretations of ambiguous statutory language." *Friends of the*
16  *Cowlitz v. Fed. Energy Regulatory Comm'n*, 253 F.3d 1161, 1166
17  (9th Cir. 2001), *as amended at* 282 F.3d 609.  "*Chevron* deference
18  is predicated on the assumption that a statute's ambiguity
19  constitutes an 'implicit delegation' to the agency to interpret
20  the statute." *Lujan-Armendariz v. INS*, 222 F.3d 728, 749 (9th
21  Cir. 2000) (citation omitted); *see also United States v. Mead*
22  *Corp.*, 533 U.S. 218, 226 (2001) ("administrative implementation
23  of a particular statutory provision qualifies for *Chevron*
24  deference when it appears that Congress delegated authority to
25  the agency generally to make rules carrying the force of law, and
26  that the agency interpretation claiming deference was promulgated
27  in the exercise of that authority.").
28      *Chevron* analysis, which reviews an administrative agency's

18

interpretation of a statute it administers, consists of two
steps. *See, e.g., CHW W. Bay v. Thompson*, 246 F.3d 1218, 1223
(9th Cir. 2001). Under *Chevron's* first step, "traditional tools
of statutory construction" are employed to determine whether
Congress has expressed its intent unambiguously on the question
before the court. *See Chevron*, 467 U.S. at 843 n.9. "If the
intent of Congress is clear, that is the end of the matter; for
the court, as well as the agency, must give effect to the
unambiguously expressed intent of Congress." *CHW W. Bay*, 246
F.3d at 1223 (citing *Chevron*, 467 U.S. at 842-43) (footnote
omitted). If Congress left a gap for the administrative agency
to fill, *Chevron's* second step "uphold[s] the administrative
regulation unless it is 'arbitrary, capricious, or manifestly
contrary to the statute.'" *Defenders of Wildlife v. Browner*, 191
F.3d 1159, 1162 (9th Cir. 1999) (quoting *Chevron*, 467 U.S. at
844). *Chevron* deference does not require a court to "conclude
that the agency construction was the only one it permissibly
could have adopted ... or even the reading the court would have
reached." *Chevron*, 467 U.S. at 843 n.11.

The Secretary's interpretation of the exceptions provision
in 42 C.F.R. §413.30 is embodied in PRM §2534.5. The PRM is
published by the HCFA under the authority of the Secretary "to
assist interested parties in navigating the shoals of the
Medicare compensation and reimbursement system." *See St. Luke's*,
182 F.Supp.2d at 769 n.2 (citation omitted). PRM provisions are
not subject to formal notice and comment rulemaking procedures
under the APA. PRM guidelines are interpretive rules lacking the
force or effect of law which advise the public as to how the

19

1   agency interprets the statute and regulations it administers.
2   *See Shalala v. Guernsey Mem. Hosp.*, 514 U.S. at 99; *St. Luke's*,
3   182 F.Supp.2d at 769 n.2 (citing *Shalala v. St. Paul-Ramsey Med.*
4   *Ctr.*, 50 F.3d 522, 524 (8th Cir. 1995)).  The PRM prescribes a
5   set of instructions issued by the Secretary that constitutes an
6   administrative interpretation of the Medicare statute and
7   regulations.  *See Paragon Health Network*, 251 F.3d at 1145
8   (citing *Guernsey*, 514 U.S. at 101-02 (referring to PRM provisions
9   as interpretive rules)).
10        Plaintiff contends the Secretary's interpretation of 42
11   C.F.R. §413.30(f)(1), embodied in PRM §2534.5, is not entitled to
12   substantial *Chevron* deference, but is instead entitled only to
13   more limited deference under *Skidmore v. Swift & Co.*, 323 U.S.
14   134 (1944), because it is contained in an agency manual and was
15   not subject to notice and comment rulemaking procedures.  *See*
16   Doc.12 at pp.6-9.  Under *Skidmore*, an agency interpretation is
17   entitled to deference only to the extent it has the "power to
18   persuade."  *See Skidmore*, 323 U.S. at 140 ("The weight [accorded
19   to an administrative] judgment in a particular case will depend
20   upon the thoroughness evident in its consideration, the validity
21   of its reasoning, its consistency with earlier and later
22   pronouncements, and all those factors which give it power to
23   persuade, if lacking power to control."); *Mead Corp.*, 533 U.S. at
24   221 ("under *Skidmore* [a] ruling is eligible to claim respect
25   according to its persuasiveness").  Plaintiff supports its
26   argument by seizing upon the following statement in *Christensen*:
27   "Interpretations such as those in opinion letters -- like
28   interpretations contained in policy statements, agency manuals,

1  and enforcement guidelines, all of which lack the force of law --
2  do not warrant Chevron-style deference."  *Christensen*, 529 U.S.
3  at 587.  Plaintiff contends that since PRM §2534.5 is an
4  interpretive rule contained in an agency manual, it must be
5  afforded only *Skidmore* deference.  *See* Doc.12 at p.8.

6       Plaintiff's attempt to apply *Skidmore* deference to the
7  Secretary's interpretation of its own regulation in an area where
8  Congress has expressly delegated lawmaking authority to the
9  Secretary is misplaced.  *Christensen* involved a challenge to a
10  county's implementation of the Fair Labor Standards Act's
11  ("FLSA") provision that hourly employees must be compensated for
12  overtime by paying them a rate not less than 1 1/2 times their
13  regular hourly wage or by granting them compensatory time at a
14  rate of 1 1/2 hours for every hour worked.  *See Christensen*, 529
15  U.S. at 578-79.  Plaintiffs, county law enforcement officers,
16  agreed to accept compensatory time in lieu of cash as
17  compensation for overtime.  *See Christensen*, 529 U.S. at 580.
18  The county, concerned that many employees were approaching the
19  statutory cap on accrued compensatory time and that it would be
20  forced to pay out large sums for overtime pay, asked the United
21  States Department of Labor, "whether the Sheriff may schedule
22  non-exempt employees to use or take compensatory time."
23  *Christensen*, 529 U.S. at 580.  The Department wrote a letter to
24  the county expressing its interpretation of the statute that,
25  absent a prior agreement to the contrary with an employee,
26  neither the statute nor applicable regulations permit an employer
27  to require the employee to use accrued compensatory time.  *See*
28  *Christensen*, 529 U.S. at 581.  After receiving the letter, the

1  county implemented a policy compelling employees to utilize

2  accrued compensatory time, and the county law enforcement

3  officers challenged the policy as violative of the FLSA. *See*

4  *Christensen*, 529 U.S. at 581.

5      The Court determined that while the FLSA imposes a

6  restriction upon an employer's efforts to prohibit employees' use

7  of accrued compensatory time, the statute says nothing about

8  restricting an employer's efforts to require employees to use

9  compensatory time. The court held that in the face of such

10  silence, the county's policy compelling the use of compensatory

11  time could not be shown to violate the FLSA. *Christensen*, 529

12  U.S. at 585 ("under the FLSA an employer is free to require an

13  employee to take time off work, and an employer is also free to

14  use the money it would have paid in wages to cash out accrued

15  compensatory time").

16      The Court declined to defer to the Department of Labor's

17  contrary interpretation of the FLSA contained in its "opinion

18  letter," in part because it was "not [an interpretation] arrived

19  at after, for example, a formal adjudication or

20  notice-and-comment rulemaking." *See Christensen*, 529 U.S. at

21  587. The court held that substantial deference is not warranted

22  where an agency's interpretation is inconsistent with an

23  unambiguous statute and regulation. *See Christensen*, 529 U.S. at

24  587-88. Similarly, in *Mead*, 533 U.S. 218 (2001), the Court held

25  a tariff classification ruling by the United States Customs

26  Service had no claim to judicial deference under *Chevron*, absent

27  an indication that Congress intended such a ruling to carry the

28  force of law. *See Mead*, 533 U.S. at 221 (holding that under

22

1    *Skidmore* the classification is entitled to respect due to its
2    persuasiveness).

3        Courts "presume that [an agency's] power authoritatively to
4    interpret its own regulations is a component of the agency's
5    delegated lawmaking powers." *Martin*, 499 U.S. at 151. The fact
6    that an interpretation is not the product of formal notice and
7    comment rulemaking does not alone preclude the application of
8    *Chevron* deference. *See Barnhart v. Walton*, – U.S. –, 122 S. Ct.
9    1265, 1272 (2002) (denying any suggestion in *Christensen* of a
10   contrary rule) (citing *Mead*, 533 U.S. at 230-31). Congress
11   explicitly conferred upon the Secretary the authority to
12   promulgate and enforce regulations setting forth criteria for
13   determining reasonable reimbursable costs. *See* 42 U.S.C.
14   §1395x(v)(1)(A), §1395yy(c) ("The Secretary may make adjustments
15   [to the reimbursement limits] to the extent the Secretary deems
16   appropriate, based upon case mix or circumstances beyond the
17   control of the facility. The Secretary shall publish the data
18   and criteria to be used for purposes of this subsection on an
19   annual basis."). The purpose of these rules is to fairly contain
20   unnecessary or unjustified expense in Medicare provider expense
21   reimbursement.

22        Plaintiff's assertion the Ninth Circuit has applied
23   *Christensen* to give no more than *Skidmore* deference to several
24   administrative interpretations not subject to notice and comment
25   rulemaking does not support the contention that only limited
26   *Skidmore* deference should apply to the Secretary's interpretation
27   of regulations it promulgated in furtherance of its
28   Congressionally delegated duty to enforce the Medicare statute

1    and adjudicate reimbursement disputes.  *See Aleman v. Glickman*,

2    217 F.3d 1191, 1196 (9th Cir. 2000) (according only *Skidmore*

3    deference to a Department of Agriculture enforcement guideline

4    because it conflicted with an Act of Congress, the Department's

5    formal regulations, and other informal Department guidelines);

6    *Moore v. Apfel*, 216 F.3d 864, 869 & n.2 (9th Cir. 2000) (holding

7    that an agency's compliance manual is not binding on the agency

8    and declining to review allegations of noncompliance with the

9    manual, citing *Christensen* as dictum in footnote); *Scales v. INS*,

10   232 F.3d 1159, 1165-66 (9th Cir. 2000) (refusing to defer to the

11   State Department's Foreign Affairs Manual because the State

12   Department was not the agency entrusted with determining the

13   citizenship of persons not in the United States, the manual did

14   not specifically interpret the statute at issue, and the

15   interpretation was not subject to notice and comment rulemaking);

16   *Grassi v. Hood*, 251 F.3d 1218, 1220 (9th Cir. 2001) (following

17   *Reno v. Koray*, 515 U.S. 50 (1995), holding Bureau of Prisons

18   program statements are not entitled to the same deference as

19   published agency regulations).

20        None of these cases addresses the deference owed the

21   Secretary in interpreting the Medicare statute and its

22   corresponding regulations.  Only one of Plaintiff's cited cases

23   appears to hold that agency interpretations, not subject to

24   notice and comment rulemaking, are not entitled to substantial

25   deference, *see Grassi*, 251 F.3d at 1220; and this holding relies

26   on a 1995 Supreme Court case directly on point, is explicitly

27   contradicted in *Mead* and other subsequent Supreme Court and Ninth

28   Circuit cases.  *See Mead*, 533 U.S. at 231 ("The fact that the

24

1  tariff classification here was not a product of such formal
2  process does not alone, therefore, bar the application of
3  *Chevron.*"); *Barnhart*, – U.S. –, 122 S. Ct. at 1271 ("the fact
4  that the Agency previously reached its interpretation through
5  means less formal than notice and comment rulemaking does not
6  automatically deprive that interpretation of the judicial
7  deference otherwise its due"); *Edelman v. Lynchburg Coll.*, – U.S.
8  –, 122 S. Ct. 1145, 1150 (2002) ("deference under *Chevron* does
9  not necessarily require an agency's exercise of express
10 notice-and-comment rulemaking power"); *see also Schuetz v. Banc
11 One Mortg. Corp.*, 292 F.3d 1004, 1012 (9th Cir. 2002) (holding
12 "*Chevron* deference is due even though HUD's Policy Statements are
13 not the result of formal rulemaking or adjudication," and
14 refusing to apply *Christensen* because Congress authorized HUD to
15 interpret and enforce the statute and HUD has expertise in the
16 home mortgage lending industry); *Navajo Nation v. Health & Human
17 Servs.*, 285 F.3d 864, 871 (9th Cir. 2002) (refusing to follow
18 *Christensen* strictly and according *Chevron* deference to an
19 informal agency letter issued, not as the result of notice and
20 comment rulemaking, but as a final adjudication on the merits);
21 *Alhambra Hosp.*, 259 F.3d at 1074 (judicial review of the
22 Secretary's interpretation of its own Medicaid regulations is
23 "extremely deferential").

24    *St. Luke's* statement that "'*Chevron*-style deference' does
25 not apply if the agency interpretation is embodied in an informal
26 or 'interpretive' rule" is an inaccurate statement and
27 misinterpretation of the law as it currently exists. *See St.
28 Luke's*, 182 F.Supp.2d at 777. "The agency's interpretation of

25

1  its own regulations must be given controlling weight unless it is
2  plainly erroneous or inconsistent with the regulation." *Ka'*
3  *Makani 'O Kohala Ohana Inc. v. Dept. of Water Supply*, – F.3d –,
4  2002 U.S. App. Lexis 13036, *7 (9th Cir. 2002) (alterations
5  omitted) (citing *Alhambra Hosp.*, 259 F.3d at 1074, *Thomas*
6  *Jefferson*, 512 U.S. at 512, and *Auer, infra*, 519 U.S. at 461).
7  *St. Luke's* observation that *Christensen* announces a change in the
8  level of deference to be applied to agency interpretations of
9  their own regulations has now been explicitly rejected by the
10 Supreme Court: "[T]he fact that the Agency previously reached
11 its interpretation through means less formal than 'notice and
12 comment' rulemaking ... does not automatically deprive that
13 interpretation of the judicial deference otherwise its due....
14 If this Court's opinion in *Christensen* suggested an absolute rule
15 to the contrary, our later opinion in *Mead* denied the
16 suggestion." *Barnhart*, – U.S. –, 122 S. Ct. at 1271–72 (citing
17 *Mead*, 533 U.S. at 230–31 ("the want of [notice-and-comment
18 rulemaking or formal adjudication] does not decide the case, for
19 we have sometimes found reasons for *Chevron* deference even when
20 no such administrative formality was required and none was
21 afforded")). Plaintiff's reliance on *St. Luke's* is unjustified.
22 The view of judicial deference to administrative interpretation
23 expressed in *St. Luke's* has been abrogated.
24     Because the "exceptions" procedure by which an SNF's
25 reimbursement limit may be adjusted upward "is a creature of the
26 Secretary's own regulations, his interpretation of it is, under
27 our jurisprudence, controlling unless plainly erroneous or
28 inconsistent with the regulation." *Auer v. Robbins*, 519 U.S.

1 452, 461 (1997) (citing *Seminole Rock*). ~~The Secretary's~~
2 ~~interpretation of the exceptions provision in 42 C.F.R.~~
3 ~~§413.30(f)(1), embodied in PRM §2534.5, is entitled to~~
4 ~~substantial deference and is valid unless it is arbitrary,~~
5 ~~capricious, an abuse of discretion, or otherwise not in~~
6 ~~accordance with law.~~

8        B.   <u>Validity of the Reimbursement Gap</u>

9           1.   *PRM §2534.5 Is Not Inconsistent with the Medicare*
10                *Statute or 42 C.F.R. §413.30*

11     The Medicare statute grants the Secretary broad discretion
12 to determine the reasonableness of costs for which providers seek
13 reimbursement. 42 U.S.C. §1395x(v)(1)(A). "The Secretary may
14 make adjustments [to the reimbursement limits] to the extent the
15 Secretary deems appropriate." 42 U.S.C. §1395yy(c). Pursuant to
16 this permissive grant of authority, the Secretary promulgated an
17 exceptions process in 42 C.F.R. §413.30(f)(1) pursuant to which
18 established cost limits may be adjusted upward for SNFs that
19 demonstrate they provided atypical services necessary in the
20 efficient delivery of needed health care due to the special needs
21 of their patients. *See* 42 C.F.R. §413.30(f)(1).

22     Neither the statute nor the regulation mandates
23 reimbursement for any amount above the statutory RCL. Any upward
24 adjustment may be "made only to the extent that the costs are
25 reasonable." 42 C.F.R. §413.30(f)(1). The regulation does not
26 address how the Secretary should interpret the reasonableness of
27 costs for which reimbursement is requested under the exceptions
28 process in light of Congress's creation in DEFRA of a two-tiered

 1  system under which FS-SNFs' RCL is 112 percent of the FS-SNF peer
 2  group mean, but HB-SNFs' RCL is the sum of the FS-SNF RCL plus
 3  fifty percent of the difference between 112 percent of the mean
 4  per diem costs for HB-SNFs and FS-SNFs. *See* 42 U.S.C. 1395yy(a).
 5  The legislative history is ambiguous as to why Congress created a
 6  reimbursement gap for HB-SNFs' routine costs. *See St. Luke's*,
 7  182 F.Supp.2d at 782 n.17 (noting "the dearth of on-point
 8  legislative history renders that history unhelpful in this
 9  case"). One reasonable interpretation argued by the Secretary is
10  that Congress determined that approximately fifty percent of the
11  greater cost of HB-SNFs was due to inefficiency and that HB-SNFs
12  should not be reimbursed for any costs incurred within that
13  inefficiency gap. *See St. Francis*, 205 F.3d at 945; *but see St.*
14  *Luke's*, 182 F.Supp.2d at 782-83 (finding unpersuasive the
15  Secretary's attempt to directly read §1395yy's two-tier RCL
16  structure onto the exceptions process in §413.30); AR at 864
17  ("Since a significant portion of the cost differences that
18  remained-were not associated with the wide range of control
19  variables tested (admissions per bed, percent of Medicare days,
20  state and other facility characteristics, patient
21  characteristics, and staffing), inefficiency remained as one
22  possible cause of the costs differences."). PRM §2534.5 reduces
23  the reimbursement to HB-SNFs by the very same proportion that
24  Congress deemed inefficient. The Secretary's exercise of its
25  discretion to deny as unreasonable exceptions requests within the
26  reimbursement gap is not an interpretation inconsistent with the
27  statute or the regulation. *See St. Francis*, 205 F.3d at 946; *St.*
28  *Luke's*, 182 F.Supp.2d at 777 (declining to conclude PRM §2534.5

1  is necessarily inconsistent with the regulatory language).  A
2  reasonable interpretation is a fortiori not arbitrary or
3  capricious.

5          2.   *PRM §2534.5 Is Not Plainly Erroneous*

6       Plaintiff advances a number of arguments why PRM §2534.5 is
7  a plainly erroneous interpretation of the exceptions regulation.

9              a.   CONTEMPORANEITY

10      Plaintiff asserts PRM §2534.5 is invalid because it was not
11  published contemporaneously with either the regulation it
12  interprets or DEFRA's changes to the Medicare statute in 1984,
13  but rather some ten years later.  *See* Doc.12 at p.9.  As noted in
14  *St. Luke's*:

15          ...  PRM §2534.5 was not developed contemporaneously
16      with 42 C.F.R. §413.30 nor, for that matter, with 42 U.S.C.
17      §1395yy.  The regulation was issued in 1974 while the
18      statute was enacted in 1984.  Thus, for nearly ten years
19      following the establishment of the two-tier statutory RCLs,
20      the Secretary consistently interpreted the §413.30
21      exceptions process to measure the HB-SNF exceptions from the
22      statutory RCL—not from a point significantly above it.
23  *St. Luke's*, 182 F.Supp.2d at 779.

24      Any "lack of contemporaneity between the promulgation of the
25  regulation and the Secretary's interpretation of it does not
26  affect the high level of deference we owe to the Secretary.  In
27  the context of judicial deference to agency interpretations of
28  administrative statutes under *Chevron*, an agency construction

                              29

1  formulated well after the statute's enactment is still entitled

2  to deference."  *Paragon Health Network*, 251 F.3d at 1146 (citing

3  *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 740-41

4  (1995)).  "[D]eference to regulatory interpretations does not

5  depend on contemporaneity, since no demonstration that the agency

6  officials had special insight into the intentions behind the

7  passage of the regulation is required.  Instead Congress is

8  presumed to have delegated the primary power to fill regulatory

9  ambiguities to the agency, and courts owe deference to agency

10 decisions that clarify a regulation regardless of the fact that

11 the agency waited to exercise this power."  *Paragon Health*

12 *Network*, 251 F.3d at 1147.

13      A rule that noncontemporaneous interpretations of

14 regulations are presumptively invalid would contravene Congress's

15 intent to delegate interpretive authority to an administrative

16 agency, charged with enforcing the statute and adjudicating

17 disputes, which over time develops and refines its expertise and

18 ability to respond effectively to unforeseen and ever-changing

19 circumstances.  The fact that the Secretary did not publish an

20 interpretation of its exceptions regulation until 1994 does not

21 render that interpretation plainly erroneous.

22

23          b.   CHANGE IN INTERPRETATION

24      Plaintiff argues PRM §2534.5 is invalid because it

25 represents a dramatic change in the interpretation of the

26 exceptions regulation, which formerly resulted in full

27 reimbursement.  *See* Doc.12 at p.9.

28      The Secretary disputes Plaintiff's characterization that

30

1 before PRM §2534.5 the HCFA measured the exception amount from an

2 HB-SNF's RCL, not the HB-SNF peer group mean as §2534.5 requires.

3 *See* Doc.17 at p.2; Doc.14 at ¶12.  Plaintiff cites no specific

4 evidence in the record indicating the Secretary's interpretation

5 of 42 C.F.R. §413.30 changed in 1994 upon the issuance of PRM

6 §2534.5.  The Secretary states its pre-1994 practice was (except

7 for nursing services) to evaluate exceptions requests by

8 comparing the SNF's per diem costs to those of its peer group

9 mean.  *See* Doc.18 at p.12.  There is evidence in the record that

10 the Secretary's pre-1994 and post-1994 methodologies for

11 evaluating exceptions requests were similar.  *See, e.g.*, AR at

12 1013-16.  It is possible the Secretary's practice was to evaluate

13 exception requests from 112 percent of the HB-SNF peer group

14 mean, in part because prior to 1984, that figure was the

15 statutory RCL for HB-SNFs.  If exceptions requests were evaluated

16 by reference to the peer group mean instead of the statutory RCL,

17 DEFRA's change to the statutory RCL would not necessarily have

18 changed the Secretary's methodology for evaluating exceptions

19 requests.  *See* Doc.18 at p.12 ("although Congress changed the

20 routine cost limits for HB-SNFs in 1984, the published cost

21 limits since 1980 unequivocally establish that CMS had

22 consistently used a methodology under which SNFs' per diem costs

23 were compared to a percentage of the peer group mean").

24       The Secretary does not explicitly contend PRM §2534.5

25 reflects the Secretary's consistent interpretation of the

26 exceptions regulation since 1984, and there are indications in

27 other cases that the new PRM §2534.5 issued in 1994 embodies a

28 new methodology.  For example, the provider in *St. Francis*

1  received full compensation under the exceptions regulation for

2  its direct service costs in excess of the RCL in the years 1984-

3  1990, but was denied reimbursement for costs falling within the

4  reimbursement gap after the new PRM §2534.5 was issued. *See St.*

5  *Francis*, 205 F.3d at 939 & n.2, 948 (Gilman, J., dissenting); *St.*

6  *Luke's*, 182 F.Supp.2d at 779-80 ("PRM §2534.5 represents a stark

7  change in the Secretary's previous, long-held position as to the

8  meaning of the regulation"). It is unclear to what extent the

9  Secretary changed methodology following Transmittal No. 378 and

10 therefore how inconsistent the interpretation in PRM §2534.5 is

11 with the Secretary's prior interpretation.

12      Assuming, *arguendo*, Transmittal No. 378 represented a change

13 in the Secretary's interpretation of the exceptions regulation,

14 it is still entitled to deference. The Secretary is not estopped

15 from changing a view he believes to have been grounded upon a

16 mistaken legal interpretation. Where the agency's interpretation

17 of its regulation is at least as plausible as competing ones,

18 there is little, if any, reason not to defer to its construction.

19 *See Thomas Jefferson*, 512 U.S. at 517 (citing *Good Samaritan*

20 *Hosp. v. Shalala*, 508 U.S. 402, 417 (1993) (alterations

21 omitted)). "An administrative agency is not disqualified from

22 changing its mind; and when it does, the courts still sit in

23 review of the administrative decision and should not approach the

24 statutory construction issue de novo and without regard to the

25 administrative understanding of the statutes." *NLRB v. Int'l*

26 *Ass'n of Bridge*, 434 U.S. 33, 351 (1978).

27      "On the other hand, the consistency of an agency's position

28 is a factor in assessing the weight that position is due." *Good*

32

1   *Samaritan Hosp.*, 508 U.S. at 417. "[A]n agency's interpretation
2   of a statute or regulation that conflicts with a prior
3   interpretation is '"entitled to considerably less deference" than
4   a consistently held agency view.'" *Thomas Jefferson*, 512 U.S. at
5   515 (holding that maxim does not apply absent persuasive evidence
6   the Secretary has interpreted a provision in an inconsistent
7   manner) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, n.30
8   (1987) (rejecting agency interpretation of statute on ground that
9   interpretation was not consistent with congressional intent, and
10   agency's interpretation was not entitled to heightened deference
11   because it had been inconsistent over time) (quoting *Watt v.*
12   *Alaska*, 451 U.S. 259, 273 (1981) (rejecting agency's revised
13   interpretation of a ten-year-old statute, proposed by the agency,
14   in favor of the agency's contemporaneous interpretation which was
15   "inescapably" more consistent with Congressional intent))). "How
16   much weight should be given to the agency's views in such a
17   situation ... will depend on the facts of individual cases."
18   *Good Samaritan Hosp.*, 508 U.S. at 417; *see, e.g., Fed. Election*
19   *Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37
20   (1981) (observing that the "thoroughness, validity, and
21   consistency of an agency's reasoning are factors that bear upon
22   the amount of deference to be given an agency's ruling," but
23   ultimately deferring to inconsistent agency position).

24      An agency's current view, although inconsistent with a prior
25   interpretation, should be accorded special weight if it "closely
26   fits the design of the statute as a whole and its object and
27   policy." *Good Samaritan Hosp.*, 508 U.S. at 417-18 (alterations
28   and citation omitted). The Medicare statute unequivocally

1  authorizes the Secretary to make adjustments to reimbursement
2  limits to the extent he "deems appropriate." *See* 42 U.S.C.
3  §1395yy(c). The regulation implementing the Secretary's
4  exceptions policy establishes a two-prong test for reimbursement
5  of costs above the statutory RCL. The amount by which a provider
6  exceeds the RCL must be 1) reasonable and 2) atypical. There is
7  no dispute Plaintiff exceeded all of the benchmarks established
8  by the HCFA to determine whether it had provided atypical
9  services. *See* Doc.14 at ¶15; Doc.17.

10     Here, reimbursement was denied on the ground the atypical
11 costs were deemed not reasonable because they fell within the
12 reimbursement gap the Secretary determined was appropriately
13 nonreimburseable due to the inefficiency of HB-SNFs as compared
14 to FS-SNFs. The Secretary's decision to enforce a reimbursement
15 gap for HB-SNF exceptions requests in the exact proportion
16 Congress prescribed should apply to such statutory RCLs "closely
17 fits the design of the statute as a whole and its object and
18 policy." *Good Samaritan Hosp.*, 508 U.S. at 417-18. As such,
19 this interpretation is entitled to substantial deference. That
20 other methodologies could have been implemented in a manner
21 plausibly consistent with the statue and regulations, *see* Doc.20
22 at pp.7-8, does not render the Secretary's equally plausible
23 interpretation invalid. *See Thomas Jefferson*, 512 U.S. at 517;
24 *Good Samaritan Hosp.*, 508 U.S. at 418-19 ("[W]here, as here, the
25 [Medicare] statute expressly entrusts the Secretary with the
26 responsibility for implementing a provision by regulation, our
27 review is limited to determining whether the regulations
28 promulgated exceeded the Secretary's statutory authority and

34

1  whether they are arbitrary and capricious.") (citation omitted).

2  *St. Luke's* found the Secretary's explanation for why it

3  changed its interpretation ten years after DEFRA unpersuasive.

4  *See St. Luke's*, 182 F.Supp.2d at 780. Here, the Secretary

5  explains the ten-year "delay" in issuing the new PRM $2534.5.

6  The "Secretary's change was made in response to new information

7  that became available in administering the exceptions process."

8  Doc.18 at p.35. As noted in *St. Luke's*, at the time Congress

9  passed DEFRA in 1984, there was insufficient information

10  available to make an "accurate assessment of the contributing

11  factors to the cost difference[s]" between HB-SNFs and FS-SNFs.

12  *St. Luke's*, 182 F.Supp.2d at 780-81 (citing HCFA Report to

13  Congress: "Study of the Skilled Nursing Facility Benefit Under

14  Medicare," (Jan. 1985), a preview of which was requested by

15  Congress prior to passage of DEFRA, *see* AR at 1012). After

16  DEFRA's enactment in 1984, the HCFA continued to compile the data

17  necessary to develop a peer group to quantify nursing hour direct

18  costs. The Secretary explains "the big problem we had in

19  developing this peer group and the reason it took so many years

20  after DEFRA to come out with this transmittal, we had a very

21  difficult time coming up with a peer group to quantify nursing

22  hours." AR at 1014. The Secretary's reasonable explanation for

23  its delay in issuing Transmittal 378 supports its contention that

24  any inconsistency in its current interpretation should not affect

25  the substantial deference owed the Secretary's interpretation of

26  its own regulations.

27  "The fact that the agency has from time to time changed its

28  interpretation ... does not ... lead us to conclude that no

35

1  deference should be accorded the agency's interpretation of the
2  statute.  An initial agency interpretation is not instantly
3  carved in stone.  On the contrary, the agency, to engage in
4  informed rulemaking, must consider varying interpretations and
5  the wisdom of its policy on a continuing basis." *Chevron*, 467
6  U.S. at 863-64; *see also Smiley v. Citibank*, 517 U.S. 735, 742
7  (1996) ("Of course the mere fact that an agency interpretation
8  contradicts a prior agency position is not fatal.").  "The
9  Secretary's position is in no sense a 'post hoc rationalization'
10 advanced by an agency seeking to defend past agency action
11 against attack." *Auer*, 519 U.S. at 462 (citing *Bowen v.*
12 *Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988)).  The
13 complained-of interpretation is contained in the PRM and was
14 adopted prior to fiscal year 1995 and long before this
15 litigation.  The issuance of the new PRM §2534.5 gave notice to
16 Plaintiff and the public of the reimbursement gap for exceptions
17 requested by HB-SNFs.  Subsequent reliance on any inconsistent
18 prior interpretation of the exceptions regulation is
19 unreasonable.  *See Paragon Health Network*, 251 F.3d at 1147 n.4.
20      Any inconsistency in the Secretary's current interpretation
21 of the exceptions regulation with prior interpretations does not
22 render the reimbursement gap in PRM §2534.5 plainly erroneous,
23 arbitrary, or capricious.  *See St. Francis*, 205 F.3d at 947 n.11
24 (rejecting provider's argument the Secretary's inconsistent
25 interpretation of the exceptions regulation rendered it invalid).
26
27           c.    DISCRIMINATION BETWEEN FS-SNFS AND HB-SNFS
28      Plaintiff contends PRM §2534.5 arbitrarily discriminates in

36

1 favor of FS-SNFs and against HB-SNFs. *See* Doc.12 at p.20:12-25.
2 Congress determined FS-SNFs should be reimbursed more fully than
3 HB-SNFs and established different statutory levels of RCLs for
4 the two types of providers. The Secretary made a rational
5 inference from this Congressional determination and its own
6 experience and expertise in administrating the Medicare
7 reimbursement statute and regulations that some of the cost
8 difference between provider types was due to HB-SNFs' greater
9 inefficiency, and that reimbursements for HB-SNFs under the
10 exceptions process should be discounted by an amount representing
11 that relative inefficiency. Congress made the choice in DEFRA in
12 1984. Plaintiff does not suggest this statute is beyond
13 Congress's legislative authority. PRM §2534.5 is a rational way
14 of preventing HB-SNFs from recovering cost amounts Congress
15 recognized were due to inefficiency and the Secretary deemed
16 unreasonable. The "discrimination" in PRM §2534.5 is rational,
17 permissible, and not plainly erroneous.
18
19                    d.    CROSS-SUBSIDIZATION
20      Plaintiff cites *St. Luke's* for the proposition that PRM
21 §2534.5 violates the Medicare statute's prohibition against
22 cross-subsidization:
23           ...  PRM §2534.5 is problematic because a provider with
24      typical costs that fall within the RCL but that exceeds the
25      RCL only because it provides necessary atypical services is
26      nevertheless precluded from reimbursement for those services
27      within the gap.  Rather, the Secretary applies an
28      irrebuttable presumption that such costs are not reasonable.

                              37

1     Thus, non-Medicare recipients bear the full brunt of all

2     costs incurred within the gap even though had those same

3     services been provided to the same patients above or below

4     the gap they would be reimbursable.

5 *St. Luke's*, 182 F.Supp.2d at 787.

6     Plaintiff's cross-subsidization argument is a nonstarter.

7 The Medicare statute prohibits payors from "cross-subsidizing"

8 each other.  *See* 42 U.S.C. §1395x(v)(1)(A).  "The key point here

9 is that Congress provided only that the cost of 'covered'

10 services should not be unfairly shifted to non-Medicare

11 patients."  *North Clackamas Cnty. Hosp. v. Harris*, 664 F.2d 701,

12 707 (9th Cir. 1980).  Amounts falling within the reimbursement

13 gap are unreasonable and are not "covered" costs.  As such, they

14 cannot be unfairly shifted to non-Medicare patients in violation

15 of the prohibition against cross-subsidization.  There is no

16 evidence such cost-shifting has occurred.

17

18     3.   *PRM §2534.5 Is Not a Substantive Rule in Invalid*

19        *Circumvention of the APA's Rulemaking Procedures*

20     Plaintiff contends the reimbursement gap in PRM §2534.5 is

21 invalid because it has not been adopted pursuant to the APA's

22 notice and comment rulemaking procedures.  *See* Doc.12 at p.14.

23 Plaintiff contends PRM §2534.5 is not an interpretive rule, but

24 is instead a substantive rule which adds a new requirement for

25 exceptions eligibility.  *See id.* at p.15.  Plaintiff asserts the

26 PRM §2534.5 reimbursement gap is invalid because it was not

27 formally promulgated as a regulation in accordance with APA

28 requirements.  *See id.*

1    The APA defines a "rule" as "the whole or a part of an

2    agency statement of general or particular applicability and

3    future effect designed to implement, interpret, or prescribe law

4    or policy or describing the organization, procedure, or practice

5    requirements of an agency." 5 U.S.C. §551(4). Rulemaking is the

6    "agency process for formulating, amending, or repealing a rule."

7    5 U.S.C. §551(5). The APA's notice and comment rulemaking

8    requirements do not apply to "to interpretative rules, general

9    statements of policy, or rules of agency organization, procedure,

10   or practice." 5 U.S.C. §553(b)(A), (d)(2). If PRM §2534.5 is an

11   "interpretive rule," the lack of notice and comment rulemaking

12   does not render the interpretation invalid.

13       PRM provisions have been described as "interpretive rules"

14   lacking the force and effect of law. *See Guernsey*, 514 U.S. at

15   101-02. PRM §2534.5 "does not effect new substantive

16   reimbursement standards inconsistent with prior regulations-the

17   central characteristic of a substantive rule." *St. Francis*, 205

18   F.3d at 947 (citing *Guernsey*, 514 U.S. at 99). APA rulemaking

19   would be required if PRM §2534.5 adopted a new position

20   inconsistent with any of the Secretary's existing regulations.

21   *See Guernsey*, 514 U.S. at 100. Because the interpretation

22   embodied in PRM §2534.5 is not inconsistent with the statute or

23   regulations, the fact that it may be inconsistent with a prior

24   interpretation of the exceptions regulation does not mean it is a

25   substantive rule in the guise of an interpretive guideline. *See*

26   *id.*

27       PRM §2534.5 reasonably interprets the statute and regulation

28   and does not "add a new requirement" for exceptions reimbursement

39

1  eligibility. Doc.12 at p.18:26. The exceptions process provided
2  in the regulation requires providers meet a two-prong test for
3  reimbursement eligibility: 1) reasonableness and 2) atypicality.
4  PRM §2534.5 interprets "reasonableness," an existing eligibility
5  requirement. There is no "basis for suggesting that the
6  Secretary has a statutory duty to promulgate regulations that,
7  either by default rule or by specification, address every
8  conceivable question in the process of determining equitable
9  reimbursement." *Guernsey*, 514 U.S. at 96. The Secretary "is
10 free to write the regulations as broadly as he wishes, subject
11 only to the limits imposed by the statute." *Auer*, 519 U.S. at
12 463. "As to particular reimbursement details not addressed by
13 h[is] regulations, the Secretary relies upon an elaborate
14 adjudicative structure which includes the right to review by the
15 Provider Reimbursement Review Board, and, in some instances, the
16 Secretary, as well as judicial review in federal district court
17 of final agency action." *Id.* (citing 42 U.S.C. §1395oo(f)(1) and
18 *Bethesda Hosp. Assn. v. Bowen*, 485 U.S. 399, 400-401 (1988)).
19      Plaintiff contends the position of the Fifth and D.C.
20 Circuits that "the APA requires an agency to provide an
21 opportunity for notice and comment before substantially altering
22 a well established regulatory interpretation" applies here. *See*
23 Doc.12 at p.16; *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629
24 (5th Cir. 2001); *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d
25 1030, 1034 (D.C. Cir. 1999) ("When an agency has given its
26 regulation a definitive interpretation, and later significantly
27 revises that interpretation, the agency has in effect amended its
28 rule, something it may not accomplish without notice and

that does no more than clarify the interpretation of a statute is
necessarily interpretive in character, even if that
interpretation has consequences for the rights of the parties");
*White v. Shalala*, 7 F.3d 296, 304 (2nd Cir. 1993) ("If the rule
is an interpretation of a statute rather than an extra-statutory
imposition of rights, duties or obligations, it remains
interpretive even if the rule embodies the Secretary's changed
interpretation of the statute."); *Metro. Sch. Dist. of Wayne
Township v. Davila*, 969 F.2d 485 (7th Cir. 1992) ("an agency's
change in its reading of the statute does not necessarily make
the rule announcing the change [substantive]"); *Paragon Health
Network*, 251 F.3d at 1147 n.4 (refusing to consider the D.C.
Circuit's position that to change a previously established
interpretation of a regulation an agency must follow notice and
comment procedures); *see also Warder v. Shalala*, 149 F.3d 73,
81-82 (1st Cir. 1998) (notice and comment is not required solely
because a new interpretive rule contradicts an old one).

In the Ninth Circuit, an agency interpretation does not
become a substantive rule requiring notice and comment by virtue
of its inconsistency with prior agency interpretations unless it
is "inconsistent with another rule having the force of law, not
just any agency interpretation regardless of whether it had been

41

1  codified." *Chief Probation Officers v. Shalala*, 118 F.3d 1327,
2  1337 (9th Cir. 1997). PRM §2534.5 is not inconsistent with any
3  prior regulation or statute. Any prior agency interpretation
4  with which PRM §2534.5 is inconsistent was not a rule having the
5  force of law. The purported inconsistency between PRM §2534.5
6  and prior agency interpretations of the exceptions process did
7  not transform the guidance manual's interpretive guideline into a
8  substantive rule requiring notice and comment pursuant to APA
9  rulemaking procedures.

10     The Secretary is congressionally authorized to administer
11  and enforce the Medicare statute in accordance with its own
12  regulations and expert in the complex field of Medicare
13  administration. The Secretary's interpretation of HHS
14  regulations is entitled to substantial deference. The
15  interpretation of the exceptions regulation embodied in PRM
16  §2534.5 is not arbitrary, capricious, inconsistent with the
17  statute or regulations, nor plainly erroneous. PRM §2534.5 is a
18  valid interpretive rule. The Secretary's final decision denying
19  Plaintiff's request for reimbursement of costs within the
20  reimbursement gap is AFFIRMED.

21

22     C.   The Secretary's Reclassification of Directly Assigned
23          Costs into Indirect Cost Centers

24     Plaintiff contends the Intermediary improperly reclassified
25  certain of its costs as indirect (rather than direct) costs
26  during the exceptions process without making a corresponding
27  reclassification in the national peer group. *See* Doc.12 at p.21.
28     The PRRB concluded:

1      ... that the Intermediary properly followed the
2      instructions for reclassifying the Provider's costs pursuant
3      to the instruction in HCFA Transmittal 378.  The Board notes
4      that the Provider did not provide sufficient evidence to
5      prove that HCFA improperly developed the peer groups.

6      The Board notes that HCFA Pub. 15-1 §§2534.5B and
7      2534.10 provide that a provider's directly assigned indirect
8      expenses be reassigned to the appropriate indirect expense
9      cost center in the peer group identified with the type of
10     cost incurred.  These costs are then compared with the
11     respective peer group costs in order to determine if an
12     exception is warranted.

13     ... Although the Board agrees that it may be
14     appropriate to make adjustments to correct classification of
15     data used to create the national peer groups, the Board did
16     not find any evidence in the record that they were
17     constructed in an erroneous manner.  The Board finds no
18     specific documentary evidence as to the extent to which data
19     used to construct the national peer groups actually
20     contained unreclassified costs.

21     The Board finds that the Intermediary properly
22     calculated the Provider's exception and that sufficient
23     proof that the national peer groups w[ere] improperly
24     constructed was not presented.

25  AR at 25-26.

26     The Secretary's decision must be held unlawful and set aside
27  if it is "arbitrary, capricious, an abuse of discretion, or
28  otherwise not in accordance with law" or "unsupported by

43

1   substantial evidence in a case ... reviewed on the record of an

2   agency hearing provided by statute." 5 U.S.C. §706(2)(A), (E).

3       Plaintiff does not ~~contest the peer group ~~~~~~~~~~~~~~~~~~~~ ~~usly~~

4   ~~constructed on that data used to construct the national~~ peer

5   ~~groups must be reconstituted.~~  See Doc.20 at p.17:13-20.

6   ~~Plaintiff does not dispute the construction of peer groups based~~

7   ~~on cost data~~ as reported by providers.  See id.; but see Doc.12

8   at pp.25-26 (contending the peer group's costs must be

9   reclassified if the provider's costs are reclassified).

10  ~~Plaintiff seeks the peer reclassification of its own costs,~~

11  because without a corresponding ~~reclassification of costs~~ of

12  other providers used in the construction of the national peer

13  ~~group, the results of comparing Plaintiff's reclassified~~ costs

14  with the non-reclassified costs of the peer group are arbitrarily

15  ~~skewed.~~  See id.

16      Plaintiff contends that California law requires that it

17  classify as direct costs the costs reclassified as indirect costs

18  by the Intermediary.  See Doc.12 at p.23; AR at 107 ("California

19  hospitals are required to follow the chart of accounts, which are

20  published by the Office of Statewide Health Planning and

21  Development ('OSHPD')").  However, there is no prohibition cited

22  by Plaintiff that it is improper to report costs to a state

23  agency to satisfy state law and to reclassify such costs to

24  indirect for federal Medicare reimbursement purposes.  PRM

25  §2534.10 contains its own criteria for direct and indirect costs

26  applicable to the exceptions process, and it requires

27  intermediaries and providers to reclassify costs "[w]hen a

28  provider has directly assigned any indirect costs."  PRM

1  §2534.10A. Plaintiff contends: "As we can best understand it,"
2  Transmittal No. 378 governing exceptions requests requires a two-
3  step process. First, the provider's costs are reclassified
4  according to the instructions. Second, the costs of the peer
5  group members are reclassified in the same way. See, e.g., PRM
6  §2534.5(B) ("If indirect costs are directly assigned (e.g.
7  nursing administration (indirect cost) assigned to the direct
8  cost center), the indirect cost elements must be identified and
9  reassigned, for the purpose of constructing the peer group, to
10 the indirect cost center identified with the type of cost
11 incurred."). Since reimbursement exceptions are available only
12 for costs that exceed 112% of the peer group mean, a reduction in
13 the provider's costs (due to reclassification) and/or a failure
14 to reduce the peer group mean costs (by not reclassifying the
15 peer group members' costs) results in a decreased exceptions
16 reimbursement for the provider ($135,000 in this case). See AR
17 at 107-110.

18     The Secretary contends the Medicare reports upon which the
19 peer groups are constructed, "taking [into account] the fact that
20 some providers might over-report in a particular cost center,
21 [and] the fact that it's an average," are sufficiently accurate
22 to use in calculating exceptions. See AR at 148. The record is
23 unclear as to the extent to which the settled reports which make
24 up the peer groups incorporate reclassified costs. See AR at
25 162. It is undisputed that "Transmittal No. 378 reflects that no
26 reclassifications occurred before the peer groups were
27 constructed." See Doc.14 at ¶36; Doc.17. Exactly what is meant
28 by this "undisputed fact" is unclear. The parties dispute the

SENT BY:

Case 1:07-cv-01000-RBW   Document 15-3   Filed 02/07/2008   Page 46 of 52
Case 1:99-cv-02765   8-13- 2   11:45   OGC HCFA DOJ   HHS OGC HCFA DIV #44/51

1  extent to which the costs used to construct the peer groups were
2  reclassified prior to reporting or were properly classified by
3  providers and/or their intermediaries in the first instance.
4  However, the Secretary does not directly contend that the
5  reclassification required by Transmittal No. 378 to be made in
6  the peer groups was in fact made.  The Secretary contends that
7  most of the settled cost reports used to construct the peer
8  groups properly classified costs in the first place, apparently
9  obviating the need for reclassification.  *See* AR at 25, 148-49;
10 *but see* AR at 162 ("Q.  [W]ere you implying that when the peer
11 groups were developed ..., that most of the intermediaries were
12 reclassed, the costs that had been classified as direct back to
13 indirect before they settled the reports?  A.  We don't know.  I
14 don't know.").

15      The HCFA's view is that the peer groups for purposes of
16 calculating exceptions requests are not designed to be adjusted
17 for every provider on a case-by-case basis.  *See* AR at 164, 168.
18 A procedure requiring the modification of peer groups each time a
19 provider requests an exception would contravene the purpose of
20 peer groups which are intended to be universally applicable.  *See*
21 *id.*  To the extent Transmittal No. 378 or the letter from James
22 Kenton of the HCFA, dated September 29, 1997,[4] may be

23      _____

24      [4]Plaintiff contends the letter from James Kenton to Karen
   Hyman, dated September 29, 1997, *see* AR at 904, explains "that if
25 the requesting provider's costs were reclassified from the direct
   cost center to indirect cost centers, the intermediary should
26 also proportionately reclassify the peer group." Doc.12 at p.25.
27 The letter from James Kenton appears not to state any such
   proposition.  The letter states, in relevant part:
28      In accordance with a memorandum dated March 13, 1995

46

1 characterized as suggesting a contrary approach, the Secretary

2 disputes such a characterization. *See* AR at 150-55.

3     Plaintiff contends the spreadsheet used by the Intermediary

4 to make the reclassification of Plaintiff's costs demonstrates a

5 reclassification use to be made for both Plaintiff and the peer

6 group. *See* Doc.12 at p.26:2-5; AR at 202. The spreadsheet left

7 blank a column reserved for reclassification of the peer group.

8 *See* AR at 202, col. C-1. The Secretary contends the spreadsheet

9 was prepared for the PRRB proceeding and is not the actual sheet

10 used in the construction of the peer group. The Secretary

11 contends an example of the peer group comparison outlined in the

12 PRM is attached as Appendix A to Transmittal 378 and does not

13

---

14

15 from HCFA Central Office to all HCFA Regional Offices, an

16 exception for direct salary costs is computed as the

provider's direct salary per diem cost in excess of the peer

17 group direct salary per diem cost. The peer group direct

salary per diem cost is determined by dividing the

18 provider's actual percent of salary costs by total direct

costs and applying this percentage to the peer group direct

19 per diem costs. No exception is allowed for the non-salary

direct cost per diem. However, if the provider can

20 disaggregate the items included as non-salary direct costs

into another cost center in the peer group, e.g. central

21 services and supply, it could combine these costs with costs

already included in that costs center. The portion of the

22 peer group amount for non-salary direct costs associated

with costs that were redistributed to the other cost center

23 of the peer group would also need to be combined with the

peer group amount for that cost center. This could result

24 in an additional exception amount for some of the provider's

costs previously categorized as non-salary direct costs.

25 Any non-salary direct costs that can not be redistributed

into a different cost center on the peer group will be left

26 in the peer group as a non-salary direct costs and no

exception is allowed for these costs.

27

28 AR at 904.

47

1   include a column similar to column C-1 in the Intermediary's
2   spreadsheet.[5]  The absence of a peer group comparison on the
3   Intermediary's spreadsheet presented during the PRRB hearing does
4   not, by itself, demonstrate no reclassification was made in the
5   construction of the peer group or that the peer group was
6   improperly constructed.

7        The Secretary tacitly admits no reclassification was made in
8   the construction of peer groups as required by Transmittal No.
9   378.  The PRRB found "that it may be appropriate to make
10  adjustments to correct classification of data used to create the
11  national peer groups," AR at 26, but it made no finding as to the
12  effect of the Secretary's failure to reclassify costs in the
13  construction of the peer groups.  Without a finding by the Board
14  as to the extent to which San Joaquin's exceptions reimbursement
15  was affected by the Secretary's failure to reclassify costs, the
16  Secretary's position that the effect was minimal and its decision
17  not to reclassify costs in the construction of the peer groups
18  was not arbitrary and capricious cannot be assessed.

19       "Medicare and Medicaid provisions 'are among the most
20  completely impenetrable texts within the human experience.'"
21  Alhambra Hosp., 259 F.3d at 1076 (quoting Rehab. Ass'n of
22  Virginia v. Kozlowski, 42 F.3d 1444, 1450 (4th Cir. 1994)).  The
23  complexity of the Medicare reimbursement scheme, many details of

24  _____

25       [5]Plaintiff contends the HCFA's witness at the PRRB hearing
26  testified that the spreadsheet used by the Intermediary was a
    standard form used in the exception process.  See Doc.12 at p.26
27  (citing AR at 146).  The witness later testified column C-1 was
    not present on the standard form and that the Intermediary's
28  spreadsheet was not a standard form.  See AR at 170-71.

1  which are not included in any written form, makes the precise
2  process for calculating exceptions somewhat open to
3  interpretation.  See, e.g., AR at 862 (responding that no
4  documents exist relating to any reclassification of costs made by
5  the HCFA in computing peer group per diem amounts).  However, the
6  PRM requires national peer groups to be constructed using
7  properly classified costs.  The parties do not dispute that no
8  reclassification of data took place from settled cost reports
9  used to construct the national peer groups against which San
10  Joaquin's exceptions reimbursement amount was calculated.  See
11  Doc.14 at ¶36; Doc.17.    The PRRB's conclusion "that the
12  Intermediary properly calculated the Provider's exception," AR at
13  26, cannot be supported on the record.  A finding by the PRRB
14  must be made as to the affect of the Secretary's failure to
15  reclassify costs in peer group construction on the amount San
16  Joaquin's exceptions reimbursement before it can be determined
17  whether the Secretary's decision not to reclassify costs in the
18  peer group was arbitrary, capricious, or plainly erroneous manner
19  inconsistent with the PRM.

20    The Secretary's decision upholding the Intermediary's
21  reclassification of certain of Plaintiff's costs is REMANDED to
22  the PRRB for a finding on the effect of the Secretary's failure
23  to reclassify costs in peer group construction on the amount San
24  Joaquin's exceptions reimbursement.

25

26                          V.  CONCLUSION

27    Plaintiff's motion for summary judgment, see Doc.11, on the
28  issue of the Secretary's final decision denying Plaintiff's

1   request for reimbursement of costs within the reimbursement gap

2   is DENIED. Defendant's motion for summary judgment, see Doc.15,

3   on the reimbursement gap issue is GRANTED.

4       Decision on the parties motions for summary judgment on the

5   issue reclassification of costs cannot be made pending a finding

6   by the PRRB as to the effect of the Secretary's failure to

7   reclassify costs in peer group construction on the amount San

8   Joaquin's exceptions reimbursement.

9       This case is REMANDED to the PRRB to make a finding as to

10  the effect of the Secretary's failure to reclassify costs in peer

11  group construction on the amount San Joaquin's exceptions

12  reimbursement

13      Within five (5) days following the date of service of this

14  decision, Defendant shall lodge a proposed order in conformity

15  with this decision.

16

17  SO ORDERED.

18

    DATED:  August 13, 2002.

19

20                                  _____

21                                      Oliver W. Wanger
                                    UNITED STATES DISTRICT JUDGE

22

23

24

25

26

27

28

                                    50

08/10/2002 TUE 09:39 FAX                                                    ☒002/0

1   FRANK P. FEDOR, CA Bar No. 110915
    MURPHY AUSTIN ADAMS SCHOENFELD LLP            FILED
2   1000 G Street, Third Floor
    P.O. Box 131                          LODGED        2002 SEP -4 P 4: 38
3   Sacramento, CA 95812-1319
    Telephone:   (916) 446-2300           AUG 27 2002      CLERK, US DIST. COURT
4   Facsimile:   (916) 503-4000                           EASTERN DIST OF CALIF
                                            CLERK, U.S. DISTRICT COURT   AT FRESNO
5                                        EASTERN DISTRICT OF CALIFORNIA
    Attorneys for Plaintiff                              BY_____ DEPUTY
6   SAN JOAQUIN COMMUNITY HOSPITAL            DEPUTY CLERK

7
                    UNITED STATES DISTRICT COURT
8
                    EASTERN DISTRICT OF CALIFORNIA
9

10
    SAN JOAQUIN                    )    NO.   CIV-F-01-5733 OWW DLB
11  COMMUNITY HOSPITAL,            )
                                   )    [PROPOSED] ORDER:
12              Plaintiff,         )    (1) DENYING PLAINTIFF'S MOTION FOR
                                   )    SUMMARY JUDGMENT AND GRANTING
13                                 )    DEFENDANT'S MOTION FOR SUMMARY
        v.                         )    JUDGMENT ON THE REIMBURSEMENT
14                                 )    GAP ISSUE; AND
    TOMMY G. THOMPSON, Secretary   )    (2) REMANDING THE
15  of the United States Department of )  RECLASSIFICATION OF COSTS ISSUE
    Health and Human Services,     )    TO THE PROVIDER REIMBURSEMENT
16                                 )    REVIEW BOARD FOR A FURTHER
                Defendant.         )    FINDING
17                                 )

18      For the reasons set forth in the court's MEMORANDUM DECISION AND ORDER RE:

19  CROSS MOTIONS FOR SUMMARY JUDGEMENT, filed on August 13, 2002, IT IS ORDERED

20  that:

21      (1)    Plaintiff's Motion for Summary Judgment on the issue of the Secretary's final decision

22  denying Plaintiff's request for reimbursement of costs within the reimbursement gap is denied.

23  Defendant's Motion for Summary Judgment on the reimbursement gap issue is granted;

24      (2)    Decision on the parties Motions for Summary Judgment on the reclassification of costs

25  issue cannot be made without a finding by the Provider Reimbursement Review Board as to the effect

26  of the Secretary's failure to reclassify costs in the peer group construction on the amounts of San

27  Joaquin's exceptions reimbursement; and

28

                             _____
                                    [PROPOSED ORDER]                    3.015/12649

# FACSIMILE COVER PAGE

U.S. Dept. of Health and Human Services
Office of the General Counsel
Centers for Medicare & Medicaid Services Division
Mailstop C2-05-23 Central Building
7500 Security Boulevard
Baltimore, MD 21244-1850
Fax No. (410) 786-5187



THE INFORMATION TRANSMITTED BY THIS FACSIMILE IN CONSIDERED ATTORNEY PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT. YOU SHOULD BE AWARE THAT ANY DISSEMINATION, DISTRIBUTION OR COPING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY US BY TELEPHONE. AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE. THANK YOU.

DATE: _9-13_, 2002    TOTAL PAGES: Cover - _53_

ADDRESSEE: _Sonia Orfield_    FAX NO: _____

ORGANIZATION: _OGC_    TEL NO: _____

SENDER: _Larry Harder_

TEL NO: (410) 786- _8080_

REMARKS:

PLEASE CALL AND CONFIRM RECEIPT:    YES ☐    NO ☐

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

MAR 2 2 2002

Michael N. Milby, Clerk of Court

FORT BEND COMMUNITY HOSPITAL,　§
　　　　　　　　　　　　　　　　§
　　　　Plaintiff,　　　　　　　　§
　　　　　　　　　　　　　　　　§
V.　　　　　　　　　　　　　　　§　　CIVIL ACTION NO. H-00-4020
　　　　　　　　　　　　　　　　§
TOMMY G. THOMPSON, Secretary　§
of the United States Department of Health　§
and Human Services,　　　　　　§
　　　　　　　　　　　　　　　　§
　　　　Defendant.　　　　　　　§

## ORDER ADOPTING RECOMMENDATION
## OF THE MAGISTRATE JUDGE

Pending is Defendant's Motion for Judgment on the Pleadings, or, alternatively, for Summary Judgment (Document No. 10), and Plaintiff's Motion for Summary Judgment and Memorandum incorporated therein (Document No. 14). The Court has received from the Magistrate Judge a Memorandum and Recommendation (Document No. 22) recommending that Defendant's Motion for Summary Judgment (Document No. 10) be GRANTED, that Plaintiff's Motion for Summary Judgment (Document No. 14) be DENIED, and that the decision of the Secretary be AFFIRMED. Plaintiff has filed objections to Magistrate Judge's Recommendations (Document Nos.23, 25), to which Defendant has responded (Document Nos. 24, 26).

The Court, after having made a *de novo* determination of Defendant's Motion for Summary Judgment, Plaintiff's Motion for Summary Judgment, the Memorandum and Recommendation of the Magistrate Judge, Plaintiff's Objections to Magistrate Judge's Recommendation, and Defendant's responses to Plaintiff's Objections, is of the opinion that the findings and recommendation of the Magistrate Judge are correct, and should be and hereby are

#29

accepted by the Court in their entirety. Particularly, the Court concludes that the reliance upon *St. Joseph Health Care Centre v. Shalala*, 205 F.3d 937 (6th Cir. 2000) was wholly proper. Plaintiff's objections to the Memorandum and Recommendation are OVERRULED, and it is

ORDERED and ADJUDGED for the reasons set forth in the Memorandum and Recommendation of the United States Magistrate Judge signed August 27, 2001 (Document No. 22), which is adopted in its entirety as the opinion of this Court, that Defendant's Motion for Summary (Document No. 13) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 14) is DENIED, and the Secretary's decision is AFFIRMED.

The Clerk will enter this Order and send copies to all parties of record.

Signed at Houston, Texas this 21st day of ___March___, 2002.

_Melinda Harmon_
MELINDA HARMON
UNITED STATES DISTRICT JUDGE

2

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Court:
Southern District of Tex...
ENTERED

MAR 2 2 2002

Michael N. Milby, Clerk of Court

| | | |
|---|---|---|
| FORT BEND COMMUNITY HOSPITAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-00-4020 |
| | § | |
| TOMMY G. THOMPSON, Secretary, | § | |
| of the United States Department of Health | § | |
| and Human Services, | § | |
| Defendant. | § | |

## FINAL JUDGMENT

It is ORDERED and ADJUDGED for the reasons set forth in this Court's separate Order

Adopting the Recommendation of the Magistrate Judge, and the Memorandum and

Recommendation of the Magistrate Judge signed August 17, 2001, which Memorandum is adopted

in its entirety as the opinion of this Court, Defendant's Motion for Summary Judgment (Document

No. 13) is GRANTED, Plaintiff's Motion for Summary Judgment (Document No. 14) is

DENIED, and the decision of the Secretary of the United States Department of Health and Human

Services is AFFIRMED

This is a FINAL JUDGMENT.

The Clerk will enter this Order and send copies to all parties of record.

Signed at Houston, Texas, this 21 day of March, 2002.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

#30

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

**AUG** 2 0 2001

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| FORT BEND COMMUNITY HOSPITAL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | |
| | § | CIVIL ACTION NO. H-00-4020 |
| TOMMY G. THOMPSON, Secretary | § | |
| OF THE UNITED STATES DEPARTMENT | § | |
| OF HEALTH AND HUMAN SERVICES, | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION GRANTING
## DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
## OR, ALTERNATIVELY, MOTION FOR SUMMARY JUDGMENT AND
## DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge in this appeal of a final administrative decision of Tommy G.

Thompson, Secretary of the Department of Health and Human Services ("Secretary), is Defendant's

Motion for Judgment on the Pleadings, or, alternatively, for Summary Judgment (Document No. 13),

and Memorandum in Support (Document No. 15), and Plaintiff's Response (Document No. 20); and

Plaintiff's Motion for Summary Judgment and Memorandum incorporated therein (Document No.

14), to which Defendant has responded (Document No. 19). After considering the Cross Motions

for Summary Judgment, the Responses, Plaintiff's Request for Judicial Notice (Document No. 16),

the administrative record (Document No. 9, Vol. 1-3), and the applicable law, the Magistrate Judge

RECOMMENDS, for the reasons set forth below, that Defendant's Motion for Judgment on the

Pleadings, or, Alternatively, for Summary Judgment (Document No. 13) be GRANTED, that

Plaintiff's Motion for Summary Judgment be DENIED, and that the decision of the Secretary of the

Department of Health and Human Services be AFFIRMED.

1

## I. Introduction

Plaintiff Fort Bend Community Hospital ("Fort Bend" or "Provider") operates a seven bed hospital based skilled nursing facility ("HB-SNF"), located in Missouri City, Texas, which participates in the Medicare program. Plaintiff brings this action pursuant to Title XVIII of the Social Act, 42 U.S.C. § 1395, *et.seq.*, the Medicare Act, challenging the amount it was reimbursed for atypical services by the Secretary for its fiscal year ending December 31, 1994. Plaintiff contends the amount reimbursed should be increased by approximately $86,821. Defendant responds that Plaintiff was fully reimbursed for its services pursuant to applicable rules and regulations, and therefore the decision of the Secretary should be affirmed.

## II. Statement of Facts and Prior Proceedings

A hospital, such as Fort Bend, may participate in the Medicare program as a provider by entering into a provider agreement with the Secretary. 42 U.S.C. § 1395cc. On March 11, 1997, Fort Bend requested an exception to Medicare's routine cost limits ("RCL") based on its provision of atypical services during its fiscal year ending December 31, 1994, in the amount of $344,703. On August 19, 1997, the Health Care Finance Administration ("HCFA") responded and agreed with Mutual of Omaha's (the fiscal intermediary) recommendation to grant an exception totaling $93,491, which represents $56.49 per patient, multiplied by the number of medicare patient days (1655). On September 2, 1997, Mutual of Omaha notified Fort Bend of the HCFA's determination to allow an additional $93,491 in reimbursement. On December 3, 1997, Fort Bend requested a reconsideration of this determination. On February 25, 1998, HCFA responded and agreed that Fort Bend's exception should be increased by an additional $30.97 per patient, per day, such that Fort Bend be

2

granted a total exception of $144,746 representing $87.46, per patient, per day, multiplied by 1655 or the number of medicare patient days.

The Medicare Act provides a mechanism, where by a provider such as Fort Bend, who disagrees with a fiscal determination, may appeal that determination to the Program Reimbursement Review Board ("PRRB" or "Board"), 42 U.S.C. § 1395oo(a), and request a hearing if the following jurisdictional requirements are met: (1) there is a final payment determination; (2) the amount in controversy exceeds $10,000, and (3) the provider requests a hearing within 180 days after receiving notice of the intermediary's final determination. 42 U.S.C. § 139500(a)(1)-(a)(3). Here, Fort Bend met these requirements and requested a hearing before the Board. On September 21, 2000, the Board issued its decision, denying Fort Bend's requests for additional reimbursement. Fort Bend appealed the Board's September 21, 2000, decision to the HCFA. The HCFA declined to review the PRRB's decision which became the final decision of the Secretary. This appeal follows.

## III. Background

The Medicare program reimburses eligible skilled nursing facilities ("SNFs") for the reasonable costs of covered services provided to Medicare beneficiaries. 42 U.S.C. § 1395x(u) & (v)(1))A). Costs for "routine services" such as nursing, room, board, and administrative expenses are ordinarily subject to a statutory limit. Indeed, 42 U.S.C. § 1395yy(a) provides:

> The Secretary, in determining the amount of the payments which may be made under this subchapter with respect to routine service costs of extended care services shall not recognize as reasonable (in the efficient delivery of health services) per diem costs of such services to the extent that such per diem costs exceed the following per diem limits....

The statute further provides that the routine cost limits ("RCLs") to be applied to HB-SNFs "shall

be equal to" the sum of the following:  the freestanding skilled nursing facilities (FS-SNFs) cost limit

plus 50% of the amount by which 112% of the HB-SNFs mean per diem routine service cost exceeds

the FS-SNFs cost limit."  *Id.* at § 1395yy(a)(3).  Even though Congress established statutory

reasonable costs limits, it nonetheless, recognized in the same legislation that situations might arise

which would warrant an upward adjustment to these statutory cost limits.  Because of the Secretary's

expertise in the area of medicare provider reimbursement, Congress gave the Secretary discretion

to make upward adjustments to these reasonable cost limits, when appropriate.  Section 1395yy(c)

provides, in pertinent part:

> The Secretary may make adjustments in the limits set forth in
> subsection (a) of this section with respect to any skilled nursing
> facility [SNF] to the extent the Secretary deems appropriate, based
> upon case mix or circumstances beyond the control of the facility.
> The Secretary shall publish the data and criteria to be used for
> purposes of this subsection on an annual basis.

Given this express grant of discretion to the Secretary by Congress to make adjustments to the

reasonable cost limits submitted by SNFs, when appropriate, the Secretary promulgated 42 C.F.R.

§ 413.30, which "set[s] forth the general rules under with [the Health Care Financing Administration

("HCFA") may establish limits on provider costs recognized as reasonable in determining Medicare

program payments" and "also sets forth rules governing exemptions, exceptions, and adjustments

to limits established under this section that HCFA may make as appropriate in consideration of

special needs or situations of particular providers."  *Id* at § 413.30(a).  To facilitate the

implementation of rules such as 42 C.F.R. § 413.30, the Secretary adopts non-binding rules in its

Provider Reimbursement Manual ("PRM"), which clarify and provide guidance to providers and

4

fiscal intermediaries, such as Fort Bend, with regard to the Secretary's reimbursement policies and regulations. In July 1994, the HCFA adopted Transmittal No. 378, Provider Reimbursement Manual ("PRM") § 2534.5 ("Determination of Reasonable Costs in Excess of Cost Limit or 112 percent of Mean Cost"), which set forth a new methodology for handling exception requests for atypical services provided by HB-SNFs, such as Fort Bend. Under this methodology, only those costs in excess of 112% of the mean per diem cost which are attributable to the HB-SNFs atypical services are reimbursable. It is the application of this methodology as contained in PRM § 2534.5 to Fort Bend's request for an exception to the Medicare reasonable cost limit based on its provision of atypical services, which is at issue. Fort Bend challenges the validity of this change in methodology as it relates to the reimbursement for services provided to Medicare patients by HB-SNFs.

### IV. Discussion

The gravamen of Fort Bend's claim in this case is that the Secretary substantially altered the methodology followed from 1979 until 1994, to calculate reimbursement to HB-SNF for atypical services, without comment and notice, as required by the APA, which resulted in a reimbursement gap for HB-SNFs. Fort Bend contends that this substantive change in methodology penalizes providers like Fort Bend, who care for the sickest patients and under this reimbursement formula are unable to fully recover their costs for atypical services. Here, Fort Bend states that it had an average length of stay of 7.63 days compared to the national average stay of 132.34 days, a medicare utilization rate of 99.27 % compared to the national average of 56.39%, and ancillary per diem costs of $175.43, compared to the national average of $67.23. Fort Bend suggests these figures show that its seven bed facility provided atypical services to which an exception for routine costs limits should

5

apply. Fort Bend further argues that the HCFA's action in adopting the reimbursement "gap" in PRM § 2534.5 was arbitrary, capricious, and an abuse of discretion because the reimbursement "gap" is contrary to the intent of Congress, as evidenced in the language of 42 U.S.C. § 1395yy(a), which pertains only to RCLs but is silent as to the exception process, and that the change is not supported by the legislative history. Fort Bend also argues that the reimbursement gap in PRM § 2534.4 impermissibly discriminates between FS-SNFs and HB-SNFs such that FS-SNFs are favored over HB-SNFs in the exception process because FS-SNFs may recover up to all their reasonable costs whereas HB-SNFs cannot. In sum, Fort Bend contends that the reimbursement "gap" in PRM § 2534.5 is invalid, and Fort Bend should be awarded an atypical nursing services exception in the additional amount of $57,412 for the fiscal year ending December 31, 1994. In response, the Secretary maintains that the Secretary's final decision was not arbitrary, capricious, an abuse of discretion, comports with the applicable law and regulations, and is supported by substantial evidence.

### A. Standard of Review

Pursuant to 42 U.S.C. § 1395oo(f)(1), the court reviews the Secretary's decision under the same standard as that which applies under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et. seq.*, to a review of an administrative agency's decision. 42 U.S.C. § 1395oo(f)(1). The Fifth Circuit in *Harris County Hosp. Dist. v. Shalala,* 64 F.3d 220, 221 (5th Cir. 1995), described this standard of review as follows:

> "'[t]he district court, ... may overturn the Secretary's decision only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole.' In addition, this court must defer to the Secretary's interpretation of medicare legislation and its attendant regulations. The Secretary's interpretation of medicare regulations is given

6

"controlling weight unless it is plainly erroneous or inconsistent with the regulation'. And if, ... a statute is involved and its meaning is unambiguous, this Court must give effect to the intent of Congress." (citations omitted).

Various courts have considered and rejected arguments identical to Fort Bends' arguments, as they relate to Transmittal No. 378, PRM § 2534.5, and 42 U.S.C. § 1395yy and 42 C.F.R. § 413.30. *See St. Francis Health Care Centre v. Shalala,* 10 F.Supp. 2d 887 (N.D.OH 1998), *affirmed by St. Francis Health Care Centre v. Shalala,* 205 F.3d 937 (6th Cir. 2000); *Canonsburg General Hospital v. Tommy G. Thompson,* Civil Action No. 00-0284, (W.D.Pa. Feb. 28, 2001). Fort Bend cites no federal cases, District or Circuit, which have considered the identical Medicare provider reimbursement provisions at issue, and which have reached a contrary result. Based upon the Sixth Circuit's reasoning in *St. Francis Health Care Centre v. Shalala,* 205 F.3d 937 (6th Cir. 2000) the Secretary's decision of September 21, 2000, is not arbitrary, capricious and is supported by substantial evidence.

### B. Adoption of PRM § 2534.5 was not procedurally invalid based on a lack of notice

With regard to Fort Bend's arguments that PRM § 2534.5 is procedurally invalid, the Sixth Circuit rejected this claim when, based on *Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87 (1995), it wrote:

[W]e cannot agree with St. Francis's argument that PRM § 2534.5 is invalid because it was not adopted pursuant to the notice and comment procedures set forth in the APA, 5 U.S.C. § 553(b). In *Guernsey,* [*Shalala v. Guernsey Memorial Hosp.,* 514 U.S. 87 (1995)], the Court sustained another of the Secretary's PRMs concerning reimbursement. In doing so, the Court stated that the PRM at issue was not subject to the notice and comment requirement of the APA because it was a "prototypical example of an interpretive rule." 514 U.S. at 99, 115 S.Ct. 1232. *See* 5 U.S.C. § 553(b)(A) (establishing that notice and comment are not required for "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice"). Specifically, the Court defined interpretive rules as those "issued by an

7

agency to advise the public of the agency's construction of the statutes and rules which it administers." *Guernsey,* 514 U.S. at 99, 115 S.Ct. 1232. (citation omitted). Such rules "do not have the force and effect of law and are not accorded that weight in the adjudicatory process," and do not effect a "substantive change" which is inconsistent with existing regulations. *Id. See also Friedrich v. Secretary of HHS,* 894 F.2d 829 (6th Cir. 1990) (holding that a national coverage determination by the Secretary was an interpretive rule). Lower court decisions looking at PRMs have been consistent with *Guernsey,* concluding that they are interpretive rules and do not require notice and comment rulemaking. *See, e.g., St. Mary's Hosp. v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield,* 788 F.2d 888, 891 (2d Cir. 1986) (stating that PRM rules "have consistently been held to be 'interpretive rules,' and thus exempt from the notice and comment requirements"); *Columbus Community Hosp., Inc. v. Califano,* 614 F.2d 181, 187 (8th Cir. 1980) (stating that PRMs are agency interpretive rules).

Even beyond the simple fact that PRMs are generally categorized as interpretive, the work done by PRM § 2534.5 places it within the *Guernsey* Court's definition of an interpretive rule. The rule does not effect new substantive reimbursement standards inconsistent with prior regulations—the central characteristic of a substantive rule. *see Guernsey,* 514 U.S. at 99, 115 S.Ct. 1232; *Warder v. Shalala,* 149 F.3d 73, 80 (1st Cir. 1998). Rather, as explained above, the PRM reasonably interprets a statute and regulation which placed the determination of general terms such as the "reasonableness" of costs and the "typicality" of services in the hands of the Secretary. We agree with the Secretary that the PRM partially performs this rule by providing the means by which HB-SNFs' systemic unreasonable costs are accounted for in determining exceptions. Thus, just as in *Friedrich,* the PRM "creates no new law." 894 F.2d at 837. "Rather, it interprets the statutory language ... as applied to a particular medical service or method of treatment." *Id.; see also Warder,* 149 F.3d at 80 (finding an administrative ruling to be interpretive because "it addresse[d] an area of ambiguity" and did not "stake out any ground the basic tenor of which [was] not already outlined in the law itself") (internal quotations and citation omitted).

*St. Francis,* 205 F.3d at 946-947. Therefore, because PRM § 2534.5 is an interpretative rule which did not alter a well established regulatory interpretation, the APA's notice and comment requirements did not apply. *See Shell Offshore, Inc. v. Babbit,* 238 F.3d 622, 629 n. 6 (5th Cir. 2001) ("Agencies need not provide notice and comment for every meaningful policy decision. Interpretations of ambiguous or unclear regulations by agencies may be exempt from the APA's notice and comment requirement.").

8

## C. Adoption of the Reimbursement Gap in PRM § 2534.5 was not arbitrary, capricious or an abuse of discretion

As to Fort Bend's arguments which center around its contention that PRM § 2534.5 is

inconsistent with the plain language of the governing statute and regulation and which relate to the

timing of these changes, the Sixth Circuit wrote:

> [n]either Congress in 42 U.S.C. 1395yy nor the Secretary in 42 C.F.R. § 413.30 mandated that a HB-SNF be reimbursed any amount above the statutory RCL set forth in § 1395yy. [Provider] therefore overstates its case when it claims the language of these provisions "dictates that a provider who demonstrates that its costs in excess of its cost limit are 1) due to the provision of atypical services and 2) reasonable, attributable, identified and verified, *is entitled* to reimbursement if full above the cost limit." Instead, both provisions are phrased in the permissive, merely stating that the Secretary "may" adjust cost limits upward. 42 U.S.C. § 1395yy(c); 42 C.F.R. § 413.30(f). Moreover, neither provision provides guidance as to the level of adjustment the Secretary must make. (citations omitted).

The Sixth Circuit further opined:

> [T]he Secretary's interpretation of the regulation and statute in the PRM is reasonable, not arbitrary. First, we agree with the Secretary that the best way to characterize the effect of the PRM is that it applies a "discount factor" to all HB-SNFs to account for the "unreasonable costs" above those of FS-SNF. As the district court recognized, discounting for these unreasonable costs comports with the general recognition by Congress that "certain systemic inefficiencies ... associated with unreasonable costs [] are associated with HB-SNFS." *St. Francis*, 10 F.Supp.2d at 892. In fact, the PRM calculation reduces the reimbursement to HB-SNFs by the very same proportion that Congress deemed to be inefficient–half of the difference in costs between FS-SNFs and HB-SNFs. Likewise, the guideline comports with 42 C.F.R. § 413.30, which allows the Secretary to determine the extent to which costs for atypical services are "reasonable." 42 C.F.R. § 413.30(f).
>
> In sum, PRM § 2534.5 does not *create* the "two-tier" system in contravention of the statute and regulation. To the contrary, the Secretary merely acted within the discretion she was granted by putting into place the very cost ratio established by Congress in 42 U.S.C. § 1395yy and elaborated upon by 42 C.F.R. § 413.30. (footnotes and citations omitted).

*St. Francis*, 205 F.3d at 945-946.

9

As to Fort Bend's argument that the legislative history did not support the Secretary's

methodology, the Sixth Circuit found this argument unpersuasive:

> First, the history is sparse and generally inconclusive, and should be given little
> weight when the text of the statute so clearly resolves this dispute. Second, even the
> history to which St. Francis points does not contradict the Secretary's reading of the
> statutory language. The language from the Senate report that St. Francis emphasizes
> is that "[f]acilites eligible for exceptions could receive, where justified, *up to all of
> their reasonable costs.*" Senate Comm. on Finance, 98[th] Cong., 2d Sess., Deficit
> Reduction Act of 1984; Explanation of Provisions Approved by the Committee on
> March 21, 1984, Vol. 1 at 947 (Comm. Print 1984) (emphasis added). PRM §
> 2534.5, through the discretion granted to the Secretary by the plain text of the
> Medicare Act, is indeed consistent with this directive because it provides a general
> formula for determining the extent to which an HB-SNF's costs are "reasonable."

*St. Francis,* 205 F.3d at 946, n. 10. There is no basis for reaching a contrary conclusion in this case.

### D. The Reimbursement Gap does not impermissibly discriminate between FS-SNFs and HB-SNFs

Finally, with regard to Fort Bend's arguments that the methodology discriminates between

FS-SNFs and HB-SNFS, and is therefore invalid, this argument was likewise unpersuasive "given

the clear Congressional conclusion that HB-SNFs suffer from general cost inefficiencies" and as a

result, "FS-SNFs are more efficient than HB-SNFs, and thus should be reimbursed more favorable."

*St. Francis,* 205 F.3d at 946.

### E. The Secretary's Reimbursement Decision is not arbitrary, capricious or an abuse of discretion

Finally, Fort Bend argues that the Secretary arbitrarily reclassified certain of its costs from its

direct cost center to several indirect cost centers without making a corresponding proportionate

reclassification to the costs of the peer group. Fort Bend maintains that the administrative record

contains evidence of the "second step" of the Kenton letter[1] which are included in the administrative record as Fort Bend's exhibits P-29 (Document No. 9, AR 751), and P-30 (Document No.9, AR 738-749), and as a result, Fort Bend's exception amount should be adjusted upward in the amount of $24,478 for Fort Bend's fiscal year ending December 31, 1994.

The Board considered Fort Bend's arguments and documentation, including P-29 and P-30, but found that the record as a whole did not support the adjustment suggested by Kenton's letter. The Board wrote:

> The Board further finds that the Provider's argument for HCFA/Intermediary to apply the second step in the Kenton letter compelling. However, the Board finds no evidence in the record that explains how the peer group study should have been adjusted. Further, there is no attempted calculation of such adjustment to the peer group comparison. Thus, the Board concludes that an adjustment to the peer group's costs is inappropriate in light of the lack of evidence to support the reclassification

---

[1] This letter, which was purportedly written by James Kenton, employed by HCFA, in response to a query about Transmittal No. 378 and the calculation of atypical direct costs, provides in pertinent part:

> In accordance with a memorandum dated March 13, 1995 from HCFA Central Office to all HCFA Regional Offices, an exception for direct salary costs is computed as the provider's direct salary per diem cost in excess of the peer group direct salary per diem cost. The peer group direct salary per diem cost is determined by dividing the provider's actual percent of salary costs by total direct costs and applying this percentage to the peer group direct per diem costs. No exception is allowed for the non-salary direct cost per diem. However, if the provider can disaggregate the items included as non-salary direct costs into another cost center in the peer group, e.g. central services and supply, it could combine these costs with costs already included in that cost center. The portion of the peer group amount for non-salary direct costs associated with costs that were redistributed to the other cost center of the peer group would also need to be combined with the peer group amount for that cost center. This could result in an additional exception amount for some of the provider's costs previously categorized as non-salary direct costs. Any non-salary direct costs that can not be redistributed into a different cost center on the peer group will be left in the peer group as non-salary direct costs and no exception is allowed for these costs.

(Document No. 9, Administrative Record at 1513).

of the per group. In summary, the board concludes that HCFA's program instruction for peer group comparison is appropriate and adequate. Further, any adjustment to the peer group calculation must be supported by relevant evidence.

Given that great deference is owed to an agency's interpretation of its own regulation, *Fox v.. Bowen,* 835 F.2d 1159, 1162 (6th Cir. 1987), and a reviewing court may not "reverse an agency 'simply because it would have interpreted the [regulation] in a different manner.'" *Medical Rehabilitation Services, P.C. v. Shalala,* 17 F.3d 828, 831 (6th Cir. 1994). The undersigned Magistrate Judge finds that the Secretary's decision not to award Fort Bend additional Medicare reimbursement based upon this record was not arbitrary and capricious. The Secretary used a permissible peer group comparison to determine what reasonable costs above the applicable limit should be reimbursed and this comparison did not require a reclassification of the peer groups based on the information provided by the Provider.

## V. Conclusions and Recommendation

Based on the foregoing, and the conclusion that the Secretary's decision was not arbitrary and capricious and was supported by substantial evidence, the Magistrate Judge

RECOMMENDS that Defendant's Motion for Judgment on the Pleadings, or, Alternatively, for Summary Judgment (Document No. 13) be GRANTED, that Plaintiff's Motion for Summary Judgment be DENIED (Document No. 14-1), and that Plaintiff's Request for Oral Argument (Document No. 14-2) be DENIED, and that this proceeding be DISMISSED on the merits.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 10 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D.

12

Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the ten day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United States Automobile Association*, 79 F.3d 1415, 1429 (5th cir. 1996). The original of any written objections shall be filed with the United States District Court Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 17th day of August, 2001.

Frances H. Stacy

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

13

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CANONSBURG GENERAL HOSPITAL,       )
                                   )
             Plaintiff,            )
                                   )
      v.                           )       Civil Action No. 00-0284
                                   )
TOMMY G. THOMPSON,[1] Secretary,   )
United States Department of Health and )
Human Services,                    )
                                   )
             Defendant.            )

### MEMORANDUM OPINION

February 28, 2001

This appeal from a final administrative decision of Tommy G. Thompson, Secretary

of the Department of Health and Human Services ("Secretary"), presents the issue of whether

the interpretive guideline promulgated by the Secretary and set forth in Transmittal No. 378,

Provider Reimbursement Manual § 2534.5, is a proper interpretation of 42 U.S.C. § 1395yy and

42 C.F.R. § 413.30(f), for determining the amount of the exception from the routine cost limits

imposed by the Medicare program on reimbursements to providers at hospital-based skilled

nursing facilities.

Plaintiff, Canonsburg General Hospital, challenges the methodology used by the

Secretary in calculating the amount of its reimbursement for atypical services[2] for the fiscal

years ending ("FYE") June 30, 1987 through June 30, 1990 and June 30, 1993.

---

[1]    Pursuant to Federal Rule of Civil Procedure 25(d)(1), the Court substitutes
       Tommy G. Thompson as defendant in place of Donna E. Shalala.

[2]    Atypical services consist of laundry, housekeeping, dietary services, nursing
       administration, maintenance of personnel, central supplies and social services.
       R. at 204.

The matter is before the Court on cross motions for summary judgment. For the following reasons, the Secretary's motion will be granted and Plaintiff's motion will be denied.

## I. Background

The relevant facts are not in dispute. This case arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, which is commonly referred to as the Medicare Act. Plaintiff is a non-profit, federally tax-exempt corporation that operates a duly licensed hospital based skilled nursing facility ("HB-SNF").

Section 1395yy of title 42, United States Code, establishes, *inter alia,* that:

> The Secretary, in determining the amount of the payments which may be made under this subchapter with respect to routine service costs of extended care services shall not recognize as reasonable (in the efficient delivery of health services) per diem costs of such services to the extent that such per diem costs exceed the following per diem limits . . . .

42 U.S.C. § 1395yy(a). The provision then establishes that the routine cost limits (" RCLs") to be applied to HB-SNFs "shall be equal to" the sum of the following: the freestanding skilled nursing facilities ("FS-SNFs) cost limit plus 50% of the amount by which 112% of the HB-SNFs mean per diem routine service cost exceeds the FS-SNFs cost limit." *Id.* at § 1395yy(a)(3).

"Despite these statutory limits, Congress, recognizing the Secretary's expertise in the area, afforded the Secretary the discretion to make 'upward adjustments' to these statutory RCLs." *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 941 (6th Cir. 2000). Section 1395yy(c) provides, in pertinent part:

> The Secretary <u>may</u> make adjustments in the limits set forth in subsection (a) of this section with respect to any skilled nursing facility to the extent

2

the <u>Secretary deems appropriate</u>, based upon case mix or circumstances
beyond the control of the facility.  The Secretary shall publish the data and
criteria to be used for purposes of this section on an annual basis.

42 U.S.C. § 1395yy(c) (emphasis added).

Recognizing the discretion afforded by Congress, the Secretary implemented 42

C.F.R. § 413.30, which "set[s] forth the general rules under which [the Health Care Financing

Administration ("HCFA")] may establish limits on provider costs recognized as reasonable in

determining Medicare program payments" and "also sets forth rules governing exemptions,

exceptions, and adjustments to limits established under this section that HCFA may make as

appropriate in consideration of special needs or situations of particular providers." *Id.* at §

413.30(a).

In July 1994, the HCFA promulgated Transmittal No. 378, Provider Reimbursement

Manual ("PRM") § 2534.5 ("Determination of Reasonable Costs in Excess of Cost Limit or

112 percent of Mean Cost"),[3] a new methodology for handling exception requests -- the

methodology which Plaintiff challenges in this case.  PRM § 2534.5 permits reimbursement for

only those costs in excess of 112% of the mean per diem cost which are attributable to the HB-

SNF's atypical services.

The result of PRM § 2534.5 is that it "creates a 'gap' between the HB-SNF  RCL and

the 112% level within which the HB-SNFs cannot recover any of their costs above the RCL."

*St. Francis Health Care Centre v. Shalala,* 205 F.3d 937, 942 (6th Cir. 2000).

---

[3]     The PRM is a set of non-binding rules that the Secretary issues which provides
        guidance to providers and intermediaries and clarifies the Secretary's
        reimbursement policies and regulations. *St. Francis Health Care Centre v.
        Shalala,* 205 F.2d 937, 941 n.5 (6th Cir. 2000).

3

For its fiscal years ending June 30, 1987 through June 30, 1990 and June 30, 1993,

Plaintiff requested and obtained an exception to the Medicare RCLs based on the facility's

provision of atypical services. In evaluating Plaintiff's request for exception and calculating the

amount of the exception to which Plaintiff was entitled for these periods, the Medicare program

applied PRM § 2534.5.

## II. Discussion

*A.     Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue of material fact and that the moving party is entitled to judgment as a matter of

law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is sufficient evidentiary basis on

which a reasonable jury could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 249 (1986). The "existence of disputed issues of material fact should be

ascertained by resolving 'all inferences, doubts and issues of credibility against the moving

party.' "*Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) ( *quoting Smith v.*

*Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)). Final credibility

determinations on material issues cannot be made in the context of a motion for summary

judgment, nor can the district court weigh the evidence. *Josey v. Hollingsworth Corp.*, 996

F.2d 632 (3d Cir. 1993); *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d

1224 (3d Cir. 1993).

When the non-moving party will bear the burden of proof at trial, the moving party's

burden can be "discharged by 'showing' -- that is, pointing out to the District Court -- that there

4

AO 72A
(Rev.8/82)

is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. If the moving party has carried this burden, the burden shifts to the non-moving party who cannot rest on the allegations of the pleadings and must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Petruzzi's IGA Supermarkets*, 998 F.2d at 1230. When the non-moving party's evidence in opposition to a properly supported motion for summary judgment is "merely colorable" or "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50.

B. *Standard of Review*

Judicial review of the Secretary's decision is governed by 42 U.S.C. § 1395oo(f), which incorporates the standard of review of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq. *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 511 (1994); *Butler County Mem'l Hosp. v. Heckler*, 780 F.2d 352, 355-56 (3d Cir. 1985). Accordingly, the court must uphold the agency determination unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C.§ 706(2)(A).

In determining whether the agency acted arbitrarily and capriciously, "a court may not substitute its judgment for that of an agency, but must determine whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *State of New York Dep't of Soc. Servs. v. Shalala*, 21 F.3d 485, 492 (2d Cir. 1994) (*quoting Citizens to Preserve Overton Park, Inc., v. Volpe*, 401 U.S. 402 (1971) and *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Grounds for concluding that the agency acted arbitrarily and capriciously include

5

its reliance on factors outside those Congress intended for consideration, a complete failure by

the agency to consider an important aspect of the problem, or an agency's explanation that is

contrary to, or implausible in light of the evidence." *Harrisburg Hosp. v. Shalala*, 48 F.

Supp.2d 467, 472 (M.D. Pa. 1999) (*citing Fertilizer Institute v. Browner*, 163 F.3d 774, 777 (3d

Cir. 1998)).

      Substantial deference must be given to an agency's interpretation of its own

regulations. *See Commonwealth of Pennsylvania v. United States Dep't of Health and Human*

*Servs.*, 101 F.3d 939, 944 (3d Cir. 1996). The court must defer to the agency's interpretation

"unless an alternative reading is compelled by the regulation's plain language or by other

indications of the Secretary's intent at the time of the regulations promulgation." *Thomas*

*Jefferson Univ.* , 512 U.S. at 512. Deference to the agency's interpretation "is all the more

warranted when . . . the regulation concerns 'a complex and highly technical regulatory

program,' in which the identification and classification of relevant 'criteria necessarily require

significant expertise and entail the exercise of judgment grounded in policy concerns.' " *Id.*

(*quoting Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 697 (1991)).

C.     *The Parties' Contentions*

      Plaintiff presents three arguments in support of its position that PRM § 2534.5 does

not comport with the reasonable cost exception process mandated by the Medicare statute and

its implementing regulations.

      First, Plaintiff argues that the methodology contained in PRM § 2534.5 is invalid

because it violates the applicable cost limit statue, 42 U.S.C. § 1395yy(c), and regulation, 42

C.F.R. § 413.30(f). Next, Plaintiff argues that the methodology contained in PRM § 2534.5 is

<div align="center">6</div>

procedurally invalid because it is a substantive rule, yet it was not passed pursuant to the notice and comment requirements of the Administrative Procedure Act, 5 U.S.C. § 553.

Last, Plaintiff argues that the methodology contained in PRM § 2534.5 is invalid because it discriminates between FS-SNFs and HB-SNFs in the exception process.

Conversely, Defendant contends that the Secretary's final decision in this case was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law, and is supported by substantial evidence.

### III. Discussion

The validity of PRM § 2534.5 was analyzed recently by the Court of Appeals for the Sixth Circuit in *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937 (6th Cir. 2000). All three of Plaintiff's arguments in the present case were rejected by the appellate court in *St Francis Health Care Centre*.

First, the *St. Francis* court found that "[n]either Congress in 42 U.S.C. § 1395yy nor the Secretary in 42 C.F.R. § 413.30 mandated that a HB-SNF be reimbursed any amount above the statutory RCL set forth in § 1395yy. . . . Instead, both provisions are phrased in the permissive, merely stating that the Secretary 'may' adjust cost limits upward." *St Francis Health Care Centre*, 205 F.3d at 944-45. Thus, the appellate court found that the Secretary's interpretation of the regulation and statute in PRM 2534.5 was reasonable, not arbitrary.

The *St. Francis* court also rejected the argument that the methodology contained in PRM § 2534.5 is procedurally invalid because it is a substantive rule, yet it was not passed pursuant to the notice and comment requirements of the APA. Relying on *Shalala v. Guernsey*

7

*Memorial Hosp.*, 514 U.S. 87 (1995), the court found that PRM § 2534.5 was an interpretative rule not requiring notice and comment rulemaking. *St Francis Health Care Centre*, 205 F.3d at 947. *See, e.g., St. Mary's Hosp. v. Blue Cross & Blue Shield Ass'n/Blue Cross & Blue Shield*, 788 F.2d 888, 891 (2d Cir. 1986) (stating that PRM rules "have consistently been held to be 'interpretative rules,' and thus exempt from the notice and comment requirements"); *Columbus Community Hosp., Inc. v. Califano*, 614 F.2d 181, 187 (8th Cir. 1980) (stating that PRMs are agency interpretive rules). In conclusion, the *St. Francis* court found that "[e]ven beyond the simple fact that PRMs are generally categorized as interpretive, the work done by PRM 2534.5 places it within the *Guernsey* court's definition of an interpretive rule. The rule does not effect new substantive reimbursement standards inconsistent with prior regulations--the central characteristic of a substantive rule." *St. Francis*, 205 F.3d. at 947 (*citing Guernsey*, 514 U.S. at 99).

Lastly, the *St. Francis* court also rejected the argument that the methodology contained in PRM § 2534.5 is invalid because it discriminates between FS-SNFs and HB-SNFs in the exception process. In rejecting this argument, the *St. Francis* court stated that Congress had concluded that FS-SNFs "are more efficient than HB-SNFs, and thus should be reimbursed more favorably. Stated differently, once discounted for their unreasonable costs as determined by Congress, HB-SNFs and FS-SNFs are treated relatively the same." *St. Francis*, 205 F.3d at 946.

This Court, adopting the reasoning of the *St. Francis* court, holds that PRM § 2534.5 is not an arbitrary or capricious interpretation of the statute and regulations governing reimbursement to Medicare providers.

8

## IV. Conclusion

For the foregoing reasons, the Court finds that the Secretary's decision was not arbitrary and capricious and was supported by substantial evidence. The Court, therefore, will grant the Secretary's cross motion for summary judgment and deny Plaintiff's motion for summary judgment. An appropriate order follows.

Lee, J.

O 72A
(rev.8/82)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

CANONSBURG GENERAL HOSPITAL,          )
                                      )
                 Plaintiff,           )
                                      )
        v.                            )          Civil Action No. 00-0284
                                      )
TOMMY G. THOMPSON, Secretary,         )
United States Department of Health and )
Human Services,                       )
                                      )
                 Defendant.           )

## ORDER OF COURT

AND NOW, this 28th day of February, 2001, it is hereby **ORDERED** that:

(1)    the **Motion for Summary Judgment** filed by Plaintiff, Canonsburg General

Hospital (*Document No. 15*) is **DENIED**; and,

(2)    the **Cross Motion for Summary Judgment** filed by Defendant, Tommy G.

Thompson, Secretary, United States Department of Health and Human Services (*Document No.

17*) is **GRANTED**.


                                        _____
                                        Donald J. Lee
                                        United States District Judge


cc:        M. Theresa Creagh, Esq.
           Terrence J. O'Rourke, Esq.
           Nash & Company
           11 Stanwix Street, Suite 700
           Pittsburgh, PA 15222


                                        10

Michael C. Colville,
Assistant U.S. Attorney
United States Attorney's Office
633 United States Post Office and Courthouse
Pittsburgh, PA 15219

James C. Newman
Chief Counsel, Region III
Department of Health & Human Services
Office of the General Counsel
150 South Independence Mall West
Suite 418, The Public Ledger Building
Philadelphia, PA 19106-3499

11

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                             )
HI-DESERT MEDICAL CENTER,                )
                                                             )
                    Plaintiff,                               )
                                                             )
                    v.                                       )
                                                             )            07-CV-01000 (RBW)
MICHAEL O. LEAVITT,                           )
Secretary of Health and Human Services,    )
                                                             )
                    Defendant.                          )
                                                             )
_____)

**DEFENDANT'S RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

Defendant, Michael O. Leavitt, the Secretary of Health and Human Services, hereby

responds to Plaintiff's Statement of Material Facts Not in Dispute ("Plaintiff's Statement") in

accordance with Rule 56 of the Federal Rules of Civil Procedure and Local Civil Rule 7(h).

Defendant avers that, to the extent that the parties disagree as to the facts underlying the

present action, those disagreements are not material.  Instead, all material facts are those found in

the administrative record.  See 42 U.S.C. 1395oo(f)(1); 5 U.S.C. § 706(2).  Nevertheless,

responding specifically to the numbered paragraphs of Plaintiff's Statement and using the same

paragraph numbering, Defendant responds to the specific assertions in Plaintiff's Statement as

follows:

1.        Not disputed.

2.        Not disputed.

3.        This paragraph contains Plaintiff's characterization of the Social Security Amendments

          of 1972, which speak for themselves, not material facts.

4.      The first sentence contains a conclusion of law.  The second sentence contains Plaintiff's

characterization of 45 Fed. Reg. 58699, 58700 (Sept. 4, 1980), which speaks for itself,

not material facts.

5.      This paragraph contains Plaintiff's characterization of the Deficit Reduction Act of 1984

and 42 U.S.C. §1395yy, which speak for themselves, not material facts.

6.      The first sentence contains a conclusion of law.  The remainder of this paragraph

contains Plaintiff's characterization of 42 C.F.R. §413.30(f)(1), which speaks for itself,

not material facts.

7.      Defendant does not dispute that, for ten years prior to 1994, the Secretary calculated

atypical services reimbursement from the applicable RCL.  Before 1994, the Secretary

based atypical services exceptions on the number of nursing hours provided, an approach

that did not necessarily result in full reimbursement for qualifying providers.

8.      This paragraph contains a conclusion of law and Plaintiff's characterization of 42 U.S.C.

§ 1395yy(a), (c), which speak for themselves, not material facts.

9.      Not disputed.

10-12.  These paragraphs contain Plaintiff's characterization of Provider Reimbursement Manual

("PRM") § 2534.5 and HCFA Transmittal No. 378, which speak for themselves, not

material facts.

13.     This paragraph contains a conclusion of law.

14.     Not disputed.

15.     Defendant disputes the characterization of the impact § 2534.5 had on payment to

hospital-based SNFs as "drastic."

16-17.  These paragraphs contain conclusions of law.  In addition, Defendant disputes that

hospital-based SNFs may "never" recover certain costs under § 2534.5, and that § 2534.5

creates an "irrebutable presumption," on the ground that § 2534.5 is binding on neither

the Provider Reimbursement Review Board ("PRRB") nor the Secretary on review of a

PRRB decision.

18.     Not disputed.

19.     This paragraph contains a conclusion of law.

20.     This paragraphs contain conclusions of law.  In addition, Defendant disputes that

hospital-based SNFs may "never" recover certain costs under § 2534.5 on the ground that

§ 2534.5 is binding on neither the PRRB nor the Secretary on review of a PRRB

decision.

21.     Not disputed.

22.     Not material.  This paragraph contains Plaintiff's characterization of a document that

does not appear in the record.

23-26.  Not disputed.

27.     The Secretary does not dispute the first sentence. The second sentence is disputed.  The

Secretary denied Plaintiff approximately $155,588 of requested reimbursement based on

PRM § 2534.5.  A.R. 166 (Plaintiff's Revised Brief for Hearing on the Record, Sept.

2005); id. at 207 (Plaintiff's calculation of amount in dispute); Compl. ¶ 15.

28.     Not disputed.

29.     This paragraph contains Plaintiff's characterization of the PRRB decision, which speaks

for itself, not material facts.

3

30.    This paragraph contains Plaintiff's characterization of the decision by the Administrator

of the Centers for Medicare and Medicaid Services, which speaks for itself, not material

facts.

31.    Not disputed.


_____/s/_____
JEFFREY A. TAYLOR
United States Attorney
D.C. Bar No. 498610


_____/s/_____
CHRISTOPHER B. HARWOOD
Assistant United States Attorney
N.Y. Reg. No. 4202982
Civil Division
555 4th St., N.W.
Washington, D.C. 20530
(202) 307-0372


_____/s/_____
BRIDGETTE KAISER
Attorney
D.C. Bar No. 492406
U.S. Department of Health and Human Services
Office of the General Counsel-CMS Division
Room 5309 Cohen Building
330 Independence Ave., S.W.
Washington, D.C. 20201
(202) 205-5872

4

OF COUNSEL:

JAMES C. STANSEL
Acting General Counsel

JANICE HOFFMAN
Associate General Counsel

MARK D. POLSTON
Deputy Associate General
Counsel for Litigation

United States Department of
Health and Human Services


Dated: February 7, 2007

5

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
HI-DESERT MEDICAL CENTER,               )
                                        )
          Plaintiff,                    )
                                        )
          v.                            )
                                        )        07-cv-01000 (RBW)
MICHAEL O. LEAVITT,                     )
Secretary of Health and Human Services, )
                                        )
          Defendant.                    )
                                        )
_____ )

## **ORDER**

      Upon consideration of the parties' cross-motions for summary judgment, oppositions and replies thereto, and the entire record herein, it is this _____ day of _____, 2008,

      ORDERED, that Plaintiffs' Motion for Summary Judgment be, and hereby is, DENIED; and it is further

      ORDERED, that Defendant's Motion for Summary Judgment be, and hereby is, GRANTED; and it is further

      ORDERED that judgment be, and hereby is, entered in favor of Defendant and against Plaintiffs.


_____
REGGIE B. WALTON
United States District Judge


Copy to:        ECF counsel